

06CV 39 (KMK)

RECEIVED
NOV - 2 2006

To be argued by
Echo Westley Dixon

DC#6

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF NEW YORK

ECHO   WESTLEY   DIXON,

Petitioner,

- against -

U.S. DISTRICT COURT
FILED
NOV - 2 2006
S.D. OF N.Y.

SUPERINTENDENT,

MICHAEL P. MCGINNIS,

Respondent.

# REPLY/ADDENDUM FOR THE PETITIONER

Echo  W.  Dixon #00A6365
Auburn Correctional Facility
P.O.  Box  618
Auburn, New York    13024

Echo Westley Dixon
Of Counsel
November, 2006

<u>TABLE  OF  AUTHORITIES</u>
<u>FEDERAL   CASES</u>

PAGE

Abdul-Akbar v. Department of Correction,910 F.Supp. 986----------- 7
Adamson v. People of the State of Cal.,332 U.S. 46------------- 13
Atkins v. County of Orange,372 F.Supp.2d 377------------- 6
Bagby v. Beal,439 F.Supp. 1257------------- 13
Battle v. Anderson,564 F.2d 388------------- 10,11
Board of Curators of Missouri v. Horowitz,435 U.S. 78------------- 13
Bolling v. Sharpe,347 U.S. 497------------- 20
Briethaupt v. Abram,352 U.S. 432------------- 13,14
Brooks v. State of Texas,381 F.2d 619------------- 31,32
Calero-Toledo v. Pearson Yacht Leasing Co.,416 U.S. 663------------- 14
Chambers v. State of Florida,309 U.S. 227------------- 19,20
Cooper v. Fitzharris,589 F.2d 1325------------- 28
Cox v. State of New Hampshire,312 U.S. 569------------- 14
Dimarco v. Wyoming Dept. of Corrections Div. of Prison,Wyo. Women's Center,
300 F.Supp.2d 1183------------- 7
Ex parte Wilson,114 U.S. 426------------- 19
Field v. Boyle,503 F.2d 774------------- 24
Fierro v. Gomez,77 F.3d 301------------- 4,5
Finney v. Arkansas Bd. of Correction,505 F.2d 194------------- 6
Gaito v. Brierley,485 F.2d 86------------- 31
Galvan v. Press,347 U.S. 522------------- 20
Giaccio v. State of Pa.,382 U.S. 399------------- 12,13
Hewitt v. City of Truth and Consequences,785 F.2d 1375------------- 4
Herring v. Estelle,491 F.2d 125------------- 28
Hickman v. Hudson,557 F.Supp. 1341------------- 8
Hoitt v. Vitek,361 F.Supp. 1238------------- 9
Holscher v. Wood,632 F.2d 710------------- 28
Holt v. Sarver,300 F.Supp. 825------------- 5
Holt v. Sarver,309 F.Supp. 362------------- 10
Hope v. Pelzer,536 U.S. 730------------- 6
Horn v. O'Cheskey,378 F.Supp. 1280------------- 13
Hutchings v. Corum,F.Supp. 1276------------- 10
Ingraham v. Wright,430 U.S. 651------------- 14
In re April 1956 Term Grand Jury,352 U.S. 998------------- 19

Table of Authorities

Federal Cases (continued)

                                                                    PAGE

James v. Wallace,382 F.Spp. 1177----------------------------------------- 11

Johnson v. Smith,295 F.Supp. 835---------------------------------------- 24

Judicial Codes of Conduct---------------------------------------------- 21,22,23

Kennedy v. Cardwell,487 F.2d 101---------------------------------------- 31

Kennedy v. Mendoza-Martinez,372 U.S. 144------------------------------- 13

Laaman v. Helgemoe,437 F.Supp. 269-------------------------------------- 9

La Batt v. Twomey,613 F.2d 641------------------------------------------ 9,10

Landman v. Peyton,370 F.2d 135------------------------------------------ 9

Landman v. Royster,333 F.Supp. 621-------------------------------------- 9

LaReau v. Mc Dougall,473 F.2d 974--------------------------------------- 9

Logan v. Zimmerman Brush Co.,455 U.S. 422------------------------------- 24

Mayberry v. Robinson,427 F.Supp. 297------------------------------------ 6

Maxwell v. Mason,668 F.2d 361------------------------------------------- 31

Mempa v. Rhay,389 U.S. 128---------------------------------------------- 26

Messer v. State,439 So.2d 875------------------------------------------- 27

Minns v. Simpson,450 F.Supp. 1156--------------------------------------- 5,6

Minority Police Officers Ass'n of South Bend v. City of South Bend,721 F.2d 197-- 23

Moss v. Ward,450 F.Supp. 591-------------------------------------------- 5

Munn v. Illinois,94 U.S. 123-------------------------------------------- 12

Myer v. Milbert,281 F.Supp. 825----------------------------------------- 5

Nash v. Florida Indus. Commission,Inc.,389 U.S. 235--------------------- 13,24

National Ass'n for the Advancement of Colored People v. Wyoming Medical-
Center ,Inc.,453 F.Supp. 330-------------------------------------------- 20,21

Negron v. Preiser,382 F.Supp. 535--------------------------------------- 7,8

Pack v. Artuz,348 F.Supp.2d 63------------------------------------------ 8

Paul v. Davis,424 U.S. 693---------------------------------------------- 23

Presley v. Morrison,950 F.Supp. 1298------------------------------------ 5

Redd v. Gilless,875 F.Supp. 601----------------------------------------- 7

Robert E. v. Lane,530 F.Supp. 930--------------------------------------- 8

Rochin v. People of Cal.,342 U.S. 165----------------------------------- 23,24

Schultz v. Wainwright,701 F.2d 900-------------------------------------- 28

Silver v. Cormier,529 F.2d 161------------------------------------------ 24

Smith v. Texas,233 U.S.630---------------------------------------------- 14,24

Stewart v. Winter,669 F.2d 328------------------------------------------ 8,9

Table of Authorities
Federal Cases (continued)

|                                                              | PAGE  |
|--------------------------------------------------------------|-------|
| Thacker v. Cox,309 F.Supp. 101                               | 16    |
| Tunstall v. Rowe,478 F.Supp. 87                              | 8     |
| U.S. v. Bavers,781 F.2d 1022                                 | 26,27 |
| U.S. v. King,664 F.2d 1171                                   | 26    |
| U.S. v. Meek,338 F.2d 836                                    | 26    |
| U.S. v. Melton,689 F.2d 679                                  | 27    |
| U.S. v. Porterfield,642 F.2d 122                             | 28    |
| U.S. v. Romano,583 F.2d 1                                    | 20    |
| U.S. v. Townsend,151 F.Supp. 378                             | 19    |
| U.S. v. Wood,628 F.2d 554                                    | 27    |
| U.S. ex rel. Ford v. State of N.J.,400 F.Supp. 587          | 27,28 |
| U.S. ex rel. Hoss V. Cuyler,452 F.Supp. 256                  | 5,6   |
| U.S. ex rel. Miller v. Twomey,479 F.2d 71                    | 5     |
| U.S. ex rel. Toth v. Quaries,350 U.S. 11                     | 19    |
| U.S. ex rel. Wolfish v. Levi,406 F.Supp.1243                 | 9     |
| Van Evey v. State,499 N.E.2d 245                             | 28    |
| Walker v. Savell,243 F.Supp. 478                             | 20    |
| Watson v. Wyrick,532 F.Supp. 301                             | 27    |
| Wayne v. Neunker,622 F.Supp. 101                             | 8     |
| Weaver v. Graham,450 U.S. 24                                 | 20    |
| Whiteside v. Kay,446 F.Supp. 716                             | 24    |
| Wolf v. People of the State of Colo.,338 U.S. 25            | 14    |
| Zannino v. Arnold,531 F.2d 687                               | 13    |
| 458 F.Supp. 302                                              | 11    |
| 626 F.2d 345                                                 | 11    |

TABLE  OF  AUTHORITIES

STATE  CASES

PAGE

People v. Abdullad,184 A.D.2d 195------------------------------------------- 17

People v. Anderson,629 N.Y.S.2d 223------------------------------------------ 30

People v. Evans,583 N.Y.S.2d 358--------------------------------------------- 18

People v. Fleming,560 N.Y.S.2d 50-------------------------------------------- 30

People v. Pfitzmayer,72 Misc.2d 85------------------------------------------- 18

People v. Smith,642 N.Y.S.2d 568--------------------------------------------- 18

People v. Tocco,525 N.Y.S.2d 137--------------------------------------------- 29,30

People v. Wroblewski,489 N.Y.S.2d 797---------------------------------------- 30

Sardino v. State Com'n on Judicial Conduct,461 N.Y.S.2d 229----------------- 23

TABLE    OF    CONTENTS

|  | PAGE |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| QUESTIONS PRESENTED | 3A, 3B |
| STATEMENT OF FACTS | 2 |
| Introduction | 2 |
| Court's Ascention of Case | 12 |
| Counsel's Failure to Timely File Motion | 2 |
| State's Evidence | 2 |
| Defense's Evidence | 2,3 |
| Charge | 3 |
| Deliberations and Supplemental Instructions | 3 |
| Sentence | 3 |
| ARGUMENT | |

NEW YORK CITY DEPARTMENT OF CORRECTION'S DEPRIVATION OF
PETITIONER'S VISITS WITH HIS MOTHER TERMINALLY ILL WITH
AIDS,FOOD,SHOWERS,RECREATION AND ACCESS TO   THE COURT,
GAVE RISE TO PETITIONER'S ACTIONS AND VIOLATED     HIS
CONSTITUTIONAL RIGHT TO BE FREE FROM CRUEL AND UNUSUAL
PUNISHMENT. U.S. CONST.,AMEND. 8.

THE JUDGE'S INITIAL ASCENTION OF PETITIONER'S CASE FROM
CRIMINAL TO SUPREME COURT,WITHOUT ACCORDING   HIM   HIS
INVOKED CONSTITUTIONAL RIGHT TO GIVE TESTIMONY,     WAS
CONTRIBUTABLE TO COUNSEL'S UNTIMELY FILED MOTION,    AND
VIOLATED PETITIONER'S CONSTITUTIONAL RIGHT      TO    DUE
PROCESS AND EQUAL PROTECTION OF THE LAW. U.S. CONST.,
AMENDS. 5,6,8 & 14.

COUNSEL'S FAILURE TO TIMELY FILE MOTION TO HAVE INDICT-
MENT DISMISSED CONSTITUTED INEFFECTIVE ASSISTANCE   OF
COUNSEL BECAUSE PETITIONER'S ATTORNEY DID NOT POSSESS
THE KNOWLEDGE,CUSTOMARY SKILLS AND DILIGENCE THAT    A

Argument (continued)

REASONABLY COMPETENT ATTORNEY UNDER SIMILAR CIRCUMSTANCES
WOULD HAVE PERFORMED. U.S. CONST.,AMENDS. 5,6 & 14.

TOP COUNTS OF ARSON SHOULD HAVE BEEN REDUCED,BY THE COURT
OR PROSECUTOR,OR DISMISSED CONSIDERING THE MITIGATING CIR-
CUMSTANCES INVOLVING PETITIONER'S MOTIVE FOR SETTING FIRES,
AND THE RETALIATORY NATURE OF THE NEW YORK CITY DEPARTMENT
OF CORRECTION FILING CHARGES AGAINST PETITIONER AFTER  HIS
FILING OF 42 U.S.C. § 1983 AGAINST EMPLOYEES OF THE     NEW
YORK CITY DEPARTMENT OF CORRECTION. U.S. CONST.,AMENDS. 5,
6,8 & 14.

THE DEPRIVATION OF PETITIONER'S CLOTHING,DENIED HIM    THE
GARB OF INNOCENCE,WHEN HE WAS FORCED TO APPEAR BEFORE   THE
JURY WEARING PRISON CLOTHES. U.S. CONST.,AMENDS. 5,6,8 & 14.

CONCLUSION------------------------------------------------------------ 33

UNITED  STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Echo Westley Dixon, Petitioner,

       -against-

Superintendent
  Micheal P. McGinnis, Respondent.

## P R E L I M I N A R Y   S T A T E M E N T

    This is a petition from a judgment of the Supreme/Superior Court,
Bronx County,New York,rendered February 11,2003,convicting petitioner,
after a jury trial,of two counts of arson in th second-degree and one
count of arson in the third-degree (Cirigliano,J. at trial and sent-
ence).Timely notice of appeal was filed and thereafter court granted
petitioner leave to appeal as a poor person on the original  record
and typewritten brief and assigned Andrew C. Fine,succeeded by Laura
R. Johnson,as counsel on appeal.Petitioner was indicted   with   no
co-defendants and is the sole petitioner of this petition,  and  is
currently incarcerated pursuant to this judgment.

## S T A T E   O F   F A C T S

### I n t r o d u c t i o n

Petitioner realleges and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus petition/brief  and  appellate counsel's appeal brief (Introduction), as if fully restated herein.

### C o u r t ' s   A s c e n t i o n   o f   C a s e

See Point II of this Brief.

### C o u n s e l ' s   F a i l u r e   t o   T i m e l y   F i l e   M o t i o n

Petitioner realleges and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus petition/brief  and  appellate counsel's brief (Counsel's Failure to Timely File Motion),  as   if fully restated herein.

### S t a t e ' s   E v i d e n c e

Petitioner reallages and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus petition/brief  and  appellate counsel's brief (State's Evidence), as if fully restated herein.

### D e f e n s e ' s   E v i d e n c e

Petitioner realleges and incorporates by reference, for brevity,

petitioner's Writ of Habeas Corpus petition/brief and appellate coun-
sel's brief (Defense's Evidence),as if fully restated herein.


## C h a r g e

Petitioner realleges and incorporates by reference,for brevity,
petitioner's Writ of Habeas Corpus petition/brief and    appellate
counsel's brief (Charge),as if fully restated herein.


## D e l i b e r a t i o n s   a n d   S u p p l e m e n t a l   I n s t r u c t i o n ' s

Petitioner realleges and incorporates by reference,for brevity,
petitioner's Writ of Habeas Corpus petition/brief  and  appellate
counsel's brief (Deliberations and Supplemental Instructions),   as
if fully restated herein.


## S e n t e n c e

Petitioner realleges and incorporates by reference,for brevity,
petitioner' Writ of Habeas Corpus petition/brief    and  appellate
counsel's appeal brief (Sentence),as if fully restated herein.

## Q U E S T I O N   P R E S E N T E D

I) Whether,New York City Department of Correction's deprivation
of petitioner's visits with his Mother terminally ill with Aids,food,
showers,recreation and access to the court,gave rise to petitioner's
actions and violated his constitutionsl right to be free from cruel
and unusual punishment. U.S. Const.,Amend. 8.


II) Whether,judge's initial ascention of petitioner's case    to
Supreme court,without according him his invoked constitutional right
to give testimony,was contributable to counsel's untimely filed mot-
ion,and violated petitioner's constitutional right to due process
and equal protection of the law. U.S. Const.,Amends. 5,6,8 & 14.


III) Whether,counsel's failure to timely file motion to have  in-
dictment dismissed,constituted ineffective assistance of counsel be-
cause petitioner's attorney did not possess the knowledge,customary
skills and diligence that a reasonably competent attorney      under
similar circumstances would have performed. U.S. Const.,Amends. 5,6,
8, & 14.


IV) Whether,top counts of arson should have been reduced,by the
court or the prosecutor,or dismissed,considering the mitigating cir-
cumstances involving petitioner's motive for setting fires and   the
retaliatory nature of the New York City Department  of  Correction
filing charges against petitioner after his filing of 42 U.S.C.  §
1983 against employees of the New York City Department of Correction.
U.S. Const.,Amends. 5,6,8 & 14.

Questions Presented (Continued)


    V) Whether,the deprivation of petitioner's clothing,denied  him
th garb of innocence,when he was forced to appear before the  jury
wearing prison clothes. U.S. Const., Amends. 5,6,8 & 14.

A R G U M E N T

P O I N T  I

NEW YORK CITY DEPARTMENT OF CORRECTION'S
DEPRIVATION OF PETITIONER'S VISITS  WITH
HIS MOTHER TERMINALLY ILL WITH AIDS,FOOD,
SHOWERS,RECREATION AND ACCESS   TO   THE
COURT,GAVE RISE TO PETITIONER'S  ACTIONS
AND VIOLATED HIS CONSTITUTIONAL RIGHT TO
BE FREE FROM CRUEL AND UNUSUAL   PUNISH-
MENT.U.S. CONST.,AMEND. 8.

The petitioner of this action was subjected to cruel   and
unusual punishment by the New York City Department of Correction
while he was incarcerated at the Otis Bantum Correctional Center's
Punitive Segregation Unit at Rikers Island.

When two (2) prisoners within a fifty (50) man housing unit,
would refuse to allow correction officers to close and   secure
their feed-up hatches,the remaining forty-eight prisoners within
the housing unit were made to suffer.

The suffering of the petitioner was administered by   the
deprivation of food,visits,showers,recreation and access to the
court.

Eighth Amendment does not apply until after adjudication of
guilt.Hewitt v. City of Truth and Consequences,785 F.2d 1375.

Meaning of "cruel and unusual punishment"   under   Eighth
Amendment must be interpreted in flexible and dynamic manner,and
measured against evolving standards of decency that mark the pro-
gress of maturing society.Fierro v. Gomez,77 F.3d 301.To make out

claim for cruel and unusual punishment under Eighth  Amendment, plaintiff must show that punishment has been imposed which  included elements of severity,arbitrary infliction,unacceptability in terms of contemporary standards or gross disproportion.<u>Presley v. Morrison,950 F.Supp. 1298.</u>This amendment's prohibition of punishments judged to be cruel and unusual is absolute;although governmental objectives and attitudes are factors considered in determining whether punishment is cruel and unusual,once such  determination is made,punishment is absolutely prohibited.<u>U.S.  ex rel. Hoss v. Cuyler,452 F.Supp. 256.</u>

   If prisoner has not suffered serious or significant physical or mental injury as a result of the challenged condition,he simply has not been subjected to cruel and unusual punishment within meaning of the Eighth Amendment.<u>Myers v. Milbert,281 F.Supp. 859.</u> Punishment or system of punishment is unconstitutional  if  it offends concepts of decency and human dignity and precepts  of civilization which Americans profess to possess,or if it is disproportionate to offense,or if it violates fundamental standards of good conscience and fairness.<u>Holt v. Sarver,300 F.Supp. 825.</u>

   Punishment is "cruel an unusual,"within this amendment,if it is of such character as to shock general conscience or to be intolerable to fundamental fairness,if it is greatly disproportionate to offense for which it is imposed,or if,even though applied in pursuit of legitimate penal aim,it goes beyond what is necessary to achieve that aim,that is,it is unnecessarily cruel in view for which it is used.<u>Moss v. Ward,450 F.Supp. 591.</u>Constitutional

standard of cruel and unusual punishment is not readily adaptable
to precise mathematical application;it depends on careful analy-
sis of the totality of the circumstances.Minns v. Simpson,450 F.
Supp. 1156."Cruel and unusual punishment" is conduct that is foul,
inhuman,and violative of the basic concepts of decency,punishment
which is barbaric and shocking to the conscience, or  physical or
mental abuse or cor poral punishment of such base,inhuman and bar-
barous proportions as to shock court's sensibilities.Mayberry  v.
Robinson,427 F.Supp. 297.Among unnecessary and wanton inflictions
of pain constituting cruel and unusual punishment forbidden by the
Eighth Amendment are those that are totally  without  penological
justification.Hope v. Pelzer,536 U.S. 730.Sanction  imposed   on
prisoner cannot be so totally without penological   justification
that it result in gratuitous infliction of suffering. U.S. ex rel.
Hoss Cuyler,452 F.Supp. 256.

  To prevail on claim that the conditions of confinement fell below
minimal civilized measure of life's necessities ;  the  prisoner
must show extreme deprivations,because routine discomfort is part of
the penalty that criminal offenders pay for their offenses against
society.Atkins v. County of Orange,372 F.Supp.2d 377(S.D.N.Y. 2005).
Although there is no such thing as a perfect prison system,that does
not relieve prison officials of their duty to make their  system  a
constitutional one which the human dignity of each individual inmate
is respected.Finney v. Arkansas Board of Correction,505 F.2d 194.

382 F.Supp. 535.

Degree of culpability required by Eighth Amendment prohibition against cruel and unusual punishment is whether    punishment complained of is result of deliberate indifference to  prisoner's liberty interest.Wayne v. Neunker,622 F.Supp. 101.where the risk of harm is such as to put prison official on notice   that safety problem exists and that protective measures are needed,the absence of any procedure or guideline to protect prisoners  from  risk of harm constitutes complete indifference to prisoner's safety needs in violation of this amendment.Hickman v. Hudson,557 F.Supp.1341. Two standards of proof have evolved to show deliberate "indifference" causing prisoner "pain" proscribed by this amendment;a series of incidents closely related in time may disclose  a  pattern of conduct amounting in deliberate indifference,and deliberate indifference can be reflected as by systematic deficiencies in staffing,facilities or procedures which make unnecessary suffering  inevitable.Robert E. v. Lane,530 F.Supp. 930.

When prison officials,with deliberate indifference, fail  to provide for serious need of prisoners,a violation of this amendment occurs.Tunstall v. Rowe,478 F.Supp. 87.In context of failure-to-protect Eighth Amendment claim,prison official has  sufficient culpable intent if he knows that inmate faces  substantial risk of serious harm and he disregards that risk by failing  to  take reasonable measures to abate harm.Pack v. Artuz,348 F.Supp.2d 63 (S.D.N.Y. 2004).

In  applying the totality test to determine whether conditions

In order to state a violation of Eighth Amendment based on con-
ditions of confinement,prisoner must prove that prison     officials
acted with deliberate indifference to deprive him    of    minimal
civilized measure of life's necessities;constitutional    violation
occurs when conditions of confinement have mutually    reinforcing
effect that produces deprivation of single identifiable    human
need such as food,warmth or exercise and nothing so   amorphous   as
overall conditions can rise to level of violation when no specific
deprivation of single human need exists.Abdul-Akbar v. Department of
Correction ,910 F.Supp. 986.Various allegedly   inhumane conditions
of confinement may establish Eighth Amendment violation in combinat-
ion when each would not do so alone,but only when they have mutually
enforcing effect that produces the deprivation of a single,identifi-
able need such as food,warmth or exercise.Dimarco v. Wyoming  Dept.
of Corrections Div. of Prisons,Wyo. Women's Center,300 F.Supp.2d 1183.

Prison official violates Eighth Amendment prohibition against
cruel and unusual punishment if he displays deliberate indifference
to inmate's personal safety;prison official displays    deliberate
indifference when he causes unnecessary and wanton infliction of
pain on inmate by deliberately disregarding serious thret to  in-
mate's safety after actually becoming aware of threat. Redd    v.
Gilless,875 F.Supp. 601.While rights of prisoners are severely cir-
cumscribed,among the rights which persons retain even after incar-
ceration are freedom from cruel and unusual punishment,and freedom
from arbitrary imposition of serious sanctions.Negron v. Preiser,-

of confinement amount to cruel and unusual punishment,court must make a detailed inquiry into all of the conditions of a  prison as well as circumstances which have created the conditions.Stewart v. Winter,669 F.2d 328.

Restrictions on visitation priveleges constitute deprivation of liberty under this clause and may be accomplished only in  accordance with the normal disciplinary procedures of the  prison. Laaman v. Helgemoe,437 F.Supp. 269.Central amoung rights possessed by people in confinement is the opportunity to communicate and visit with friends,a reciprocal opportunity protected in law  for those on the outside as well as the inside.U.S. ex rel. Wolfish v. Levi,406 F.Supp. 1243.

Just as cruel and unusual punishment clause restrains judiciary and legislature,so it also limits discretion of administators. Landman v. Royster,333 F.Supp. 621.This amendment does not  give constitutional dimension to theories of penologists on  what  is appropriate disposition of offender,but condemns only that punishment which is barbarous or shocking to collective conscience  of our society.LaReau v. McDougall,473 F.2d 974.

State prisoners have right under this amendment to be  free from cruel and unusual punishment and to be accoreded unfettered access to courts to seek vindication of their rights.Landman   v. Peyton,370 F.2d 135.Prohibition against cruel and unusual punishment is not limited to instances in which particular inmate  is subjected a punishment directed at him as an individual but  may apply to punishment inflicted upon general population.Hoitt   v. Vitek,361 F.Supp. 1238.To establish a violation of this amendment

9

prisoners must either show that the actions defendant prison off-
icials intentionally inflicted excessive or grossly severe punish-
ment on them or that conditions so  harsh as to shock general con-
science were knowingly maintained.La Batt v. Twomey,613 F.2d 641.

Cocept of cruel and unusual punishment is not   limited   to
instances which particular prison inmate is subjected to  punish-
ment directed at him as an individual;confinement itself   within
given institution may amount to "cruel and unusual   punishment"
where confinement is characterized by conditions and practices so
bad as to be shocking to the conscience of reasonably  civilized
people,even though particular inmate may never personall be  sub-
jected to any disciplinary action.Holt v. Sarver,309 F.Supp. 362.
This amendment may be violated by prison officials either by  in-
tentional infliction of punishment which is cruel,or by such cal-
lous indifference to predictable consequences of standard prison
conditions that official intent to inflict unwarranted harm may be
inferred.U.S. ex rel. Miller v. Twomey,479 F.2d 701.

Failure of county jail authorities to provide each inmate one
hour per day of exercise outside cells was intolerable  condition
under this amendment.Hutchings v. Corum,501 F.Supp. 1276.

Prohibition of this amendment against cruel and unusual pun-
ishment is intended to protect and safeguard a  prisoner from  an
environment where degeneration is probable and self-improvement un-
likely because conditions existing which inflict needless suffering,
whether physical or mental.Battle v. Anderson,564 F.2d 388.Also,in

Battle v. Anderson the Court further stipulates "When subhuman conditions existing at a jail facility cannot help but destroy     the spirit and threaten the sanity of inmates,the courts must act    immediately to enforce mandates of the Constitution".(Id. in original). In deciding whether conditions at a jail are so onerously   burdensome as to reach constitutional dimensions,courts must look at   totality of the circumstances,including the extent to which restrictions adversely affect the mental or physical health of the inmate. (626 F.2d 345).Where conditions within prison are such that inmates incarcerated therein will inevitably and necessarily become    more sociopathic and less able to adapt to conventional society    as    a result of their incarceration than they were prior thereto,cruel and unusual punishment is inflicted.James v. Wallace,382 F.Supp. 1177. The failure to provide an inmate with an environment that does  not impair his physical and mental health violates this clause.( 458 F. Supp. 302).

P O I N T   II

THE JUDGE'S INITIAL ASCENTION OF PETITIONER'S
CASE FROM CRIMINAL TO SUPREME COURT   WITHOUT
ACCORDING HIM HIS INVOKED CONSTITUTIONAL RIGHT
TO GIVE TESTIMONY,WAS CONTRIBUTABLE TO   COUN-
SEL'S UNTIMELY FILED MOTION AND VIOLATED   THE
PETITIONER'S CONSTITUTIONAL RIGHT TO DUE PRO-
CESS AND EQUAL PROTECTION OF THE LAW. U . S .
CONST. AMENDS. 5,6,8 & 14.


    In addition to cruel and unusual punishment administered to
and inflicted upon the petitioner,even the criminal charges that
were sought against him were unconstitutionally obtained;by  the
court disregarding his constitutional right to be heard at mean-
ingful time and meaningful manner before the Grand Jury and   by
transferring his case to higher court without said right   being
satisfied.
    Perceived in such light,wherefore,the entire basis for  the
purported constitutional conviction was,from beginning to end,ob-
tained unconstitutionally,the vacatur of the conviction and  bar-
ring of representation of the indictment must be ordered.
    While this clause is new in the Constitution,as a limitation
upon the powers of the states,it is old in principle of civilized
government;it is found in Magna Charta,and,in substance if not in
form,in nearly or quite all the constitutions that have been from
time to time adopted by several states of Union.Munn v. Illinois,
94 U.S. 123.
    One basic purpose of this clause is to protect person against

12

having government impose burdens upon him except in accordance with valid laws of the land. Giaccio v. State of Pa., 382 U.S. 399.

The purpose of this clause is not to protect an accused against a proper conviction but against an unfair conviction. Adamson    v. People of the State of Cal., 332 U.S. 46. Constitution of the United States, rather than state law, defines what process is due once  the deprivation of property or liberty has been demonstrated. Bagby    v. Beal, 439 F.Supp. 1257.

State courts bear equal responsibility with federal courts  to guard and protect rights secured by the Constitution of the  United States. Horn v. O'Cheskey, 378 F.Supp. 1280. The Federal Constitution is a law for rulers and people, equally in war and in peace and cov-- ers with the shield of its protection all classes of men  at  all times , and under all circumstances. Kennedy v. Mendoza--Martinez, 372 U.S. 144.

The states are devoid of any power to retard, impede, burden  or in any measure control the operations of constitutional laws enacted by Congress, to carry into execution the powers vested in the general government. Nash v. Florida Indus. Commission, 389 U.S. 235. Relevant factor in determining nature of requisite of due process is private interest that is affected by official action. Board of Curators    of Missouri v. Horowitz, 435 U.S. 78.

Touchstone of this clause is protection of the individual again- st arbitrary action of government. Zannino v. Arnold, 531 F.2d 687. Due process is not measured by the yardstick of personal reaction or the sphygmogram of the most sensitive person, but by that whole community sense of decency and fairness that has been woven by the common ex--

perience  into the fabric of acceptable conduct. Briethaupt v. Abram, 352 U.S. 432. This clause exacts from states for the lowliest    and most outcast,all that is implicit in the concept of ordered liberty, embracing all those rights which courts must enforce because   they are basic to a free society. Wolf v. People of the State of Colo.,338 U.S. 25. "Civil liberties" as guaranteed by the Constitution  imply the existence of an organized society maintaining public order without which liberty itself would be lostin the excesses of unrestrained abuses. Cox v. State of New Hampshire,312 U.S. 569.

There cannot exist under the American Flag any governmental authority untrammeled by requirements of due process. Calero-Toledo v. Pearson Yacht Leasing Co.,416 U.S. 663. Freedom from bodily restraint and punishment is within liberty interest in personal security that is protected from state deprivation without due process of law. Ingraham v. Wright,430 U.S. 651. Liberty means freedom from servitude,and the constitutional guarantee is an assurance that the citizen shall be protected to use his powers of mind and body in any lawfull calling. Smith v. Texas,233 U.S. 630.

Pursuant to C.P.L. § 180.50(4)-The court must inform the   defendant of all rights specified in subdivisions 2 and 3.The   court must accord the defendant opportunity to exercise such rights   and must itself take affirmative action as necessary to effectuate them. Also,in accordance to C.P.L. § 180.50(2)(b)-If there is reasonable cause to believe that the defendant committed a felony in addition to the non-felony offense,the court may order a reduction of the charge to one for the non-felony offense only if (i)it is satisfied   that

14

such reduction is in the interest of justice,and (ii)the district
attorney consents thereto;provided,however,that the court may not
order such reduction where there is reasonable cause to believe
that the defendant committed a class A felony,other than those
defined in subdivision forty-one of § 1.20.Further,pursuant to
C.P.L. § 180.50(3)(a)- If the factual allegations of the felony
complaint and/or any supporting depositions are legally sufficient
to support the charge that the defendant committed the non-felony
offense in question,the court may: (iii)convert the felony com-
plaint ,or a copy thereof,into an information by notations upon or
attached thereto which make necessary and appropriate charges in
the title of the instrument and the names of the offense or of-
fenses charged.In case of such conversion,any supporting deposit-
ion supporting or accompanying the felony complaint is deemed al-
so to support or accompany any finding other than that specified
in subdivision two,the court must conduct a hearing upon the fel-
ony complaint,unless the defendant has waived the same.In the case
of such waiver the court must order the defendant be held for the
action of a grand jury.

Even the practices of C.P.L. §§ 180.60 and 180.70 are applic-
able to petitioner's contentions,insofar as C.P.L. § 180.60(2)
stipulates "The defendant may as a matter of right be present at
such hearing".Also,C.P.L. § 180.70(1) further iterates "If there
is reasonable cause to believe that the defendant committed a fel-
ony,the court must,except as provided in subdivision three, order

that the defendant be held for the action of a grand jury of the appropriate superior court,and it must promptly transmit to such superior court the order,the felony complaint,supporting depositions and all other pertinent documents.Until such papers are received by the superior court,the action is deemed to be still pending in local criminal court".

The purpose of petitioner quoting aforementioned C.P.L. sections,is to exhibit that there were procedural safeguards to prevent his invoked constitutional right from being squandered,when he was denied to testify before a grand jury.

Furthermore,C.P.L. § 190.50(5) goes even further to express "Although not called as a witness by the People or at the instance of the grand jury,a person has a right to be a witness of a grand jury proceeding under cicumstances prescribed in this subdivision:

> (a)When a criminal charge against a person is being about to be or has been submitted to a grand jury,such person has a right to be a witness in his own behalf if,prior to filing of any indictment or any direction to file a prosecutor's information in the matter,he serves a written notice making such request and stating an address to which communications may be sent.The district attorney is not obliged to inform such a person that such grand jury proceeding against him is

pending,is in progress or about to occur  unless
such person is a defendant who has been arraign-
ed in local criminal court upon a currently  un-
disposed of felony complaint charging an offense
which is a subject of the prospective or pending
grand jury proceeding.In such case,the  district
attorney must notify the defendant  o r   h i s
attorney of the prospective or pending    grand
jury proceeding and accord the defendant a reas-
onable time to appear as a witness therein; and,
subdivision 6 of C.P.L. § 190.50-A defendant  or
person against whom a criminal charge is   being
or is about to be brought in a grand jury   pro-
ceeding may request the grand jury,either orally
or in writing,to cause a person designated   b y
him to be called as a witness in such proceeding.
The grand jury may as a matter of   discretion
grant such request and cause such witness  to be
called pursuant to subdivision three.


   The defendant's right to notice of his right to testify before
Grand Jury is absolute and C.P.L. § 190.50 contemplates " actual  "
rather than technical notice to defendant,reasonably calculated  to
apprise the defendant of the Grand Jury proceeding so as to  permit
the defendant to exercise his or her right to testify.People       v.
Abdullah,184 A.D.2d 195.

To sustain dismissal of an indictment,something more is re-
quired than the bare allegations that grand jury proceedings were
defective.To dismiss an indictment a court must have before   it
a preponderance of facts which establish clear violations of Art-
icle 190 of C.P.L.,and which are sufficient to overcome the  pre-
sumption of regularity which applies to all grand jury proceedings.
Motion to dismiss based on facts outside the pleadings  must  be
supported by sworn allegations of facts supporting grounds assert-
ed.People v. Pfitzmayer,72 Misc.2d 85.Also,C.P.L. § 180.60(6) in-
structs the court that "The defendant may,as a matter of right ,
testify in his own behalf"

A prospective defendant has no constitutional right to test-
ify before Grand Jury;right is provided by statute,and upon serv-
ing proper notice,appearing at given time and place,and executing
waiver of immunity,prospective defendant must be permitted    to
testify before Grand Jury and give any relevant and competent ev-
idence concerning case under consideration.People v. Smith. 642
N.Y.S.2d 568.Where a defendant properly serves timely C. P. L. §
190.50 notice he is entitled to testify prior to a vote by   the
Grand Jury.People v. Evans,583 N.Y.S.2d 358.

Even according to the Text of the Agreement on Detainers,the
court can have the production of a defendant prisoner produced to
the court for the purposes of defendant/prisoner proffering test-
imony before a grand jury.

C.P.L. §§ 580.20,Articles III (d) & (e); IV (d) & V (d),all
proffer the court a way of having a defendant in prison produced

to court after his request for the final disposition of an untried indictment,information or complaint,and for him to be held at a suitable jail or other facility regularly used for persons awaiting prosecution.

Interalia,C.P.L. §§ 610.20(1),610.30(1),620.10(4)(b)    and 650.10,all provide the court with various avenues of pursuit    to have the production of a prospective defendant,who is incarcerated, to court for the purposes of appearing before a grand jury.

This amendment adopted the grand jury as it existed at common law and thereby made the grand jury a part of the fundamental  law of the United States for the prosecution of crimes.In re April 1956 Term Grand Jury,352 U.S. 998.This amendment is a safeguard designed to protect defendants against governmental practices.U.S. ex  rel. Toth v. Quaries,350U.S. 11.

The purpose of this amendment was to limit the powers of  the legislature as well as of the prosecuting officers of  the  United States,and no declaration of Congress that a crime is infamous  is needed to secure,or competent to defeat,the constitutional    safeguard.Ex parte Wilson,114 U.S. 426.Due process under this    amendment,when applied by federal courts,serves as basic protection  of citizen against unjust federal action and must be   given    even broader connotation than due process under Amend. 14.U.S. v. Townsend,151 F.Supp. 378.

The "due process" provision of Amend. 14,just as that in this clause,was intended to guarantee procedural standards adequate and appropriate to protect at all times people charged with or suspected of crime by those holding positions of power and authority  .

Chambers v. State of Florida,309 U.S. 227.Evaluation of whether a
right has vested is important  for claims under this clause,which
solely protects preexisting entitlements.Weaver V. Graham,450 U.S.
24.

The term "liberty" within this amendment is not confined  to
mere freedom from bodily restraint,but it extends to the full range
of conduct which the individual is free to pursue,and it cannot be
restricted except for proper governmental objective.Bolling    v.
Sharpe,347 U.S. 497.Also,Bolling v. Sharpe states "The concepts of
equal protection of the laws and due process both stem from    the
American ideal of fairness,and are not mutually exclusive,nor  are
the concepts interchangeable;in that equal protection of the laws
is a more explicit safeguard of prohibited unfairness than due pro-
cess of the law,but a discrimination may nevertheless be so unjust-
ifiable as to be violative of due process".

Liberty  is common-law right which Constitution protects from
governmental invasion without due process of law.This amendment and
and Amend. 14 did not create any new rights.Walker v. Savell,243 F.
Supp. 478.

Fair play is the essence of "due process ".Galvan v. Press,347
U.S. 522.This clause is a shield against unfair or deceptive treat-
ment of the accused by the government.U.S. v. Romano,583 F.2d 1.

Very nature of due process negates any concept of inflexible
procedures universally applicable to every imaginable  situation;
nevertheless,an elementary and fundamental requirement   of  due
process in any proceeding which is to be accorded finality is no-

tice reasonably calculated under all circumsatnces,to apprise the
parties of the pendency of the action and afford them an opport-
unityto present their objections.<u>National Ass'n for Advancement of
Colored People v. Wyoming Medical Center,Inc.,</u>453 F.Supp. 330.

    Regarding the judge's conduct in the ascention of petitioner's
case,without according him his invoked constitutional right  to
appear  and defend before a grand jury,there are Judicial Codes of
Conduct the judge is sworn to follow;which it did not.

    22 NYCRR § 100.1 A judge Shall Uphold the Integrity of the
                Judiciary.

Cannon 1 [1.1]Deference to judgments and rulings of courts
                depends upon public confidence in the integ-
                rity and independence of judges.The integri-
                ty and independence of judges depends   in
                turn upon their acting without fear or favor.
                Although judges should be independent,  they
                must comply with the law,including  the pro-
                visions of this Code.Public confidence   in
                the impartiality of the judiciary is   main-
                tained by the adherence of each judge to this
                responsibility.Conversely,violation of  this
                Code diminishes public confidence   in   the
                judiciary and thereby does injury to the sys-
                tem of government under law.

22 NYCRR § 100.2 A Judge Shall Avoid Impropriety and the Appear-
                ance of Impropriety in All of the Judge's  Act-

ivities.

Cannon 2 § A - A judge shall respect and comply with
the law and shall act at all times in
a manner that promotes public confid-
ence in the integrity and impartiali-
ty of the judiciary.

Cannon 2,2.1 [2A]Public confidence in the judiciary
is eroded by irresponsible or improp-
er conduct by judges.A judge must avoid
all impropriety and the appearance  of
impropriety.

Cannon 2,2.2 [2A]The prohibition against behaving with
impropriety or the appearance of  im-
propriety applies to both the profess-
ional and personal conduct of a judge.
Because it is not practicable to list
all prohibited acts,the proscription
is necessarily cast in general  terms
that extend to conduct by judges that
is harmful although not specifically
mentioned in the Code.Actual improprie-
ties under this standard include vio-
lations of law,court rule or   other
specific provisions of this Code. The
test for appearance of impropriety is
whether the conduct would create   in

reasonable minds a preception that the
judge's ability to carry out judicial
responsibilities with integrity , im-
partiality and competence is impaired.

22 NYCRR §  100.3

Cannon 3 [3.2][3B(4)] A judge must perform jud-
icial duties impartially and fairly.A
judge who manifests bias on any basis
in a proceeding impairs the fairness
of the proceeding and brings the jud-
iciary in disrepute.

Equally as important as ability to be impartial is requirement
that judge conduct himself in such a way that the public can   per-
ceive and continue to rely upon impartiality of those who have been
chosen to pass judgment on legal matters involving their lives,lib-
erty  and property.Sardino v. State Com'n on Judicial Conduct, 461
N.Y.S.2d 229.

This amendment could not be construed as " a repository   un-
adulterated freedom and liberty in which everyone (people and states)"
are required to act in a way or fashion that maximizes not minimizes
all citizens' liberties.Minority Police Officers Ass'n of South Bend
v. City of South Bend,721 F.2d 197. The procedural guarantee of this
clause seeks to remove or significantly alter interests comprehended
within meaning of either "liberty" or "property".Paul v. Davis,  424
U.S. 693.Due process of law is summarized constitutional guarantee of
respect for those personal immunities which are so rooted in tradit-

ions and conscience of our people as to be ranked as fundamental or implicit in the concept of liberty.Rochin v. People of Cal.,   342 U.S. 165.Rights of access to the courts cannot be infringed upon or burdened.Silver v. Cormier,529 F.2d 161.

Liberty means more than freedom from servitude,and the constitutional guarantee is an assurance that the citizen shall be protected in the right to use his powers of mind and body in any   lawful calling.Smith v. Texas,233 U.S. 630.Due process questions under federal Constitution may be presented either by failure of state   to follow its own rules of law or by state rules of law serving as   a deprivation of due process.Field v. Boyle,503 F.2d 774.A state   or governmental body violates due process whenit fails to follow   procedural steps it has adopted for proceedings held before it.White - side v. Kay,446 F.Supp. 716.

A state law cannot stand that either frustrates the purpose of national legislation or impairs the efficiency of those agencies of federal government to discharge the duties for the performance   of which they were created.Nash v. Florida Indus. Commission,389 U.S. 235.

Having made access to the courts an entitlement or a necessity,state may not deprive someone of that access unless balance of state and private interests favors the government.Logan v. Zimmerman Brush Co.,455 U.S. 422.The states may not encourage or authorize any private denials of due process or equal protection , but must remain neutral with respect to such private conduct.Johnson v. Smith,295 F.Supp. 835.

P O I N T   III

COUNSEL'S FAILURE TO TIMELY FILE MOTION TO
HAVE INDICTMENT DISMISSED     CONSTITUTED
INEFFCTIVE ASSISTANCE OF COUNSEL   BECAUSE
PETITIONER'S ATTORNEY DID NOT POSSES   THE
KNOWLEDGE,CUSTOMARY SKILLS,  OR  DILIGENCE
THAT A REASONABLY COMPETENT ATTORNEY UNDER
SIMILAR CIRCUMSTANCES WOULD HAVE PERFORMED.
U.S. CONST.,AMENDS. 5 , 6 , & 14.

At the beginning of the petitioner's case,an   attorney   was
appointed to represent him at arraignment at Bronx Criminal Court.

During arraignment petitioner informed his attorney  that  he
wished to exercise his right to testify before the grand jury ,and
in turn petitioner's counsel apprised the court that   petitioner
invoked such right to appear and testify before said grand jury.

Subsequently,the case was adjourned and petitioner was trans-
ported to a state correctional facility.

Upon petitioner's return to the local jail regularly used for
the confinement of pretrial detainees awaiting prosecution for un-
tried indictments,informations or complaints,for what he  presumed
would be his appearance before a grand jury,he was transported in-
stead to Bronx Supreme/Superior Court.

At Bronx Supreme/Superior Court,the petitioner had   come   to
find out,while in his absence and against his invoked constitution-
right to appear and defend,that he had been indicted.

Further,while in the midst of Bronx Supreme/Superior   Court's
arraignment of petitioner,petitioner was assigned a new counsel,and
apprised the court and new counsel of his being denied his constit-

utionally invoked right to testify before the grand jury;at which
juncture the court directed petitioner's newly appointed counsel
to file the proper motion to have said indictment dismissed.Once
again the case was adjourned.

At the next court appearance the petitioner's attorney  had
informed the petitioner that he had filed the necessary motion to
have the indictment dismissed.What counsel failed to apprise  the
petitioner of was that counsel had submitted the motion tardy and
upon those grounds the court denied the motion as untimely.

Astounded at counsel's display of incompetence,the petitioner
requested the court to remove counsel from his representational
duties.To wit the court opted to allow the attorney to recuse him-
self instead of permitting the petitioner to have him terminated.

Appointment of counsel for indigent is required at every stage
of criminal proceeding where substantial rights of criminal accused
may be affected.Mempa v. Rhay,389 U.S. 128.Purpose for appointing
counsel is to insure that person charged with criminal offense shall
have advice and aid of person trained in law.U.S. v. Meek,388 F.2d
936.This amendment entitles criminal defendant more  than   legal
representation and he has right to effective assistance of competent
counsel.U.S. v. King,664 F.2d 1171.

Right to counsel is not merely a formalism to be mechanically
exercised by the courts,but is requirement of this amendment placing
affirmative duty on courts to appoint counsel  who  will represent
defendant fairly.Thacker v. Cox,309 F.Supp. 101.Defendant claiming
ineffective assistance of counsel must make affirmative showing not

only that his counsel failed to perform at least as well   as   a
lawyer with ordinary training and skill in criminal law but   also
that counsel's conduct so undermined the proper functioning of the
adversarial process that the trial cannot be relied on   as having
reached a just result.U.S. v. Bavers,781 F.2d 1022.

Defendant is entitled to counsel whose performance meets min-
imum standards of professional representation.U.S. v. Melton,6 8 9
F.2d 679.One claiming denial of right to effective assistance   of
counsel must first identify specific overt act or omission up-
on which argument is based;claimant must then show that act   or
omission was substantial and serious deficiency measurably  below
standard of performance expected of competent attorneys;claimant
must then establish that,but for serious and substantial defici-
ency,outcome of proceedings probably would have been different ;
finally,showing must withstand state's rebuttal which is achiev-
ed by proving beyond a reasonable doubt that there was no prejud-
ice in fact.Messer v. State,439 So.2d875.

The defendant alleging inadequacy of counsel must   show   a
"substantial breach" in the duty owed to defendant by counsel.U.S.
v. Wood,628 F.2d 554.In order to prevail on a claim of ineffective
assistance of counsel,a defendant must show that his attorney fail-
ed to exercise the customary skill and diligence that a reasonably
competent attorney would perform under similar circumstances, and
that he was prejudiced thereby.Watson v. Wyrick,532 F.Supp. 301.

Standard of adequacy of representation of defense counsel is
the exercise of customary skill and knowledge which normally pre-

vails at time and place. <u>U.S. ex rel. Ford v. State of N.J.,  400 F.Supp. 587.</u>Standard for determining adequacy of counsel is whether counsel exercised customary skills and diligence that a reasonably competent attorney would perform under similar circumstances. <u>Holscher v. Wood,632 F.2d 710.</u>To demonstrate ineffective assistance of counsel,defense counsel's errors or omissions must reflect failure to exercise skill,judgment,or diligence of reasonably competent attorney acting as conscientious advocate would not  have made.<u>Cooper v. Fitzharris,589 F.2d 1325.</u>Proper measure of performance in considering claim of ineffective assistance of counsel is reasonableness under prevailing norm.<u>Van Evey v. State,499 N.E.2d 245.</u>

To establish prejudice,a habeas petitioner must show that ineffective   counsel   resulted in actual and substantial  disadvantage to course of his defense.<u>Schultz v. Wainwright,701 F.2d 900.</u>

Reasonable diligence and skill is the test of competency  of counsel,and "prejudice" is not second tier in the test of incompetency;where incompetence of counsel is pervasive,defendant  is not required to prove prejudice on top of inadequacy,and burden is on government to establish lack of prejudice.<u>U.S. v. Porterfield, F.2d 122.</u>A lawyer who is not familiar with the facts and law relevant to his client's case cannot meet required minimum level  of effective assistance of counsel.<u>Herring v. Estelle,491 F.2d 125.</u>

<u>P O I N T   IV</u>

TOP COUNTS OF ARSON SHOULD HAVE   BEEN
REDUCED,BY THE COURT OR   PROSECUTOR,TO
A LESSER INCLUDED OFFENSE,OR DISMISSED
CONSEIDERING THE MITIGATING CIRCUMST-
ANCES INVOLVING PETITIONER'S   MOTIVE
FOR SETTING FIRES,AND THE RETALIATORY
NATURE OF THE NEW YORK CITY DEPARTMENT
OF CORRECTION FILING CHARGES   AGAINST
PETITIONER AFTER HIS FILING OF 42 U.S.C.
§ 1983 AGAINST EMPLOYEES OF THE   NEW
YORK CITY DEPARTMENT OF CORRECTION.U.S.
CONST.,AMENDS. 5 , 6 , 8 & 14.

The petitioner of this action was tried and convicted by a jury for two counts of Arson in the Second Degree and one count of Arson in the Second Degree,however,after the obtainment of petitioner's unconstitutional indictment of three counts of arson in the Second Degree,he received a verdict of Arson in the  Third Degree;a lesser included offense.

Having set an innumerable amount of fires for the deprivation of his visits,food,showers,recreation,and access to the courts,the petitioner knew,from his previous setting of fires,that he could not damage the structure of the cell he occupied by the setting of still fires.Although completely wrong in his actions,the petitioner had no avenue of recourse to pursue,as various behavioral antics by him were ignored.

Defendant's lighting fires in apartment he lived in with  his wife and children while he was severely intoxicated made out elements of first-degree reckless endangerment,even though defendant claimed he was chronic alcoholic.Mckinney's Penal Law § 120.25.<u>People   v.</u>

<u>Tocco,525 N.Y.S.2d 137.</u>

Evidence that defendant set five fires in apartment building which he knew to be inhabited,after threatening neighbors that he was going to do so,was sufficient to support conviction for reckless endangerment in the first-degree,although no individual suffered actual harm.<u>People v. Anderson,629 N.Y.S.2d 223(N.Y.A.D. 1 Dept.1995).-Criminal Procedure Law § 470.15,subd.5.</u>

Conviction of arson in the fourth-degree was sufficiently supported by evidence that fire,which started by putting match to combustible liquid poured on mattress,burned clothing,caused damage to the ceiling and walls,heat damage to light fixture,and charring to bed mattress and bed frame.<u>Mckinney's Penal Law § 150.05,subd.   1. People v. Fleming,560 N.Y.S.2d 50.</u>

Defendant may be found guilty of arson,fourth-degree,for causing damage to building from fire that was intentionally set . Even if jury believed defendant lit fire on purpose,it could have acquitted him of second-degree arson if it was unconvinced beyond rasonable doubt that he intended any damage to structure.<u>Mckinney's Penal Law § 150.05.People v. Wroblewski,489 N.Y.S.2d 797.</u>

P O I N T   V

THE DEPRIVATION OF PETITIONER'S CLOTHING,
DENIED HIM THE GARB AND PRESUMPTION    OF
INNOCENCE,WHEN HE WAS FORCED TO    APPEAR
BEFORE THE JURY WEARING PRISON CLOTHES.
U.S. CONST.,AMENDS. 5 , 6 , 8 , & 14.

During the prosecution of petitioner's case,he was banned/barred from being held and confined at Rikers Island,due to the  filing of numerous 42 U.S.C. § 1983's against employees of the New York City Department of Correction,and because of his incorrigible  behavior when he was continuously denied the bare necessities of life.

Due to such banning/barring of petitioner from Rikers Island,he was incapable of donning suits,dress shirts and socks,ties and shoes to appear with dignity before the court and jury.

Inmate's clothing is basic necessity of human existence  which cannot be deprived in same manner as privilege an inmate may enjoy. Maxwell v. Mason,668 F.2d 361.

Presumption of innocence requires garb of innocence,and regard-less of ultimate outcome,or of awaiting evidence presentation,every accused is entitled to be brought before court with appearance,dignity and self-respect of a free and innocent man.Kennedy v. Cardwell,487 F.2d 101.

Compelling a defendant to appear before jury in his  prison clothes unconstitutionally infringes his due process right to  be presumed innocent until proven guilty.Gaito v. Brierley,485 F.2d 86. It is inherently unfair to try a defendant for a crime while garbed in his jail uniform,especially when his civilian clothing  is  at hand;no insinuations,indications or implications suggesting  guilt

should be displayed before the jury,other than admissible evidence and permissible argument.<u>Brooks v. State of Tex.,381 F.2d 619.</u>

Lastly,petitioner was not only deprived of the garb of innocence but was incapable of combing his hair during the course of his trial.

<u>C O N C L U S I O N</u>

**WHEREFORE,** FOR THE FOREGOING REASONS, PRIOR BRIEFS, EXHIBITS AND OTHER PERTINENT DOCUMENTS SUBMITTED BY THE PETITIONER, THE  INDICT- MENTS AND CASES MUST BE DISMISSED AND THE PEOPLE BARRED FROM   RE- PRESENTATION, FOR THE CRUEL AND UNUSUAL PUNISHMENT WANTONLY INFLICT- ED UPON THE PETITIONER, THE UNCONSTITUTIONALITY OF THE OBTAINMENT OF PETITIONER'S CONVICTION, AND THE FAILURE OF THE ATTORNEY GENERAL TO RESPOND TO THE PETITION IN THE TIME ORDERED BY THE COURT FOR   THE ATTORNEY GENERAL TO RESPOND.

Respectfully Submitted,

*Echo Westley Dixon*

Echo       Westley      Dixon #00A6365
Petitioner  Pro  Se
Auburn Correctional  Facility
P.O.   Box   618
Auburn, New York   13024

October 28,2006
County of Cayuga

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, EXCEPT THOSE MATTERS STATED  UPON INFORMATION AND BELIEF, AND TO THOSE MATTERS I BELIEVE TO BE TRUE.   28 U.S.C. § 1746.

*Echo W. Dixon*

ORIGINAL COPY

To be argued by

Echo Westley Dixon

# U N I T E D  S T A T E S  D I S T R I C T  C O U R T

# S O U T H E R N  D I S T R I C T  O F  N E W  Y O R K

E C H O  W E S T L E Y  D I X O N ,
P e t i t i o n e r ,

- a g a i n s t -

S U P E R I N T E N D E N T ,

M I C H A E L  P.  M C G I N N I S ,
R e s p o n d e n t .

# R E P L Y / A D D E N D U M  F O R  T H E  P E T I T I O N E R

Echo  W.  Dixon #00A6365
Auburn Correctional Facility
P.O.  Box  618
Auburn,New York    13024

Echo Westley Dixon
Of Counsel

TABLE   OF   AUTHORITIES

FEDERAL   CASES                                     PAGE

Ayala v. Leonardo, 20 F.3d 83------------------------------------22, 25

Bagby v. Kuhlman, 742 F.Supp. 137--------------------------------24

Bruanskill v. Hilton, 629 F.Supp. 511---------------------------26, 27

Brooks v. State of Tex., 381 F.2d 619---------------------------28, 29

Cartalino v. Washington, 122 F.3d 8------------------------------7

Cotto v. Herbert, 331 F.3d 217---------------------------------25, 26

Daily v. New York, 388 F.Supp.2d 238-----------------------------24

Dobbin v. Greiner, 249 F.Supp.2d 241-----------------------------25

Faretta v. California, 422 U.S. 806------------------------------26

Gaiter v. Lord, 917 F.Supp. 145--------------------------------22, 23

Gaito v. Brierley, 485 F.2d 86----------------------------------28

Grant v. Demskie, 75 F.Supp.2d 201-------------------------------24

Henry v. Speckard, 22 F.3d 1209----------------------------------22

Kennedy v. Cardwell, 487 F.2d 101--------------------------------28

Lawrence v. Henderson, 334 F.Supp. 1287--------------------------27

Maxwell v. Mason, 668 F.2d 361-----------------------------------28

Overton v. Newton, 146 F.Supp.2d 267-----------------------------22

Ryan v. Miller, 303 F.2d 231------------------------------21, 22, 24

Salemme v. Ristaino, 587 F.2d 81---------------------------------27

Singleton v. Lefkowitz, 583 F.2d 618---------------------------24, 25

Tafoya v. Tansy, 9 Fed.Appx. 862---------------------------------12

Taus v. Senkowski, 283 F.Supp.2d 238---------------------------11, 12

Truman v. Wainwright, 514 F.2d 150-------------------------------26

U.S. v. Ali-Balogun, 72 F.3d 9-----------------------------------17

U.S. v. Benefield, 889 F.2d 1061---------------------------------9

U.S. v. Biaggi, 705 F.Supp. 848---------------------------------16, 17

U.S. v. Blood, 435 F.3d 612--------------------------------------9

U.S. v. Brooks, 145 F.3d 446------------------------------------10

U.S. v. Castner, 50 F.3d 1267------------------------------------11

U.S. v. Chan, 184 F.Supp.2d 337----------------------------------22

U.S. v. Delano, 55 F.3d 720--------------------------------------22

U.S. v. Edwards, 342 F.3d 168------------------------------------18

U.S. ex rel. Eccleston v. Henderson, 534 F.Supp. 813--------------9, 10

T A B L E   O F   C O N T E N T S

PAGE

PRELIMINARY STATEMENT------------------------------------------------------1

QUESTIONS PRESENTED--------------------------------------------------------4

STATEMENT OF FACTS---------------------------------------------------------2

Introduction---------------------------------------------------------------2

The Court's Sandoval Ruling------------------------------------------------2

State's Evidence-----------------------------------------------------------2

Defense's Case-----------------------------------------------------------2, 3

Summations-----------------------------------------------------------------3

Charge, Verdict and Sentence-----------------------------------------------3

ARGUMENT-----------------------------------------------------------------

JUDGE'S INTERJECTIONS, ADOPTING ROLE OF PROSECUTOR, DURING PROSECUTOR'S DIRECT-EXAMINATION, AND DEFENSE COUNSEL'S CROSS-EXAMINATION OF THE COMPLAINING WITNESS AND OTHER WITNESSES, WAS VIOLATIVE OF THE PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JUDGE. U.S. CONST. AMENDS. 5, 6, 14.

COURT'S SANDOVAL RULING, PERMITTING THE PROSECUTOR TO QUERY PETITIONER ABOUT A DRUG RELATED CRIMINAL OFFENSE THAT WAS IRRELEVANT TO THE INSTANT CASE OF ROBBERY IN THE SECOND DEGREE, INTRODUCTION OF OTHER PRIOR CRIMINAL OFFENSES AND THEIR UNDERLYING FACTS THAT WERE SIMILAR TO THE INSTANT ROBBERY, WHERE THEIR PROBATIVE VALUE FAR OUTWEIGHED THE DANGERS OF CREATING UNFAIR PREJUDICE, AND MADE THE PROSECUTOR'S INQUIRY INTO THE PRIOR CRIMINAL OFFENSES AND THEIR UNDERLYING FACTS UNDULY LONG, WAS VIOLATIVE OF THE PETITIONER'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY. U.S. CONST. AMENDS. 5, 6, 14.

Table of Authorities

Federal Cases (continued)                                              PAGE

U.S. v. Gallego, 191 F.3d 156----------------------------------------------26

U.S. v. Gill, 90 F.2d 274----------------------------------------------------11

U.S. v. Goodwin, 625 F.2d 693----------------------------------------------27

U.S. v. Lalvie, 184 F.3d 180--------------------------------------------23, 24

U.S. v. Logan, 419 F.3d 172--------------------------------------------------24

U.S. v. Logan, 875 F.2d 1025-------------------------------------------------8

U.S. v. Matt, 116 F.3d 971---------------------------------------------------10

U.S. v. Nixon, 418 U.S. 683--------------------------------------------------27

U.S. v. Ortiz, 875 F.2d 900--------------------------------------------------17

U.S. v. Ozsusamlar, 428 F.Supp.2d 161--------------------------------------18

U.S. v. Paredes, 176 F.Supp.2d 195-------------------------------------------7

U.S. v. Parker, 241 F.3d 114--------------------------------------------------8

U.S. v. Pascarella, 84 F.3d 556----------------------------------------------17

U.S. v. Peterson, 808 F.2d 969-----------------------------------------------16

U.S. v. Pipola, 83 F.3d 556---------------------------------------------------17

U.S. v. Pisani, 773 F.2d 397--------------------------------------------------7

U.S. Quattrone, 441 F.3d 153-------------------------------------------------10

U.S. v. Rainone, 32 F.3d 1203------------------------------------------------23

U.S. v. Robinson, 635 F.2d 981----------------------------------------------8, 9

U.S. v. Ruffin, 117 Fed.Appx. 271-------------------------------------------11

U.S. v. Sanchez, 325 F.3d 600------------------------------------------------11

U.S. v. Santiago, 199 F.Supp.2d 101---------------------------------------17, 18

U.S. v. Sasson, 62 F.3d 874--------------------------------------------------23

U.S. v. Seeger, 180 F.Supp. 467----------------------------------------------25

U.S. v. Tilghman, 134 F.3d 414------------------------------------------------9

U.S. v. Villarini, 238 F.3d %30-----------------------------------------------11

U.S. v. Wallach, 935 F.2d 445------------------------------------------------17

U.S. v. Weaver, 282 F.3d 302-------------------------------------------------10

Washington v. State of Tex., 388 U.S. 14------------------------------------26

Argument (continued)

    COURT'S DENIAL OF THE PETITIONER"S FEDERAL CONSTITUTIONAL
    RIGHT TO THE COMPULSORY PROCESS,  WHEN THE PETITIONER HAD
    INVOKED TO EXERCISE SAID RIGHT BY HAVING HIS CO-DEFENDANT
    SUBPOENAED TO TESTIFY AT HIS TRIAL, AND WHERE THE COURT
    HAD NOT INFORMED THE PETITIONER OF HIS COMPULSIONARY RIGHT,
    VIOLATED THE PETITIONER'S RIGHT  TO  CALL A WITNESS IN HIS
    BEHALF.  U.S.  CONST.  AMENDS.  5, 6, 14.

    THE  DEPRIVATION  OF  PETITIONER'S CLOTHING  DENIED   HIM
    OF  THE  GARB  AND  PRESUMPTION  OF  INNOCENCE,  WHEN  HE
    WAS  FORCED  TO  APPEAR  BEFORE  THE  JURY  WEARING PRISON
    CLOTHES.  U.S.  CONST.  AMENDS.  5, 6, 14.

CONCLUSION-------------------------------------------------------------30

<u>TABLE   OF   AUTHORITIES</u>

<u>STATE   CASES</u>                                    <u>PAGE</u>

Fappiano v. New York City Police Department, 724 N.Y.S.2d 782---------------23

People v. Arnold, 745 N.Y.S.2d 782----------------------------------------7, 8

People v. Brown, 632 N.Y.S.2d 938--------------------------------------------23

People v. Egan, 78 A.D.2d 34-------------------------------------------------23

People v. Hunte, 637 N.Y.S.2d 996------------------------------------------23

People v. Melendez, 227 A.D.2d 646--------------------------------------------8

People v. Rufrano, 220 A.D.2d 701--------------------------------------------23

People v. Vazquez, 686 N.Y.S.2d 624------------------------------------------23

Sardino v. State Com'n  on  Judicial Conduct, 461 N.Y.S.2d 229-------------13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Echo Westley Dixon, Petitioner

      -against-

Superintendent
Michael P. McGinnis, Respondent.

## P R E L I M I N A R Y   S T A T E M E N T

This is a petition from a judgement of the Supreme/Superior Court, Bronx County, New York, rendered on or about February 2, 2003, convicting petitioner, after a jury trial, of one count of Robbery in the Second Degree (Arlene Silverman, J. at trial and sentence).   Timely notice of appeal was filed and thereafter court granted petitioner leave to appeal as a poor person on the original record and typewritten brief and assigned Andrew C. Fine succeeded by Laura R. Johnson, as counsel on appeal. Petitioner was indicted with one co-defendant, Christopher Seldon; however, petitioner is the sole petitioner of this petition, and is currently incarcerated pursuant to this judgment.

## S T A T E M E N T   O F   F A C T S

### I n t r o d u c t i o n

Petitioner realleges and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus Brief/Petition and appellate counsel's appeal brief (Introduction), as if fully restated herein.

### T h e   C o u r t ' s   S a n d o v a l   R u l i n g

Petitioner realleges and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus Brief/Petition and appellate counsel's appeal brief (The Court's Sandoval Ruling), as if fully restated herein.

### S t a t e ' s   E v i d e n c e

Petitioner realleges and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus Brief/Petition and appellate counsel's appeal brief (State's Evidence), as if fully restated herein.

### D e f e n s e ' s   C a s e

Petitioner realleges and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus Brief/ petition and

Statement of Facts
Continued.

appellate counsel's appeal brief (Defense' Case), as if fully
restated herein.

S u m m a t i o n s

Petitioner realleges and incorporates by reference, for
brevity petitioner's Writ of Habeas Corpus Brief/Petition and
appellate counsel's appeal brief (Summations), as if fully
restated herein.

C h a r g e ,   V e r d i c t   a n d   S e n t e n c e

Petitioner realleges and incorporates by reference, for
brevity, petitioner's Writ of Habeas Corpus Brief/Petition and
appellate counsel's appeal brief (Charge, Verdict and Sentence),as
if fully restated herein.

QUESTIONS PRESENTED

I) Whether, judge's interjections, adopting role of prosecutor, during prosecutor's direct-examination, and defense counsel's cross-examination of the complaining witness and other witnesses, was violative of the petitioner's federal constitutional right to a fair trial by an impartial judge. U.S. CONST. AMENDS. 5, 6, 14.

II) Whether, court's Sandoval ruling, permitting the prosecutor to query petitioner about a drug related criminal offense that was irrelevant to the instant case of Robbery in the Second Degree, introduction of other prior criminal offenses and their underlying facts that were similar to the instant robbery, where their probative value far outweighed the dangers of creating unfair prejudice, and made the prosecutor's inquiry into the prior criminal offenses and their underlying facts unduly long, was violative of the petitioner's constitutional right to a fair verdict by an impartial jury. U.S. CONST. AMENDS. 5, 6, 14.

III) Whether, court's denial of the petitioner's federal constitutional right to the compulsory process, when the petitioner had invoked to exercise said right by having his co-defendant supoenaed to testify at his trial, and where the court had not informed the petitioner of his compulsionary right, violated the petitioner's right to call a witness in his behalf. U.S. CONST. AMENDS. 5, 6, 14.

IV) Whether, the deprivation of petitioner's clothing denied him the garb and presumption of innocence, when he was forced to appear before the jury wearing prison clothes. U.S. CONST. AMENDS. 5, 6, 14.

4

POINT   I



JUDGE'S INTERJECTIONS, ADOPTING ROLE OF PROSECUTOR,
DURING PROSECUTOR'S DIRECT-EXAMINATION, AND DEFENSE
COUNSEL'S CROSS-EXAMINATION OF THE COMPLAINING
WITNESS AND OTHER WITNESSES, WAS VIOLATIVE OF THE
PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO A FAIR
TRIAL BY AN IMPARTIAL JUDGE. U.S. CONST. AMENDS.
5, 6, 14.


Throughout the petitioner's entire trial the court; repeatedly
interjected, adopted the role of the prosecutor, interrupted the
petitioner's counsel during counsel's cross-examination of the
complaining witness and other witnesses, when defense  counsel
began to build a defense, to pose queries structured to glean  from
the complainant testimony that had been previously elicited during
the court's inappropriate conduction of direct-examination, which
was unrelated to the clarification of confusing testimony, evidence,
ambiguities, or correction of misstatements that had arose during
petitioner's trial, and violated petitioner's federal constitutional
right to a fair trial by an impartial judge.

During the course of a two day trial, when the prosecutor had
begun to conduct the direct-examination of the complaining witness,
the judge interjected and posed one-hundred and six (106) queries
to the complainant. None of which were relative to the Clarification
of confusing testimony, evidence, or ambiguities that had  arose
during petitioner's trial.

After the court inappropriately conducted direct-examination of the complaining witness and petitioner's counsel commenced to conduct cross-examination of said witness, the court interrupted petitioner's counsel while in the midst of counsel developing and presenting a defense to pose a queue of seventy-five (75) queries to the complainant; all of which were structured, formulated and posed by the court for the purpose of eliciting identical testimony from the complainant the court had adduced during its unconstitutional conduction of direct-examination of the complaining witness.

However, when the petitioner testified, the court, disregarding the tremendous influential role and respect judges play, attract, possess, and command during trial, when called on by petitioner's attorney who sought the court's attention and assistance determining an approximation of distance from the judge's bench to where the petitioner sat, responded "I was reading something. What happened ?" ( **Trial Transcripts, page 113, lines 13, 14.** )

This inattention by the court after playing such an active role throughout the petitioner's trial, moreover, the vocalization of the court's inattention before the jury, at only a juncture when the petitioner testified, clearly subliminally evinced to the jury the judge's disbelief in the petitioner's testimony.

Moreso, even during the prosecutor's and defense attorney's examination of police officers Robertson and Burke, the court had interrupted both, the petitioner's attorney and the prosecutor, to pose twenty-seven (27) inquiries to police officer Robertson, and twenty-

three (23) queries to police officer Burke.

In only a two-day course of trial the court repeatedly interjected and interferred with the petitioner's attorney's efforts to build a defense and examine witnesses. In only a short span of two days of trial had by the petitioner, the court posed a whopping two-hundred and thirty-one (231) questions; one-hundred and eighty-one (181) of which were posed to the complainant during the very first day of petitioner's trial. With no questions posed by the court for the purpose of clarifying confusing testimony, evidence, or ambiguities that arose during petitioner's trial, nor for purposes of the court's need to make a ruling on matters imperative to the petitioner's trial.

Criminal defendant has federal constitutional right to be tried before impartial judge.

Trial judges are given discretion to manage trial so that evidence is effectively presented, and a trial judge may actively participate and give its own impressions of evidence or question witnesses, as an aid to the jury, so long as it does not step across the line and become advocate for one side.  Cartalino v. Washington, 122 F.3d 8.

Trial judge must be ever conscious of the special attention and respect he commands from the jury and must exercise caution to maintain appearance of impartiality.  U.S. v. Paredes, 176 F.Supp.2d 195 (S.D.N.Y. 2001); see, also, U.S. v. Pisani, 773 F.2d 397.

The overarching principle restraining the court's discretion in assuming active role in truth-seeking process is that it is the

function of the judge to protect the record at trial, not make it.

A court may not assume the advocacy role traditionally reserved for counsel, and in order to avoid this, the court's discretion to intervene must be exercised sparingly. <u>People v. Arnold, 745 N.Y.S. 2d 782.</u>

Record established that defendant was denied a fair trial as a result of manner in which trial court presided over trial; court repeatedly interrupted prosecutor and made numerous unwarranted inquiries of witnesses, and asked questions that clearly evinced court's assessment of witness' credibility. <u>People v. Melendez, 227 A.D.2d 646.</u>

Judge must be disinterested and objective participant in the proceedings and must not create appearance of partiality by supporting one of the parties, nor may judge undermine effective functioning of counsel by repeated interruption of the examination of witnesses. <u>U.S. v. Logan, 998 F.2d 1025.</u> A trial judge's participation oversteps the bounds of propriety and deprives the parties of a fair trial only when the record discloses actual bias or leaves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality. <u>U.S. v. Parker, 241 F.3d 114.</u>

While district judge is more than a moderater or umpire and has active responsibility to see that criminal trial is fairly conducted, his participation during trial, whether it takes form

of interrogating witnesses, addressing counsel, or some other conduct, must never reach point at which it appears clear to jury that court believes the accused guilty. U.S.  v.  Robinson, 635 F.2d 981.

Because juries, not judges, decide whether witnesses are telling the truth, and because judges wield enormous influence over juries, judges may not ask questions that signal their belief or disbelief of witnesses. U.S.  v.  Tilghman, 134 F.3d 414.  While court can interrogate witnesses to clarify testimony and ensure that case is tried fairly, judge may not repeatedly interject himself  into proceedings when attorneys are conducting case in competent manner. U.S.  v.  Benefield, 889 F.2d 1061.

Judicial misconduct is found where judge's remarks clearly indicate hostility to one party, or unwarranted prejudgment of merits of case, or alignment on part of court with one party or where judge, in exercising his discretion interrogates witnesses, abandons his proper role and assumes role of advocate. U.S.  v.  Blood, 435 F.3d 612.

Petitioner's contentions of judge's inappropriate adoption of role of advocate and prosecutor is corroborated by the trial transcripts. No curative instructions were ever proffered by the court to the jury in regard to the judge's lengthy examination of witnesses, to wit - petitioner was prejudiced by the court's conduct and was denied an impartial verdict by the jury.

Although trial judge played relatively actice role in trial, where he specifically instructed jury to disregard any impression

they may have gained that he believed or disbelieved items of evidence or that his questions were entitled to any more weight than those of attorneys, instructions sufficed to eliminate any error that may have otherwise existed and thus there was nothing in the record to indicate that any of the trial court judge's behavior was so offensive to deprive defendant of his right to fair trial. U.S. ex rel. Eccleston v. Henderson, 534 F.Supp. 813.

Where court assumes role of prosecutor and displays bias, reversal is required; judge should only ask those questions necessary to clarify ambiguities, correct misstatements, or obtain information necessary to make rulings, and, if judge actions create impression of partianship, curative instructions will generally not save the day. U.S. v. Matt, 116 F.3d 971.

District courts have a duty to avoid creating even the slightest appearance of partiality and must refrain from repeated intervention on the side of one of the parties. U.S. v. Weaver, 282 F.3d 302. Judge must not only be scrupulously fair in the administration of justice, but also foster aura of fairness. U.S. v. Brooks, 145 F.3d 446.

Trial judges are given discretion to manage trial so that evidence is effectively presented, and trial judge may actively participate and give its own impressions of evidence or question witnesses, as an aid to the jury, so long as it does not step across the line and become advocate for one side. U.S. v. Quattrone, 441 F.3d 153.

A district court may question witnesses to bring out needed facts or clarify the presentation of issues; however, the court should not give the appearance of partiality, nor impose its views on jury, and should not undermine the legitimate efforts of any of the parties to present their case. U.S. v. Ruffin, 117 Fed.Appx. 271; see, also, U.S. v. Villarini, 238 F.3d 530. District court must not create appearance of partiality by continued intervention on side of one of the parties or undermine effective functioning of counsel through repeated interruption of the examination of witnesses. U.S. v. Castner, 50 F.3d 1267. Critical inquiry in regard to defendant's challenge to trial judge's questioning of government witnesses is whether by its conduct trial judge conveyed to jury bias or belief regarding defendant's guilt. U.S. v. Gill, 90 F.2d 274.

Although trial court may question witnesses and elicit facts not yet adduced or clarify those previously presented, judge's questions must be for purpose of aiding jury in understanding testimony and may not come at cost of strict impartiality. Fed. Rules Evid. Rule 614(b); 28 U.S.C.A.; U.S. v. Sanchez, 325 F.3d 600.

The court in the instant petition overly participated during the petitioner's trial, which can be ascertained by the trial transcripts. It is obvious, from the trial transcripts, that the court favored the prosecution. Moreover, it played the role of the prosecutor and left nothing for the prosecutor to argue.

Petitioner can only pray that this Court can discern that the argument made by him is evident and a reversal is ordered.

A judge 's intervention in the conduct of a trial must both be

significant and adverse to defense to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeds constitutional limits. <u>Taus v. Senkowski, 293 F.SUpp.2d 238.</u>

To succeed on his claim of judicial bias, habeas petitioner must demonstrate either that the trial judge was actually biased against him or that circumstances were such that an appearance of bias created a conclusive presumption of actual bias. <u>Tafoya v. Tansy, 9 Fed.Appx. 862.</u>

22 NYCRR § 100.1-A Judge Shall Uphold the Integrity of the Judiciary.

Cannon 1 [1.1]  Deference to judgments and rulings of courts depends upon public confidence in the integrity and independence of judges. The integrity and independence of judges depends in turn upon their acting without fear or favor. Although judges should be independent, they must comply with the law, including the provisions of this Code. Public confidence in the impartiality of the judiciary is maintained by the adherence of each judge to this responsibility. Conversely, violation of this Code diminishes public confidence in the judiciary and thereby does injury to the system of government under law.

22 NYCRR § 100.2-A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities.

Cannon 2 § A -A Judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Cannon 2, 2.1 [2A]-Public confidence in the judiciary is eroded by

irresponsible and improper conduct by judges. A judge must avoid all impropriety and the appearance of impropriety.

Cannon 2, 2.2 [2A]–The prohibition against behaving with impropriety or the appearance of impropriety applies to both the professional and personal conduct of a judge. Because it is not practicable to list all prohibited acts, the proscription is necessarily cast in general terms that extend to conduct by judges that is harmful although not specifically mentioned in the Code. Actual improprieties under this standard include violations of law, court rule or other specific provisions of this Code. The test for appearance of impropriety is whether the conduct would create in reasonable minds a preception that the judge's ability to carry out judicial responsibilities with integrity, impartiality and competence is impaired.

22 NYCRR § 100.3

Cannon 3 [3.2] [3B(4)]–A judge must perform judicial duties impartially and fairly. A judge who manifests bias on any basis in a proceeding impairs the fairness of the proceeding and brings the judiciary in disrepute.

Equally as important as ability to be impartial is requirement that judge conduct himself in such a way that the public can perceive and continue to rely upon impartiality of those who have been chosen to pass judgment on legal matters involving their lives, liberty and property. Sardino v. State Com'n on Judicial Conduct, 461 N.Y.S.2d 229.

13



POINT II

COURT'S SANDOVAL RULING, PERMITTING THE PROSECUTOR
TO QUERY PETITIONER ABOUT A DRUG RELATED CRIMINAL
OFFENSE THAT WAS IRRELEVANT TO THE INSTANT CASE
OF ROBBERY IN THE SECOND DEGREE, INTRODUCTION OF
OTHER PRIOR CRIMINAL OFFENSES AND THEIR UNDERLYING
FACTS THAT WERE SIMILAR TO THE INSTANT ROBBERY,
WHERE THEIR PROBATIVE VALUE FAR OUTWEIGHED THE
DANGERS OF CREATING UNFAIR PREJUDICE, AND MADE THE
PROSECUTOR'S INQUIRY INTO THE PRIOR CRIMINAL
OFFENSES AND THEIR UNDERLYING FACTS UNDULY LONG,
WAS VIOLATIVE OF THE PETITIONER'S CONSTITUTIONAL
RIGHT TO A FAIR VERDICT BY AN IMPARTIAL JURY. U.S.
CONST. AMENDS. 5, 6, 14.

Prior to the court's conduction of the direct-examination of
the complaining witness, a Sandoval Hearing was held. The purpose
of said hearing was conducted to allow the court to entertain and
render a presidial ruling upon the asserted oral contentions of
the prosecutor and the petitioner's attorney for the introduction
and referential admittance, or the denial of the introduction
and referential admittance, of the petitioner's prior criminal
offenses/similar act evidence, and their underlying facts.

The prosecutor sought to move the court to permit the usage
of the petitioner's prior criminal offenses/similar act evidence,
and their underlying facts before the jury, in the event that the
petitioner decided to testify at trial. However, the petitioner's
attorney, oppositional to the prosecutor's contentions, requested
the nisi prius to deny the introduction and referential admittance

of the petitioner's prior criminal offenses/similar act evidence, and their underlying facts before the jury, in the event that the petitioner opted to testify at trial.

The petitioner's attorney went further to stress to the nisi prius the prejudicial affect such introduction and referential admittance of said offenses/evidence would infer to the jury. The petitioner's counsel then expressed to the court that should the court permit the introduction and referential admittance of such damaging prior criminal offenses/similar act evidence, and their underlying facts before the jury, it would deprive petitioner of a constitutional, fundamentally fair verdict by an impartial jury. Also, in the event that the court rendered a ruling permitting the prosecutor to interrogate petitioner about his prior offenses, the petitioner's counsel requested the court to deny the prosecutor from delving into the underlying facts of said offenses.

After all asserted oral contentions were iterated, the court rendered a ruling permitting the prosecutor to interrogate the petitioner about his prior criminal offenses/similar act evidence, as well as their underlying facts. However, prior to the court's ruling the court iterated, as to the purpose for rendering such a ruling, that "I will allow them (the jury) to know him for who he is". It is well documented case law that the purpose for such an introduction and referential admittance of prior criminal offenses/similar act evidence, must not be admitted solely to exhibit and display a defendant's bad character, or the propensity of him or her to commit the crime charged.

15

What is more, not only did the court allow the introduction and referential admittance of the petitioner's prior criminal offenses/similar act evidence, and their underlying facts, but also allowed the introduction and referential admittance of an unsimilar criminal offense of Criminal Sale of a Controlled Substance. This introduction and referential admittance of such an unsimilar crime was violative of the Similar Act Evidence Ordinance, and warrants the automatic reversal of the conviction obtained therefrom.

Furthermore, in the matter of the prosecutor's inquiry into the underlying facts of the petitioner's prior criminal offenses; said inquiry, due to the court allowing the prosecutor to delve into the underlying facts, made the prosecutor's inquisition unduly long, and prejudiced the jury against the petitioner.

The court's decision to permit such a lengthy inquiry into the petitioner's prior criminal convictions, and their underlying facts, was extremely prejudicial and denied petitioner a fair verdict by an impartial jury. Moreover, the probative value of the similar act evidence introduced by the prosecutor and allowed by the court, destroyed the overall fairness of the trial.

Admission of similar act evidence would be abuse of discretion if other act were not sufficiently similar to conduct at issue, or if chain of inferences necessary to connect evidence with ultimate fact to be proved is unduly long. Fed. Rules Evid. 404(b), 404 note, 28 U.S.C.A. - U.S. v. Peterson, 808 F.2d 969.

Details of defendant's prior conviction for obstruction of justice could not be introduced as other crime evidence by

16

Government in Rico prosecution unless defendant put his intent in issue as to perjury charges against him. U.S. v. Biaggi, 705 F.Supp. 848 (S.D.N.Y. 1988).

"Other crimes, wrongs, or acts" evidence is admissible unless introduced for sole purpose of showing defendant's character, unless it is overly prejudicial or not relevant. U.S. v. Pascarella, 84 F.3d 556.

Evidence of other crimes is admissible if such evidence is relevant to issues such as intent and knowledge and if probative value of the evidence is not substantially outweighed by the risk of unfair prejudice. U.S. v. Ali-Balogun, 72 F.3d 9.

Appellate court's inclusionary interpretation of other crimes evidence rule allows evidence of other wrongs to be admitted so long as it is relevant and it is not offered to prove criminal propensity. U.S. v. Pipola, 83 F.3d 556.

When defendant unequivocally relies on defense that defendant did not do act charged, evidence of other acts is not admissible for purpose of proving intent. U.S. v. Ortiz, 875 F.2d 900, C.A.2 (N.Y.).

Even under the inclusionary approach to the introduction of similar act evidence, district court must be careful to consider the cumulative impact of the evidence on the jury and to avoid the potential prejudice that might flow from its admission. U.S. v. Wallach, 935 F.2d 445.

Evidence of prior acts is admissible for any purpose other than to show a defendant's criminal propensity; however, such evidence, although relevant, may be excluded if its probative

value is substantially outweighed by the danger of unfair prejudice. U.S. v. Santiago, 199 F.Supp.2d 101 (S.D.N.Y. 2002).

To determine if the trial court properly admitted other act evidence, the Court of Appeals considers whether: (1) it was offered for a proper purpose; (2) it was relevant to a disputed trial issue; (3) its probative value is substantially outweighed by its possible prejudice; and (4) the trial court administered an appropriate limiting instruction. U.S. v. Edwards, 342 F.3d 168.

Prior bad-acts evidence must be (1) offered for proper purpose, (2) relevant, (3) substantially more probative than prejudicial, and (4) at defendant's request, district court should give jury appropriate limiting instructions. U.S. v. Ozsusamlar, 428 F.Supp.2d 161 (S.D.N.Y. 2006).

P O I N T   I I I


COURT'S DENIAL OF THE PETITIONER'S FEDERAL CONSTITUTIONAL
RIGHT TO THE COMPULSORY PROCESS, WHEN THE PETITIONER HAD
INVOKED TO EXERCISE SAID RIGHT BY HAVING HIS CO-DEFENDANT
SUBPOENAED TO TESTIFY AT HIS TRIAL, AND WHERE THE COURT
HAD NOT INFORMED THE PETITIONER OF HIS COMPULSIONARY RIGHT,
VIOLATED THE PETITIONER'S RIGHT TO CALL A WITNESS IN HIS
BEHALF. U.S. CONST. AMENDS. 5, 6, 14.

Before the commencement of the petitioner's trial, and prior
to the conduction of the Sandoval Hearing, the petitioner sought
to have his co-defendant produced to testify at trial. It was the
petitioner's only request to have a witness produced and the nisi
prius denied petitioner's request upon the premise of untimeliness.

However, the court conferred with the petitioner's attorney
about the production of the petitioner's co-defendant to testify,
and, though petitioner's counsel expressed to the court that he
strategically did not wish to have the petitioner's co-defendant
produced to testify, he nonetheless objected to the non-production
of the petitioner's co-defendant at the petitioner's behest.

Nevertheless, the court denied the petitioner his federally
protected constitutional right to the compulsion of a witness in
his behalf. Interalia, the compulsionary process, once invoked, is
controlling and the court nor a petitioner's attorney, regardless
of stratagem, is capable of defeating a cognizable consciously
invoked constitutional right. Such a right is individualistic and
bears no semblance of dualism in its exercent.

The Compulsory Clause is one of the most fundamental tenets of the United States Constitution of America, and deviation from its prerequisites violates the law of the land. The petitioner contends that the court's denial of permitting him to subpoena a lone witness, nonetheless, his co-defendant, whom was a participant of the crime and who had knowledge of what occurred during the commission of the crime, was an abuse of the court's discretion.

It is incontrovertible case law what the compulsory process encompasses, and to whom it encompasses once it is invocationally activated. Having endured a previous trial upon the same criminal offense herein stated, which resulted in a mistrial, depicts that there was not a preponderance of guilt, nor evidence, to convince the jury of the petitioner having committed the offense charged.

Petitioner's co-defendant, having written a notarized letter recanting his initial written statement to police officers, should not have been occluded, by the court, from the petitioner's trial. It cannot be said that petitioner's co-defendant's testimony was not pertinent or relevant, as such testimony could have exonerated the petitioner of all charges against him, or, in the least, have created a reasonable doubt in the minds of the jurors.

The complainant in this action, who pursued and apprehended the petitioner's co-defendant at the scene of the crime, may have mistaken petitioner's actions of breaking up the fisticuff between the complainant and petitioner's co-defendant, as partaking in the crime perpetrated. Logical deductive reasoning would support that complainant's sole focus would be directed at apprehending the

assailant who had filched the complainant's currency. Which was not the petitioner.

The petitioner's co-defendant's original statement, which had implicated the petitioner as the assailant that had taken the complainant's currency, is aft to raise suspicion to this Court; inasfar as the amount of money the petitioner's co-defendant had iterated the petitioner stated he needed prior to the commission of the crime, coupled with the amount of money the complainant is said to have been filched of. Before the petitioner was apprehended his co-defendant had stated that the petitioner needed one-hundred and twenty-five dollars ($125). What is uncanny is that the exact amount of money the complainant is said to have been pilfered of is one-hundred and twenty-five dollars ($125).

Although purely speculative, it should stand forth as evident to the Court that the arresting officers conveyed to petitioner's co-defendant exactly how much currency the complainant had been robbed of, which the co-defendant incorporated in his statement against the petitioner, in order for the arresting officers to corroborate the complainant's complainant. It should be apparent as well that the arresting officers divulged the exact amount of money taken from the complainant to petitioner's co-defendant. It is petitioner's contentions that had he been allowed to subpoena his co-defendant, as is mandated by the Confrontation Clause, the occurrences of what transpired the day petitioner's co-defendant was arrested would have been revealed.

Essence of a violation of the Confrontation Clause is the

presentation of an accusation against the defendant without presenting the accuser. Ryan v. Miller, 303 F.3d 231.

Confrontation Clause of Sixth Amendment guarantees defendant in criminal prosecution right to confront witnesses against him or her. U.S. v. Delano, 55 F.3d 720. Confrontation Clause of Sixth Amendment, which applies to states through Fourteenth Amendment, guarantees defendant a right to confront witnesses against him, and this means more than being allowed to confront witness physically, for main and essential purpose of confrontation is to secure for opponent the opportunity for cross-examination. Henry v. Speckard, 22 F.3d 1209.

Fact finder's independent assessment of credibility of witness and compulsion of adverse witness to testify in presence of accused are such important means of testing accuracy that absence of proper confrontation at trial calls into question ultimate integrity of fact-finding process. Ayala v. Leonardo, 29 F.3d 83.

Restrictions on a criminal defendant's right to confront adverse witnesses and to present evidence may not be arbitrary or disproportionate to the purpose they are designed to serve. Overton v. Newton, 146 F.Supp.2d 267. Confrontation Clause's purpose is to ensure reliability of evidence against criminal defendant by subjecting it to vigorous testing. U.S. v. Chan, 184 F.Supp.2d 337. Constitutional right to be present is rooted in Sixth Amendment and due process clause; Sixth Amendment applies when defendant has been prohibited from confronting witnesses or evidence against him or her, and due process applies when defendant is not confronting witnesses or evidence. Gaiter v. Lord, 917

F.Supp. 145. A person charged with a crime, unlike a convicted person, enjoys a presumption of innocence, the right to counsel, the right to a jury trial and the right to confront one's accuser. Fappiano v. New York City Police Department, 724 N.Y.S.2d 685.

Criminal defendant has constitutional right to confront adverse witnesses. People v. Rufrano, 220 A.D.2d 701. Purpose of confrontation clause is to prohibit trial by ex parte affidavits and to advance search for truth by garanteeing reliability of evidence submitted against criminal defendant. People v. Egan, 78 A.D.2d 34. Right to confront witness which is guaranteed by Sixth Amendment implies the right to see, hear, and, in order to effectively confront witnesses, cross-examine. People v. Vazquez, 686 N.Y.S.2d 624.

Defendant's right to confront prosecution witnesses about matters critical to defense is absolute. People v. Hunte, 637 N.Y.S.2d 996. Confrontation clause seeks to ensure that witnesses against accused testify under oath at trial, where they face defendant, where they are subject to cross-examination and where jury can evaluate their demeanor. People v. Brown, 632 N.Y.S.2d 938.

To establish violation of confrontation clause, defendant is not required to show prejudice with respect to trial as the whole; rather, the focus is on individual witnesses. U.S. v. Sasson, 62 F.3d 874. Even privileges recognized by Constitution can be trumped by constitutional rights, such as right of confrontation conferred by Sixth Amendment and interpreted to include right of cross-examination. U.S. v. Rainone, 32 F.3d 1203.

What Confrontation Clause guarantees is not cross-examination

that is effective in whatever way, and to whatever extent, the defense might wish, but rather an opportunity for effective cross-examination. U.S. v. Lalvie, 184 F.3d 180.

Pursuant to the Confrontation Clause of the Sixth Amendment, a defendant has a right to cross-examine the witnesses against him to expose any possible biases or motives for testifying falsely. Daily v. New York, 388 F.Supp.2d 238. (S.D.N.Y. 2005). Right of an accused to cross-examination is more than a desirable rule of trial procedure, but is an essential and fundamental requirement for the kind of fair trial which is the country's constitutional goal. Grant v. Demskie, 75 F.Supp.2d 201. (S.D.N.Y. 1999). Under confrontation clause, a defendant is guaranteed opportunity to demonstrate a lack of credibility, reliability or truthfulness of the testimony against him. Bagby v. Kuhlman, 742 F.Supp. 137.

The Sixth Amendment guarantees a defendant the right to be confronted by witnesses against him, and testimonial statements may be introduced by a third-party witness only when the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant regarding the statement. U.S. v. Logan, 419 F.3d 172. Although all assertions that violate the Confrontation Clause will also be a form of hearsay; not all assertions that hearsay rules prohibit will run afoul of the Confrontation Clause; Confrontation Clause targets only that testimony that contains accusations against the defendant. Ryan v. Miller (Supra).

Guarantee of compulsory process encompasses right to compel appearance of witnesses favorable to one's defense. Singleton v.

Lefkowitz, 583 F.2d 618.  Under this amendment, defendant accused of crime is guaranteed right to compel attendance of witnesses, and who those witnesses shall be is a matter for defendant and his counsel to decide and it does not rest with prosecution or person under subpoena.  U.S. v. Seeger, 180 F.Supp. 467.

Constitutionally prescribed preference for direct confrontation, personal examination, and cross-examination can be discarded only where reliability of testimony is otherwise assured, but first, prosecution must demonstrate unavailability of adverse witness. Ayala v. Leonardo, (Supra).  In determining whether a limitation on right to present witnesses rises to the level of a constitutional violation, the test is whether the omitted evidence, evaluated in the context of the entire record, creates a reasonable doubt that did not otherwise exist; in a close case, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.  Dobbin v. Greiner, 249 F.Supp.2d 241,  s t a y granted 2003 WL 222 32852. (S.D.N.Y. 2002).  Right to cross-examine witness under confrontation clause includes opportunity to expose witness's biases and possible motives to lie.  Exposing witness' motivation for testifying is proper and important function of right of cross-examination protected by confrontation clause.  In addition to demonstrating bias, defendant is entitled under confrontation clause to use cross-examination to impeach witness's recollection, ability to observe, and general credibility.

Confrontation Clause is violated when defendant is prohibited from engaging in otherwise appropriate cross-examination designed to expose to jury facts from which jurors could appropriately draw

inferences relating to reliability of witness. <u>Cotto v. Herbert,</u>
<u>331 F.3d 217.</u>

Right to confrontation, which ordinarily assures defendants
an opportunity to cross-examine witnesses against them, is not
unqualified; in particular; when a declarant is unavailable to
testify at trial, his or her hearsay statement is sufficiently
dependable to allow its untested admission against an accused when
(1) it contains particularized guarantees of trustworthiness such
that adversarial testing would be expected to add little, if
anything, to statements reliability. <u>U.S. v. Gallego, 191 F.3d 156.</u>
The right to call witnesses in one's own defense is essential to
due process. <u>Truman v. Wainwright, 514 F.2d 150.</u> Right to offer
testimony of witnesses, and to compel their attendance, if necessary,
is in plain terms the right to present a defense, and a fundamental
element of due process of law. <u>Washington v. State of Tex., 388</u>
<u>U.S. 14.</u> Right to notice, confrontation and compulsory process,
taken together, guarantee that criminal charge may be answered
in manner now considered fundamental to fair administration of
American justice, through calling and interrogating of favorable
witnesses, cross-examination of adverse witnesses, and orderly
introduction of evidence, in short this amendment constitutionalizes
right in an adversary criminal trial to make defense as we know
it. <u>Faretta v. California, 422 U.S. 806.</u>

Habeas Corpus petitioner fairly presented to state courts
that his conviction was obtained by depriving him of his Sixth
Amendment right to present witnesses in his defense and cited

federal precedent to support his arguments, not withstanding claim that petitioner stated only mere facts or grounds framed primarily in state procedural law and state case law.  Braunskill v. Hilton, 629 F.Supp. 511.  It is manifest duty of courts to vindicate guarantees of confrontation, compulsory process, and due process clause, and to accomplish that it is essential that all relevant and admissible evidence be produced.  U.S. v. Nixon, 418 U.S. 683.

The right to produce witnesses, by compulsory process, if necessary, is a constitutional guarantee.  Salemme v. Ristaino, 587 F.2d 81.  An accused right to subpoena witness is guaranteed by this amendment is a fundamental element of due process. U.S. v. Goodwin, 625 F.2d 693.

Right to compulsory process is fundamental and essential to a fair trial and is a necessary correlative of due process. Lawrence v. Henderson, 344 F.Supp. 1287.



POINT IV

THE DEPRIVATION OF PETITIONER'S CLOTHING DENIED HIM
OF THE GARB AND PRESUMPTION OF INNOCENCE, WHEN HE
WAS FORCED TO APPEAR BEFORE THE JURY WEARING PRISON
CLOTHES. U.S. CONST. AMENDS. 5, 6, 14.

During the prosecution of petitioner's case he was banned or
rather barred from being held and confined at Rikers Island.  Due
to such banning and barring petitioner was incapable of wearing
suits, dress shirts and socks, ties and shoes to appear with dig-
nity before the jury and the Court, as well as unable to groom
himself and look presentable.

Inmate's clothing is basic necessity of human existence which
cannot be deprived in same manner as privilege an inmate may enjoy.
Maxwell v. Mason, 668 F.2d 361.

Presumption of innocence requires garb of innocence, and
regardless of ultimate outcome, or of evidence awaiting presenta-
tion, every accused is entitled to be brought before court with
appearance, dignity and self-respect of a free and innocent man.
Kennedy v. Cardwell, 487 F.2d 101.

Compelling a defendant to appear before jury in his prison
clothes unconstitutionally infringes his due process right to be
presumed innocent until proven guilty.  Gaito v. Brierley, 485 F.2d
86.  It is inherently unfair to try a defendant for a crime while
garbed in his jail uniform, especially when his civilian clothing
is at hand; no insinuations, indications or implications suggesting

guilt should be displayed before the jury, other than admissible evidence and permissible argument.   Brooks v. State of Tex.,   381 F.2d 619.

C O N C L U S I O N

**WHEREFORE,** FOR THE FOREGOING REASONS, PRIOR BRIEFS, EXHIBITS AND PERTINENT DOCUMENTS SUBMITTED BY THE PETITIONER, THE CONVICTION MUST BE DISMISSED AND THE PEOPLE BARRED FROM REPRESENTATION, AS THE OBTAINMENT OF THE CONVICTION IS UNCONSTITUTIONAL AND THE COURT IS BOUND BY THE EDICTS OF THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS.

Respectfully,

*Echo Westley Dixon*

Echo   Westley   Dixon #00A6365
Auburn   Correctional   Facility
P.O.   Box   618
Auburn, New York   13024

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, EXCEPT  TO  THOSE MATTERS STATED UPON INFORMATION AND BELIEF, AND TO THSOE MATTERS I BELIEVE THEM TO BE TRUE.   28 U.S.C. § 1746.

*Echo Westley Dixon*

30

R E P L Y / A D D E N D U M


E X H I B I T   A

1  jury).

2            THE COURT:  I understand we'll reserve motions

3  until the end of the case.

4            One second.

5            (Whereupon, there was a bench conference among

6  all counsel with the court out of the presence of the

7  jury).

8            THE COURT:  Let me just take a short break.

9  Then we'll see where we go.  The People have rested.

10 That's all the evidence you're going to hear from the

11 district attorney.  That's the People's direct case.

12 We'll see if the defense wants to introduce any evidence.

13 We'll take that.  I'm hoping by lunchtime the case will be

14 in your hands.  Don't discuss the case, though.  It hasn't

15 been given to you yet.

16            COURT OFFICER:  Right this way, ladies and

17 gentlemen.

18            (Whereupon, the jury left the courtroom).

19            THE COURT:  I understand we've just had a bench

20 conference about a paycheck your client received or

21 something.

22            MR. BOWMASTER:  Yes, your Honor.  I wanted to

23 introduce the evidence from the first trial.

24            THE COURT:  What is it?

25            MR. BOWMASTER:  The evidence is my client's

*Colloquy*                                              Page 93

1    paycheck for the week of June 24th through June 30th.   He

2    was downtown on the day in question on July 7.   He had

3    cashed his paycheck at G & G Service Corp at 440 West 41st

4    Street.

5              THE COURT:   What time?

6              MR. BOWMASTER:   Judge, he picked up his paycheck

7    -- I have to go into the exact time.   He picked up his

8    paycheck about 8 o'clock.   He cashed his paycheck about

9    fifteen minutes later at a nearby liquor store.

10              THE COURT:   What time was this crime?

11              MR. VENGRIN:   The crime took place at 9 o'clock.

12              THE COURT:   34th Street.

13              MR. BOWMASTER:   Right.   The liquor store, which

14    is near 34th Street, he will testify opened up at 9

15    o'clock.   And he cashed his paycheck.   Then went directly

16    back to the station.

17              THE COURT:   He can testify to that.   Insofar he

18    wants to say he was in the liquor store, you have to bring

19    somebody from the liquor store.   I'm not going to take a

20    paycheck for that.

21              MR. BOWMASTER:   Just for the record, paychecks

22    are non-hearsay.   They do have independent legal

23    significance.   He can testify as to what they are.   They

24    are admissible over my objection.

25              THE COURT:   What is the relevance?

*Clarence Ballard, Jr.*

1           MR. BOWMASTER:  Judge, it corroborates, number

2    one, that he was working.  Number two, why he was down in

3    the area, which is that he picked up his paycheck.  Number

4    three, the date on the paycheck and the pay stub are July

5    7, 2000, which is the date of his arrest.

6           THE COURT:  He can testify to that.  To me these

7    are hearsay documents.  I don't see what exception they

8    come in under.

9           MR. BOWMASTER:  The check is not hearsay.

10   Independent significance.

11          THE COURT:  I'm not sure that's true.  You're

12   trying to say he was cashing his check, he got this check.

13   You're trying to introduce it where he was, why he was

14   there.  Are you objecting to this?

15          MR. VENGRIN:  Absolutely, judge.

16          MR. BOWMASTER:  The payor, the payee on the

17   check are not hearsay.  If there was a memo or something

18   on the check saying this check was for X, Y, that would be

19   hearsay.  The payor or payee is not.

20          MR. VENGRIN:  The People have no dispute that

21   the defendant was working.  Whether or not the defendant

22   was working is of minimal relevance to this trial, if any

23   at all, your Honor.  He can certainly testify that he was

24   working.  This check may corroborate the fact that he was

25   working.  But it --  there is nothing on the face of this

1    check or the reverse of this check that corroborates that

2    the defendant was in the liquor store on that day --

3                MR. BOWMASTER:  That's not what --

4                MR. VENGRIN:  At the time of the incident.

5                THE COURT:  Go ahead.

6                MR. BOWMASTER:  I'm not using it to corroborate

7    an alibi or where he was at the time of the incident,

8    judge.  That is not the claim here.  But it -- his

9    credibility is totally at issue here.  And I'm using

10   something to shore up, corroborate his credibility,

11   corroborate his testimony, something to counteract the

12   convictions, et cetera, that are going to come in.

13          This shows that he was working at the time of

14   the incident, that he was working -- that G & G Service

15   Corp, which is nearby.  That's why he was down in

16   Manhattan at that time.

17          He lives in the Bronx.  It corroborates the fact

18   that he picked up his check on July 7 because the check

19   was in fact dated July 7.  That --  I'm talking about the

20   pay stub as well as the check.  Pay stub actually

21   corroborates the time he worked.  It corroborates that his

22   check was cashed, which goes according to his testimony.

23   And the original of this check is actually in the

24   possession of the D A's office.  This copy is from ADA

25   Brennan, who originally had the case.


                    *Clarence Ballard, Jr.*

*Colloquy*                                          Page 96

1           THE COURT:  It is not a question whether the

2    check is or is not a check.  I just don't see the

3    relevance to the case.  It has nothing to do with where he

4    was at the moment the incident occurred insofar as -- as I

5    say, there's nothing about the check that's going to

6    indicate whether he was in the subway station or not.  To

7    me it's a hearsay document.

8           If you have someone from the liquor store who

9    remembers him and wants to come in and say he was in the

10   liquor store cashing his check, I'll take that testimony.

11   I'm not going to take some check that doesn't indicate any

12   time.  It seems somewhat ridiculous.  I'm not going to

13   take it.  That's my ruling.

14           MR. BOWMASTER:  Over my objection, please,

15   judge, with the exception.

16           THE COURT:  Step up a second.

17           (Bench conference among all counsel with the

18   court).

19           THE COURT:  Are you sure you want to take the

20   stand now?  You know you don't have to, Mr. Dixon?

21           THE DEFENDANT:  Yes.

22           THE COURT:  You have to understand, you just

23   have one witness testifying against you.  And.  You know,

24   the People do have the burden to prove the case beyond a

25   reasonable doubt.  And, you know, it's up to you.  I will

*Clarence Ballard, Jr.*

*Colloquy*                                      Page 97

1    instruct the jury that if you decide not to testify, no

2    inference adverse to you may be drawn.  So they can't use

3    that against you in any way.

4              You have one person who claims you are the other

5    robber.  It's up to you if you want -- you want to take

6    the stand?

7              THE DEFENDANT:  Excuse me, your Honor.  Yes, I

8    would like to take the stand.

9              THE COURT:  Fine.  If you want to take the

10   stand.  Have you discussed this with your attorney?  You

11   sure it's what you want to do?

12             THE DEFENDANT:  Yes.  There's one more thing I

13   want to point out.

14             THE COURT:  Nothing you have to point out to me.

15   If you have some reasons you want to testify, that's up to

16   you.

17             Discussed this with him?

18             MR. BOWMASTER:  Yes.

19             THE COURT:  And he wants to testify?

20             MR. BOWMASTER:  Yes, your Honor.

21             THE COURT:  You're going to call him?

22             MR. BOWMASTER:  Yes, I am, judge.

23             THE COURT:  Fine.  Get the jury.

24             Did you want to make a motion at the end of the

25   People's case?

*Clarence Ballard, Jr.*

1            MR. BOWMASTER:  Yes.  I make a motion for a

2     trial order of dismissal.  The People have failed to make

3     a prima facie case.

4            THE COURT:  You oppose the motion?

5            MR. VENGRIN:  Yes.

6            THE COURT:  It's denied.

7            COURT OFFICER:  Jury entering.

8            (Whereupon, the jury enters the courtroom).

9            THE COURT:  All right.  I understand the defense

10    has some evidence for you.

11            What is your evidence?

12            MR. BOWMASTER:  Judge, I wish to call Mr. Echo

13    Dixon to the stand.

14            THE COURT:  Mr. Dixon is going to take the

15    stand.  Mr. Dixon, you want to step up here, sir?

16            THE COURT:  Would you like a glass of water,

17    Mr. Dixon?

18            THE WITNESS:  No.

19  E C H O    D I X O N, called as a witness by and on behalf of

20  the Defense at the trial, having been first duly affirmed,

21  testified as follows:

22            THE COURT:  You may inquire.

23  DIRECT EXAMINATION

24  BY MR. BOWMASTER:

25      Q    Good morning, Mr. Dixon.

*Dixon/direct/defense*                              Page 99

1     A     Good morning.

2     Q     Mr. Dixon, how old are you?

3     A     I'm 32.

4     Q     And how old were you at the time of this incident?

5     A     I believe 29.

6     Q     And where were you living at the time of this incident?

7     A     Bronx, New York.

8     Q     And what's the last grade of formal education you

9  completed?

10    A     Tenth.

11    Q     Mr. Dixon, how you tall are you?

12    A     5/5.

13    Q     And how much do you weigh?

14    A     180 pounds.

15    Q     And how much did you weigh in July of 2000?

16    A     160.

17    Q     Mr. Dixon, I'd like to take you back to the time of the

18 incident, July 7, 2000.  Mr. Dixon, did you aid Christopher

19 Seldon in the commission of a robbery on July 7, 2000?

20    A     No.

21    Q     Did you at any time plan to aid in the commission of a

22 robbery by Mr. Seldon --

23             MR. VENGRIN:  Objection.

24    Q     Did you at any time plan to aid --

25             THE COURT:  Do you know a Christopher Seldon?

*Clarence Ballard, Jr.*

*Dixon/direct/defense*                    Page 100

1        Do you know what he's talking about?

2                    THE WITNESS:  Yes.

3                    THE COURT:  You do know him?

4                    THE WITNESS:  Yes.

5                    THE COURT:  I'm not going to let these types of

6        questions.  He says -- you can ask him if he was present

7        or did something.  It seems to me that's the issue, where

8        he was, what he did, what he said.  Facts, you know.

9    Q    Did you rob Mr. Martinez --

10   A    I didn't rob anybody.

11                   THE COURT:  Let him finish the question.  Is

12       that the end of your question?

13                   MR. BOWMASTER:  No.

14                   THE COURT:  Rephrase it.

15   Q    Did you rob Mr. Martinez on July 7, 2000?

16   A    No, I didn't.

17   Q    Mr. Dixon, were you employed in the end of June 2000?

18   A    Yes.

19   Q    And where did you work June 24 through June 30?

20   A    G & G Services on west 41 -- 41 west 40th Street.

21   Q    What is G & G Services?

22   A    Temporary services that dispatches workers to different

23   locations that they want employment.

24   Q    And what work were you doing for them at that time?

25   A    I was a warehouse worker.

*Clarence Ballard, Jr.*

*Dixon/direct/defense*                    Page 101

1    Q    And did you have any other temporary job lined up
2 through the agency at the time of your arrest?

·3    A    With another agency, yes.

4    Q    What was that?

5    A    Acer on 370 Madison Avenue, ninth floor.

6    Q    What were you going to do for them?

7    A    Telemarketing.

8    Q    Now, the week that you worked for G & G Services in the
9 warehouses, were you paid by the warehouse directly or from G &
10 G Temporary Services?

11    A    I was paid by G & G Temporary Services.

12    Q    What was the form of payment you received for the
13 warehouse work done?

14    A    Check.

15    Q    And in that period of time did you have a checking
16 account?

17    A    No.

18    Q    So when you worked --  when you would work and get paid
19 by G & G Services, what would you do to get money?

20    A    I would have to cash my paycheck at a different
21 location after I received my paycheck from G & G Services.

22    Q    Now, calling your attention to the morning of July 7th,
23 please tell the court what happened that morning?

24    A    Around 7 o'clock I received a phone call telling me to
25 get up, go get your paycheck.  So I leave the house around 7:30.

*Clarence Ballard, Jr.*

1  I head to the six train, because I'm across town at my

2  girlfriend's house.  And I take the six train to 125th Street

3  and get off and catch the 4 train express.  While exiting the 6

4  train I bump into Christopher Seldon.  He tells me he's --

5      Q    Prior to July 7 did you know Christopher Seldon?

6      A    Yes.

7      Q    Continue.

8      A    I bump into Christopher Seldon.  He tells me he is

9  going downtown, too.  I said, all right, I'm going downtown to

10 cash my paycheck.

11      He accompanies me downtown.  We get off at 42nd Street

12 after we take the 4 train express.  Once I get to 42nd Street, I

13 go to G & G Services.  We walk across.  Because it's July, it is

14 a nice day outside, we walk across.

15      I pick my paycheck up.  I go to 270 West 36th Street to

16 cash my paycheck.  After cashing my paycheck, I goes to the

17 train station.  He follows me.  He says he don't have any money.

18 I said I'll buy you a token because I have a Metro  --   excuse

19 me  --  a MetroCard.  And he says  -- I said, you can't get on

20 my MetroCard because it only allows, when you have a weekly

21 MetroCard, you only can swipe it every fifteen minutes.  I tell

22 him you can't get on my MetroCard.

23      When I go to pay for the token and get my change, he

24 disappears.  I look for him.  I turn around.  I don't see him.

25      I go to the staircase.  He's in the staircase fighting

*Dixon/direct/defense*                    Page 103

1  with some man.  My immediate reaction was to break up the fight.

2  When I broke up the fight, I heard a pocket rip.  I looked down.

3  Then he had his hand in the man pocket.

4       I didn't know.  I was standing there.  I didn't go way out

5  and run.  I stayed right there.  The man was looking at me.  We

6  was in the same area for about three seconds.  He ran.  He

7  jumped over the turnstile.  I search my pockets for my MetroCard

8  to pay for my fare.  I paid for my fare.  He's standing on the

9  side of the wall.

10                 THE COURT:  Who is "he"?

11                 THE WITNESS:  Christopher Seldon.  He had

12            something white in his hand.  I said, "What you took from

13            that man?"

14                 He said, "I didn't take anything."

15                 And then a man starts coming.  He starts

16            running.  So the man just chases him.

17                 I'm walking on the outside of the platform.

18            It's crowded in midtown at rush hour.  Walking on the

19            outside of the platform and watching the man chase

20            Christopher Seldon down the thing.  He goes through the

21            turnstile.  He goes down the steps.  We walk down the

22            steps.  And then the man  --   a man jumps on him, an

23            off-duty officer, he jumps on Christopher Seldon and

24            arrests Christopher Seldon right in front of me.

25                 After they arrest him, some other guy came and

*Clarence Ballard, Jr.*

1      gave him handcuffs and put their handcuffs on him.   I went

2      home.   Later that night I got a phone call.

3      Q      Let me stop you there.   Let me just -- let's go back up

4 a little bit, get a little bit more detail, Mr. Dixon.

5      A      Right.

6      Q      Now, you said you were at your girlfriend's house?

7      A      Yes.

8      Q      Where did you stay the night of July 6, the night

9 before the incident?

10     A      1635 East 174th Street.

11     Q      What time did you leave her apartment that morning?

12     A      7:30.

13     Q      The morning of July 7th?

14     A      Yes.

15     Q      And what was your intended destination when you left

16 the house?

17     A      To pick up my paycheck, cash my paycheck.

18     Q      What was that address?

19     A      440 West 41st Street.

20     Q      How did you intend to get there?   Strike that.   How did

21 you get there?

22     A      I took the 6 train to the 4 train express.   4 train

23 express I went to 42nd Street and walked over to West 41st

24 Street.

25     Q      Where were you when you first saw Mr. Seldon that day?

*Clarence Ballard, Jr.*

*Dixon/direct/defense*                    Page 105

1    A    I was getting off the 6 train to catch the 4 train

2  express.  He was either coming down the platform.  I don't

3  remember, but I saw him.

4    Q    Did you plan to see him that day?

5    A    No.

6    Q    Did you know he was going to be on the platform that

7  day?

8    A    No.

9    Q    And what happened after you saw him on the platform?

10   A    We exchanged, you know, greetings.  He asked me where I

11 was going.  I told him I was going downtown.  He said he was

12 going downtown, too, if he could come with me.  I said sure.

13 And that was that.

14   Q    Where did you get off the train?

15   A    42nd Street.

16   Q    How did you get from 42nd Street to G & G Temporary

17 Service at 440 West 41st Street?

18   A    We walked.

19   Q    Approximately what time did you get off the train that

20 morning?

21   A    About I'll say 8 o'clock, 7:50, sometime around there.

22   Q    What did you do after you got your check?

23   A    I headed towards the train station to take the C train

24 back up to the Bronx.

25   Q    What was your first stop after you got your check?

*Clarence Ballard, Jr.*

1    A    After I got the check?

2    Q    Right.

3    A    Oh, I went to the, to cash the check at 270 West 36th

4 Street.

5    Q    And why did you go to that particular location?

6    A    Because that was the location that my boss Lou Avarese

7 (phon.) told me that I had to cash my paycheck there.  That's

8 the only place I can cash my paycheck, because I don't have a

9 checking account.

10    Q    What type of establishment is that?

11    A    It is a liquor store, I believe.

12    Q    So -- and how long did it take you to go from G and G

13 to the liquor store?

14    A    Ten, fifteen minutes.

15    Q    What time did you get to the liquor store

16 approximately?

17    A    About 8:45.

18    Q    How long were you at the liquor store?

19    A    I had to wait for it to open at 9 o'clock because it

20 doesn't open until 9 o'clock.

21    Q    Was Mr. Seldon with you the entire time when you got

22 off the train until you cashed your check at the liquor store?

23    A    Yes, he was.

24    Q    Now, after cashing your check, what was your intended

25 destination?

*Clarence Ballard, Jr.*

*Dixon/direct/defense*                    Page 107

```
 1    A    To go home.

 2    Q    And what way, or what was the final subway stop you

 3 were going to?

 4    A    I believe it was Eighth Avenue, the C train or the B

 5 train is at.

 6    Q    What was the final, your final subway stop destination?

 7    A    167 and Grand Concourse, the D train.

 8    Q    How did you plan on getting there?

 9    A    I would take the C train.  Sometimes it runs to the

10 Bronx.  Sometimes it doesn't.  But it puts you close to the D

11 train.  So I would take the D train straight up, or the C train

12 to the D train, and then go up like that.

13    Q    Where did you plan to take the C train that day?

14    A    34th Street, Eighth Avenue I believe it is.

15    Q    Where did you actually enter the subway station?

16    A    At 34th Street and Eighth Avenue.

17    Q    What, if anything, happened after you entered the

18 station?

19    A    I went downstairs.  I went to get on the train, and

20 asked Christopher Seldon if he had any money.  He said he didn't

21 have any money.  So I said I'll buy you a token.

22    Q    You said you had a MetroCard?

23    A    Yes.

24    Q    Why couldn't you use the MetroCard for Mr. Seldon as

25 well?
```

1    A    Because when you buy a MetroCard, it doesn't allow --

2 if you buy a weekly MetroCard, it doesn't allow you to swipe

3 your MetroCard repeatedly.  You have to wait a certain amount of

4 time before you swipe it again.

5    Q    And were you able to see Mr. Seldon when you were

6 buying the token?

7    A    No.

8    Q    Were you able to see him immediately after you

9 purchased the token?

10    A    No.  He was gone.

11    Q    What did you do then?

12    A    I looked around for him.  He wasn't nowhere in sight.

13 So I went back to the staircase.  And when I went -- as soon as

14 --

15    Q    Let me stop you.  You went back to the same stairs that

16 you used to enter the subway?

17    A    Yes.

18    Q    What, if anything, did you see at that time?

19    A    I saw Christopher Seldon back was to me.  He was two

20 stairs under Mr. Martinez.  Mr. Martinez was standing on top of

21 him.  And he was hitting him, hitting him, hitting him.  I went

22 and broke it up.

23    Q    Who was hitting who?

24    A    Mr. Martinez was hitting Christopher Seldon, beating

25 him up.

*Dixon/direct/defense*                    Page 109

1    Q    Could you see Mr. Seldon's hands at this time?

2    A    No.

3    Q    And how exactly were they positioned on the steps in

4 reference to you when you first saw them?

5    A    In reference to me.  Mr. Martinez was up a few stairs.

6 Christopher Seldon was down probably two steps.  And they was

7 facing each other.  But their back was to me.  I could see

8 Mr. Martinez' face.

9    Q    Whose back was to you?

10   A    Christopher Seldon.

11   Q    What happened then?

12   A    I just went to break up the fight.

13   Q    How did you try to do that?

14   A    I went in-between them both and I separated them.

15   Q    Describe -- I notice a motion with your hand.  If you

16 can just describe that motion for the record?

17   A    Like when you get in-between two people and you put

18 your arms in and separate them like that.  I separated them.  I

19 separated, I heard a ripping sound.

20   Q    What portion of their bodies did you put your arm

21 in-between to separate them?

22   A    Their chest areas.

23   Q    What, if anything, happened at that point?

24   A    Christopher Seldon ran.

25   Q    What, if anything, happened immediately after you put

*Clarence Ballard, Jr.*

*Dixon/direct/defense*                    Page 110

1 your arms in-between the chest?

2      A     I separated them.  I heard a ripping sound.  I looked

3 down.  And I realized that this -- robbery, he was robbing the

4 guy.

5      Q     Did you actually see Mr. Seldon's hands in the pocket

6 of Mr. Martinez?

7      A     No, not when I first approached the scene or when I

8 broke it up.  When I broke it up, that was the only time I

9 realized what was going on.

10     Q     Right.  After you separated the two or as you separated

11 the two, did you actually see a hand in -- Mr. Seldon's hand in

12 Mr. Martinez' pocket?

13     A     No, I didn't.

14     Q     What, if anything, did Mr. Seldon do at that point?

15     A     Mr. Seldon ran.

16     Q     What did you do?

17     A     I stood in front of Mr. Martinez because I didn't know

18 what -- it wasn't -- I was shocked.  I didn't know what to do.

19 I was just standing there.  I didn't move.  I didn't run.  I

20 didn't know what to do.  Because it's a bad situation.  I

21 couldn't think because he was leaving.

22     Q     What did you do then?

23     A     After Christopher -- I moved out of his way.

24     Q     Out of whose way?

25     A     Mr. Martinez way.  I moved out his way because I didn't

1 know I had anything to do with that.  I didn't want anything to

2 do with it.  He stood there.  He must have thought I had

3 something to do with it.  But I didn't.  But he didn't move.  He

4 didn't yell.  He didn't do anything.

5       I went to the turnstile, and I searched my pockets because

6 I had in my pocket my papers and my pay stub inside my pocket.

7 I couldn't find my MetroCard. They're hard to find when you put

8 them in your pocket with the other stuff.

9    Q     What about the token you had just purchased?

10    A.    During the scuffle, I probably lost it.  I didn't have

11 no token in my hand at that time.  So I had to find my

12 MetroCard.

13    Q     Where were you when you were searching through your

14 pocket?

15    A     I was standing in front of the turnstile.

16    Q     During that time how far away from you was the person

17 who had been struggling with Mr. Seldon?

18    A     Three to five feet.

19    Q     Did he say anything to you at this time?

20    A     No.

21    Q     Did he make any attempt to grab you at this time?

22    A     No.

23    Q     Did he call for assistance at this time?

24    A     No.

25    Q     What did you do next?

*Dixon/direct/defense*                    Page 112

1    A    I paid my fare.  I got on the train.  I saw Christopher

2 Seldon standing to the side.

3    Q    Let me back you up.   You paid your fare?

4    A    Yes.

5    Q    Do you know where Mr. Martinez was when you paid your

6 fare?

7    A    He was right behind me the whole time.

8    Q    Did you see him go through the turnstile?

9    A    I didn't see him, no.

10    Q    What happened -- what, if anything, happened right

11 after you went through the turnstile?

12    A    I saw Christopher Seldon standing to the left like out

13 of eyeview.  If you're standing in front of the turnstiles, you

14 can't see if he's on the other side of the walls.  He's standing

15 on the other side of the wall.  I walks up to him.  He had

16 something white in his hand.  I said, "What did you take from

17 the man?"  He said, "Nothing."

18      And then this man start coming.  And he start running,

19 bumping into people.

20    Q    What did you do then?  .

21    A    I moved out of the way.  I walked along the platform

22 area.  It's like two sides with a pole separate the little area

23 right there.  I was on the outside walking, watching them bump

24 into people while they're running.  They running.  He's chasing

25 him.  He's bumping into people.  He's bumping into people.  So

*Clarence Ballard, Jr.*

*Dixon/direct/defense*                    Page 113

1  I'm watching the whole thing.

2     Q     When you first started walking on the platform, what

3  were you walking towards, which exit?

4     A     The Penn Station exit.

5     Q     Where was Seldon when you first started walking, if you

6  know?

7     A     When I first started walking, he was trying to run from

8  people.

9     Q     How far away from you was he at that point?

10    A     He's about to where you are right there.

11             MR. BOWMASTER:  Your Honor, approximately 35

12        feet.  Your Honor, approximately 35 feet from Mr. Seldon

13        --

14             THE COURT:  I was reading something.  What

15        happened?

16             MR. BOWMASTER:  I'm estimating 35 feet between

17        myself and Mr. Dixon.

18             THE COURT:  I think it's less.  20, 25 tops.

19        The jury has seen it.  It's up to them.

20    Q     Were you able to see Mr. Martinez at this point?

21    A     Yes.  Mr. Martinez was probably -- Mr. Martinez was

22  more closer to me than he was to him.  He was like about where

23  the officer is at, maybe like five feet back further.

24    Q     Mr. Dixon, would you describe the level of pedestrian

25  traffic on the platform as light, medium or crowded?

*Clarence Ballard, Jr.*

*Dixon/direct/defense*                    Page 114

```
 1    A    It was crowded.

 2    Q    Was it difficult to negotiate your way through the

 3 people?

 4    A    Yes.

 5    Q    And were you walking or running?

 6    A    Who, me?  I was walking.

 7    Q    And was Mr. Seldon walking or running at this point?

 8    A    He was running.  But he couldn't run because it was too

 9 crowded.  He was running into people.

10    Q    Repeat that?

11    A    He was running, but he wasn't going anywhere because he

12 was running into people and trying to knock people over.

13    Q    So were they pulling ahead of you -- I'm sorry.  Strike

14 that.

15         Was Mr. Seldon pulling ahead of you or because of the

16 people were you about the -- was --

17    A    No.  We was about the same.  The only person that ended

18 up getting closer to him was Mr. Martinez.

19    Q    Was Mr. Martinez able to run on the platform?

20    A    No.

21    Q    Why not?

22    A    Because it was too crowded.

23    Q    And what happened next?

24    A    He exited -- we both exit the train station around the

25 same time.
```

*Clarence Ballard, Jr.*

1      Q     We're talking about exiting the subway?

2      A     Yes.

3      Q     Into the Penn Station?

4      A     Going towards the Penn Station area.  Christopher

5  Seldon didn't make it to the Penn Station area because the

6  off-duty officer must have noticed him running and jumped right

7  on top of him.  And they arrested him right there on the scene.

8      Q     How far away from Mr. Seldon were you at this time you

9  saw him get jumped on?

10     A     When he initially got jumped on, I was standing maybe a

11  foot next to him.

12     Q     And where were you located at this time in reference to

13  the turnstile exiting the subway into Penn Station?

14     A     Once the officers jumped on him, I moved back three

15  feet.  And I watched them arrested him on the floor.

16     Q     What, if anything, did you do then?

17     A     I left.  I went home.

18     Q     Let me stop you there.

19           MR. BOWMASTER:  I have no further questions,

20      your Honor.

21           THE COURT:  Cross.

22           MR. VENGRIN:  Yes.

23  CROSS EXAMINATION

24  BY MR. VENGRIN:

25     Q     Mr. Dixon, you claim that your sole involvement in this

*Clarence Ballard, Jr.*

*Dixon/direct/defense*                           Page 116

1  incident was to break up a fight between Mr. Martinez and

2  Christopher Seldon, right?

3      A    Yes.

4                  MR. BOWMASTER:  Judge, can we approach one

5      second?

6                  THE COURT:  Yes.

7                  (Whereupon, there was a bench conference among

8      all counsel with the court out of the presence of the

9      jury).

10                 (Continued on the following page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Clarence Ballard, Jr.*

1                  (Discussion held off the record at the bench)

2                  THE COURT:  Go ahead, Mr. Vengrin.

3    CROSS-EXAMINATION

4    BY MR. VENGRIN: (Continuing)

5        Q     And your story is that Mr. Seldon was getting beat up

6    pretty badly by Joseph Martinez?

7                  MR. BOWMASTER:  Objection to the your story, Judge.

8                  THE COURT:  Is that your testimony?

9                  THE WITNESS:  Yes.

10       Q     And approximately how many times did you see Joseph

11   Martinez hit Christopher Seldon?

12       A     Maybe ten, ten times, ten, 15 times.

13       Q     Where did he hit him?

14       A     About the shoulder and the head area because he was

15   below him.

16       Q     How was Mr. Seldon responding when Mr. Martinez was

17   punching him?

18       A     Mainly like I said, he wasn't responding.  He just

19   looked like he was standing there holding him.  So I broke it up

20   and when I broke it up that's --

21       Q     Let's not get to the point where you break it up yet.

22   I'm saying that Mr. Martinez is sitting there getting punched

23   about the face, the shoulders and you say you saw about ten

24   punches land, right?

25       A     Not Mr. Martinez.

-J.L.M-

Dixon - cross - People

1    Q    I'm sorry, Mr. Seldon.   You saw Mr. Martinez land about

2    ten punches to Mr. Seldon's face and upper body?

3    A    He was just throwing punches at him, it wasn't like --

4    Q    Did you see any punchings land?

5    A    I couldn't say if they landed, I couldn't say if they

6    caused any effect to him.   But I know that he was swinging at him.

7    Q    Wouldn't you say that Mr. Seldon was getting pummeled by

8    Mr. Martinez?

9    A    Yes.

10    Q    And when you say that Mr. Seldon is getting pummeled by

11    Mr. Martinez, doesn't that mean that some of those punches are in

12    fact landing?

13    A    Yes.

14          MR. BOWMASTER:   Objection, argumentative.

15          THE COURT:   He said yes.   I think that we could

16    move on.   Next question.

17    Q    How far apart were the two of them when this was

18    happening?

19    A    Maybe two feet, two steps.   Christopher Seldon was on

20    the second step, two steps down from him, he was probably two

21    steps up from him.   That's his best I could describe it.

22    Q    And the first thing you did was you separated them?

23    A    Yes.

24    Q    And who did you touch first?

25    A    Both of them.

-J.L.M-

Dixon - cross - People

1      Q      Where did you touch them?

2      A      In the chest area.

3      Q      And you pushed them apart?

4      A      Yes.

5      Q      What was Mr. Martinez' reaction when you came over and

6    did this?

7      A      He didn't, he didn't, he must, his first reaction he

8    didn't say anything, he didn't do anything to me.  Once

9    Christopher Seldon started running he just looked at me.

10     Q      You just break up a violent fight between two people and

11   Mr. Martinez says nothing to you?

12     A      He says nothing.

13     Q      And did Mr. Seldon say anything to you?

14     A      Mr. Seldon runs.

15     Q      As you broke them up?

16     A      Yeah, when I broke them up he just kept on going and

17   left me standing right there looking at Mr. Martinez.

18     Q      And it's your testimony that as you broke them up where

19   was Mr. Seldon's hand?

20     A      Mr. Seldon's hand was in his pocket when I broke -- when

21   I separated them and I heard the ripping sound, his hand was in

22   his pocket.

23     Q      So what's happening is he's got his hand in the pocket

24   of Mr. Martinez and Mr. Martinez with both hands is punching him

25   about the face and body, is that correct?

-J.L.M-

Dixon - cross - People

1      A      I can't see it, I can't see his hand from behind him.

2      Q      What did you see?  You eventually got up close to them,

3   right?

4      A      Yeah, when I got up close to them.  When you come up on

5   the side of a fight, somebody is swinging, you get in between and

6   separate it.  And when I got in between and separate it, it ripped

7   and I heard a ripped sound and he had a white piece of paper in

8   his hand and he runs off and there was nothing else I could do.

9      Q      An after Mr. Seldon runs off Mr. Martinez just stands

10   there looking at you, correct?

11      A      Yes.

12      Q      And he stood there looking at you for about three

13   seconds, right?

14      A      Yes.

15      Q      And after he stands there looking at you you two both

16   walk over towards the subway turnstile, correct?

17      A      No, we don't walk over together, he's behind me.  He

18   must have don't want to come in my area because he think I have

19   something to do with it.  This is what I'm reading from the way

20   he's looking at me.  But after I paid my fare he chases, he

21   chases --

22      Q      Let's stop there just a minute, Mr. Dixon.  You said

23   that you looked for your MetroCard for approximately 30 seconds,

24   isn't that right?

25      A      Yes.

Dixon - cross - People

1    Q    And while those 30 seconds go by Mr. Martinez is still

2  behind you, correct?

3    A    Yes.

4    Q    And how close would you say that he's standing to you at

5  that point?

6    A    Three to five feet.

7    Q    So he's three to five feet away from you while you're

8  looking for your MetroCard at the turnstile, right?

9    A    Yes.

10   Q    And he's just standing there?

11   A    Yes.

12   Q    Now, you claim at this point you knew that Mr. Martinez

13  was the victim of a robbery?

14   A    Yes.

15   Q    Did he say anything to you?

16   A    No.

17   Q    Did you say anything to him?

18   A    No.

19   Q    And you also knew at this point that there were no other

20  witnesses to this robbery, isn't that true?

21            MR. BOWMASTER:  Objection.  How could he know that?

22            THE COURT:  I think that you could ask him.

23   Q    Was there anyone else there?

24   A    Yes, it was rush hour.

25   Q    In the stairway when this happened?

Dixon - cross - People

1       A       In the stairway there was people coming up the stairs.

2       Q       And all these people coming up and down the stairs are

3   just passing by as the two of them fight, is that it?

4       A       No, when I came, when I came a train just came in,

5   that's why I said that it was crowded because the train just left.

6       Q       I understand that.  I'm talking about the incident that

7   happened, the scuffle that happened between Mr. Martinez and Mr.

8   Seldon.  At that point isn't it true that the only people in the

9   stairway was the two of them and you?

10      A       The two of them and me, yes, when it happened.

11      Q       Exactly.

12      A       Yes.

13      Q       You claim that at the scene you were three feet away

14  from Christopher Seldon when he was arrested by the police?

15      A       Yes.

16      Q       And that the victim Joseph Martinez was right there when

17  that happened?

18      A       Right.

19      Q       Three feet from you?

20      A       Yes.

21      Q       You could see him?

22      A       I could see, I could see all -- I could see the off

23  duty, the off duty security guard, I could see the officer that

24  jumped on him and I could see Mr. Martinez.

25      Q       Did you ever come forward to the police at that point

-J.L.M-

Dixon - cross - People

1    and tell them that you had just witnessed a robbery?

2         A    He got arrested in front of me for what he did, God made

3    sure he got arrested right there.   I went home --

4              THE COURT:  So you didn't step forward, is that

5         fair to say?

6              THE WITNESS:  No, I didn't.

7              THE COURT:  Next question.

8         Q    And you just said that you were the only witness to what

9    happened in the stairway but you didn't come forward?

10             THE COURT:  Is that true?  You didn't come forward,

11        you didn't speak to anybody?

12             THE WITNESS:  I didn't speak to anybody.  He got

13        arrested and I left.

14             THE COURT:  Next question.

15        Q    Now, there are a few things I just want to make sure

16   that you testified on direct that I understood you right.

17             Now, you agree that Mr. Martinez' pants were not ripped

18   until you came and got involved in this incident, isn't that true?

19             I know you're not saying that you ripped them, but the

20   pants were not ripped until you got there, correct?

21        A    The pants were ripped as to me separating them, not

22   because I ripped them myself.  My hand wasn't in his pocket, it

23   was Christopher Seldon's hand in his pocket, so I didn't rip his

24   pants.

25        Q    Mr. Dixon, on January 5th 1989 you were convicted of two

-J.L.M-

Dixon - cross - People

1    counts of attempted grand larceny in the 4th Degree, isn't that

2    true?

3         A    Yes.

4         Q    And in the first case you tried to take property from

5    the victim by using a box cutter, right?

6         A    I don't recall.

7              THE COURT:  Next question.

8         Q    And that incident took place on December 13th 1988 at

9    11:39 at East 167th Street and Sherman Avenue?

10        A    Yes.

11        Q    And in the second case you pushed the victim into a wall

12   and demanded money, isn't that true?

13        A    I don't remember.

14        Q    Well, that incident took place on December 19th 1988 at

15   12:26 p.m. at 161st Street and River Avenue, correct?

16        A    I don't remember.

17        Q    It took place in the Bronx?

18        A    Yes.

19        Q    And on August 17th 1992 you were convicted of robbery in

20   the 1st Degree, isn't that correct?

21        A    I don't see the relevance me answering that question.

22             THE COURT:  Yes or no, you have to answer it yes or

23   no.

24        A    Yes.

25        Q    And you and another person forcibly took property from

-J.L.M-

Dixon - cross - People

1    the victim and kicked and hit the victim in that case, isn't that

2    true?

3         A    I don't, I don't remember the specifics of the case.

4         Q    Well, would anything refresh your recollection, Mr.

5    Dixon?

6         A    Yes.

7              MR. VENGRIN:  Could we approach?

8              MR. BOWMASTER:  Could I ask for a limiting

9    instruction at this time as well?

10             THE COURT:  Sure.  What do you want to approach

11   about?

12             MR. VENGRIN:  Okay.

13             THE COURT:  You want me to give it now?

14             MR. BOWMASTER:  Yes.

15             THE COURT:  I'm allowing the district attorney to

16   ask certain questions of the defendant about any prior

17   criminal convictions he may have.  I now emphasize and charge

18   you that under no circumstances are you to consider the fact

19   that the defendant has previously been convicted of a crime

20   as proof that he committed the crime with which he is

21   currently charged.

22             You may consider the defendant's previous

23   convictions only for the purpose of assisting you in making

24   your evaluation of his credibility, that is his believability

25   as a witness.  In other words, to aid you in making your

-J.L.M-

Dixon - cross - People

1  determination of what weight you will give to the testimony

2  of the defendant.

3          Mr. Vengrin, do you have any other questions?  Go

4  ahead.

5          MR. VENGRIN:  Yes.

6  Q    And isn't it true on August 17th 1992 you were convicted

7  of criminal possession of a weapon in the 3rd Degree?

8  A    Yes.  I copped out to everything that you say that I've

9  done, that's on my record, I've done it and I've copped out to it.

10 Q    And you possessed a loaded firearm?

11 A    What date is that?

12 Q    August 17th 1992?

13 A    Yes.

14 Q    And on a June 9th 1993 you were convicted of robbery in

15 the 2nd Degree, isn't that true?

16 A    Yes.

17 Q    And in that case you and another person forcibly took

18 property from the victim in the Bronx and that's November 8th

19 1995?  That incident happened at 10:00 in the morning at 260 East

20 161st Street?

21 A    I don't remember that.

22 Q    And finally on November 2nd 2000 you were convicted of

23 criminal sale of a controlled substance in the 3rd Degree?

24 A    Yes.

25 Q    And that was a felony conviction for selling drugs,

Dixon - redirect - Bowmaster

1    right?

2        A    Yes.

3        Q    And that incident took place at 10:30 in the morning in

4    the Bronx?

5        A    Yes.

6                    MR. VENGRIN:  Judge, I have nothing further.

7                    THE COURT:  Did you have anything further?

8                    MR. BOWMASTER:  Yes.

9    REDIRECT EXAMINATION

10   BY MR. BOWMASTER:

11       Q    Mr. Dixon, you said that you saw approximately ten

12   punches being thrown by Mr. Martinez?

13       A    Yes.

14       Q    And do you know how many of those punches landed?

15       A    Not all of them, maybe like two, three, he was just

16   swinging wildly at him.

17       Q    And do you know where the punches landed on his person?

18       A    Shoulder and head mostly because he was, he was under

19   him.

20                   MR. BOWMASTER:  Nothing further.

21                   THE COURT:  Thank you.  You can take your seat

22   again, Mr. Dixon.

23                   (Witness excused)

24                   THE COURT:  Do you have any other evidence?

25                   MR. BOWMASTER:  No.

                          -J.L.M-

Colloquy

1           THE COURT:   The defense rests.  Do you have any

2      other evidence?

3                MR. VENGRIN:   No.

4           THE COURT:   That completes the evidentiary portion

5      of the case.   The case is not in your hand and we're going to

6      go to the summation and charge in a few minutes.  And I want

7      to give the lawyers a chance to collect their thoughts and

8      then they are going to sum up and I think we'll charge and

9      hopefully we'll be through with everything, and when the

10     lunch arrives you'll be ready to start deliberating.

11          And until that time you cannot discuss anything

12     about the case.  And if you wait in the jury room I'm going

13     to give the lawyers five or ten minutes to collect their

14     thoughts and we'll hear the summations, and I'll explain the

15     elements of the crime and the other rules of law that

16     pertain.  Thank you very much.

17               (Jury exiting courtroom)

18          THE COURT:   The defendant is present and the

19     attorneys are present.   I'm going to give acting in concert I

20     think and I'll give the robbery 2nd Degree.   The defendant is

21     an interested witness.   But I'll explain about again the

22     defendant's convictions just go to credibility.   And police

23     officers, same standard on evaluating their credibility.

24     Other than that I don't have really anything special, it's

25     the usual.  Does anybody want to make any special request?

Colloquy

1           MR. BOWMASTER:  No.

2           THE COURT:  All right, I'm giving, as you

3     requested, mere presence isn't either acting in concert or

4     aiding and participating in the commission of a crime.

5     That's how the statute spells out.  Then we're ready to go.

6     So I think that we'll do it all in one shot.  If anybody

7     wants a break, let me know.  Otherwise the two summations and

8     then I'll do my charge.

9           MR. BOWMASTER:  You're giving acting in concert and

10    the aiding and abetting?

11          THE COURT:  The aiding and abetting is the

12    elements, the issue is the force.  Allegations is that your

13    client ripped open his pocket and took the money.  But the

14    other man is alleged to have actually punched him in the

15    back.  So I think that I'll give both.  I mean, without it

16    maybe one could argue it was a larceny rather than a robbery.

17    People want acting in concert?

18          MR. VENGRIN:  Actually on further reflection the

19    People would request that.

20          THE COURT:  I'm going to give it.  Okay, get the

21    jury.  It's just the one count, I'm not giving any lesser

22    included, Mr. Bowmaster?

23          MR. BOWMASTER:  Yes.

24          MR. VENGRIN:  Yes.

25          COURT OFFICER:  Jury entering.

                              -J.L.M-

RESPONDENT'S COPY

To be argued by
Echo Westley Dixon

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

ECHO WESTLEY DIXON, Petitioner,

- against -

SUPERINTENDENT, MICHAEL P. MCGINNIS, Respondent.

REPLY/ADDENDUM FOR THE PETITIONER

Echo W. Dixon #00A6365
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13024

Echo Westley Dixon
Of Counsel.

TABLE OF AUTHORITIES

FEDERAL CASES

PAGE

Ayala v. Leonardo, 20 F.3d 83--------------------22, 25

Bagby v. Kuhlman, 742 F.Supp. 137--------------------24

Braunskill v. Hilton, 629 F.Supp. 511--------------------26, 27

Brooks v. State of Tex., 381 F.2d 619--------------------28, 29

Cartalino v. Washington, 122 F.3d 8--------------------7

Cotto v. Herbert, 331 F.3d 217--------------------25, 26

Daily v. New York, 388 F.Supp.2d 238--------------------24

Dobbin v. Greiner, 249 F.Supp.2d 241--------------------25

Faretta v. California, 422 U.S. 806--------------------26

Gaiter v. Lord, 917 F.Supp. 145--------------------22, 23

Gatto v. Brierley, 485 F.2d 86--------------------28

Grant v. Demskie, 75 F.Supp.2d 201--------------------24

Henry v. Speckard, 22 F.3d 1209--------------------22

Kennedy v. Cardwell, 487 F.2d 101--------------------28

Lawrence v. Henderson, 334 F.Supp. 1287--------------------27

Maxwell v. Mason, 668 F.2d 361--------------------28

Overton v. Newton, 146 F.Supp.2d 267--------------------22

Ryan v. Miller, 303 F.2d 231--------------------21, 22, 24

Salemme v. Ristaino, 587 F.2d 81--------------------27

Singleton v. Lefkowitz, 583 F.2d 618--------------------24, 25

Tafoya v. Tansy, 9 Fed.Appx. 862--------------------12

Taus v. Senkowski, 283 F.Supp.2d 238--------------------11, 12

Truman v. Wainwright, 514 F.2d 150--------------------26

U.S. v. Ali-Balogun, 72 F.3d 9--------------------17

U.S. v. Benefield, 889 F.2d 1061--------------------6

U.S. v. Biaggi, 705 F.Supp. 848--------------------16, 17

U.S. v. Blood, 435 F.3d 612--------------------6

U.S. v. Brooks, 145 F.3d 446--------------------10

U.S. v. Castner, 50 F.3d 1267--------------------11

U.S. v. Chan, 184 F.Supp.2d 337--------------------22

U.S. v. Delano, 55 F.3d 720--------------------22

U.S. v. Edwards, 342 F.3d 168--------------------18

U.S. ex rel. Eccleston v. Henderson, 534 F.Supp. 813--------------------9, 10

## Table of Authorities

### Federal Cases (continued)

| | PAGE |
|---|---|
| U.S. v. Gallego, 191 F.3d 156 | 26 |
| U.S. v. Gill, 90 F.2d 274 | 11 |
| U.S. v. Goodwin, 625 F.2d 693 | 27 |
| U.S. v. LaIvie, 184 F.3d 180 | 23, 24 |
| U.S. v. Logan, 419 F.3d 172 | 24 |
| U.S. v. Logan, 875 F.2d 1025 | 8 |
| U.S. v. Matt, 116 F.3d 971 | 10 |
| U.S. v. Nixon, 418 U.S. 683 | 27 |
| U.S. v. Ortiz, 875 F.2d 900 | 17 |
| U.S. v. Ozsusamlar, 428 F.Supp.2d 161 | 18 |
| U.S. v. Paredes, 176 F.Supp.2d 195 | 7 |
| U.S. v. Parker, 241 F.3d 114 | 8 |
| U.S. v. Pascarella, 84 F.3d 556 | 17 |
| U.S. v. Peterson, 808 F.2d 969 | 16 |
| U.S. v. Pipola, 83 F.3d 556 | 17 |
| U.S. v. Pisani, 773 F.2d 397 | 7 |
| U.S. Quattrone, 441 F.3d 153 | 10 |
| U.S. v. Rahone, 32 F.3d 1203 | 23 |
| U.S. v. Robinson, 635 F.2d 981 | 8, 9 |
| U.S. v. Ruffin, 117 Fed.Appx. 271 | 11 |
| U.S. v. Sanchez, 325 F.3d 600 | 11 |
| U.S. v. Santiago, 199 F.Supp.2d 101 | 17, 18 |
| U.S. v. Sasson, 62 F.3d 874 | 23 |
| U.S. v. Seeger, 180 F.Supp. 467 | 25 |
| U.S. v. Tillghman, 134 F.3d 414 | 9 |
| U.S. v. Villarini, 238 F.3d 530 | 11 |
| U.S. v. Wallach, 935 F.2d 445 | 17 |
| U.S. v. Weaver, 282 F.3d 302 | 10 |
| Washington v. State of Tex., 388 U.S. 14 | 26 |

## TABLE OF AUTHORITIES

### STATE CASES

| | PAGE |
|---|---|
| Fappiano v. New York City Police Department, 724 N.Y.S.2d 782 | 23 |
| People v. Arnold, 745 N.Y.S.2d 782 | 7, 8 |
| People v. Brown, 632 N.Y.S.2d 938 | 23 |
| People v. Egan, 78 A.D.2d 34 | 23 |
| People v. Hunte, 637 N.Y.S.2d 996 | 23 |
| People v. Melendez, 227 A.D.2d 646 | 8 |
| People v. Ruffano, 220 A.D.2d 701 | 23 |
| People v. Vazquez, 686 N.Y.S.2d 624 | 23 |
| Sardino v. State Com'n on Judicial Conduct, 461 N.Y.S.2d 229 | 13 |

# TABLE OF CONTENTS

| | PAGE |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| QUESTIONS PRESENTED | 4 |
| STATEMENT OF FACTS | 2 |
| Introduction | 2 |
| The Court's Sandoval Ruling | 2 |
| State's Evidence | 2 |
| Defense's Case | 2, 3 |
| Summations | 3 |
| Charge, Verdict and Sentence | 3 |
| ARGUMENT | |

JUDGE'S INTERJECTIONS, ADOPTING ROLE OF PROSECUTOR, DURING PROSECUTOR'S DIRECT-EXAMINATION, AND DEFENSE COUNSEL'S CROSS-EXAMINATION OF THE COMPLAINING WITNESS AND OTHER WITNESSES, WAS VIOLATIVE OF THE PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JUDGE. U.S. CONST. AMENDS. 5, 6, 14.

COURT'S SANDOVAL RULING, PERMITTING THE PROSECUTOR TO QUERY PETITIONER ABOUT A DRUG RELATED CRIMINAL OFFENSE THAT WAS IRRELEVANT TO THE INSTANT CASE OF ROBBERY IN THE SECOND DEGREE, INTRODUCTION OF OTHER PRIOR CRIMINAL OFFENSES AND THEIR UNDERLYING FACTS THAT WERE SIMILAR TO THE INSTANT ROBBERY, WHERE THEIR PROBATIVE VALUE FAR OUTWEIGHED THE DANGERS OF CREATING UNFAIR PREJUDICE, AND MADE THE PROSECUTOR'S INQUIRY INTO THE PRIOR CRIMINAL OFFENSES AND THEIR UNDERLYING FACTS UNDULY LONG, WAS VIOLATIVE OF THE PETITIONER'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JURY. U.S. CONST. AMENDS. 5, 6, 14.

Argument (continued)

COURT'S DENIAL OF THE PETITIONER"S FEDERAL CONSTITUTIONAL RIGHT TO THE COMPULSORY PROCESS, WHEN THE PETITIONER HAD INVOKED TO EXERCISE SAID RIGHT BY HAVING HIS CO-DEFENDANT SUBPOENAED TO TESTIFY AT HIS TRIAL, AND WHERE THE COURT HAD NOT INFORMED THE PETITIONER OF HIS COMPULSIONARY RIGHT, VIOLATED THE PETITIONER'S RIGHT TO CALL A WITNESS IN HIS BEHALF. U.S. CONST. AMENDS. 5, 6, 14.

THE DEPRIVATION OF PETITIONER'S CLOTHING DENIED HIM OF THE GARB AND PRESUMPTION OF INNOCENCE, WHEN HE WAS FORCED TO APPEAR BEFORE THE JURY WEARING PRISON CLOTHES. U.S. CONST. AMENDS. 5, 6, 14.

CONCLUSION------------------------------------------------------------------30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

Echo Wesley Dixon, Petitioner

-against-

Superintendent
Michael P. McGinnis, Respondent.
_____

P R E L I M I N A R Y   S T A T E M E N T
_____

This is a petition from a judgement of the Supreme/Superior Court, Bronx County, New York, rendered on or about February 2, 2003, convicting petitioner, after a jury trial, of one count of Robbery in the Second Degree (Arlene Silverman, J. at trial and sentence). Timely notice of appeal was filed and thereafter court granted petitioner leave to appeal as a poor person on the original record and typewritten brief and assigned Andrew C. Fine succeeded by Laura R. Johnson, as counsel on appeal. Petitioner was indicted with one co-defendant, Christopher Seldon; however, petitioner is the sole petitioner of this petition, and is currently incarcerated pursuant to this judgement.

## S T A T E M E N T   O F   F A C T S

### I n t r o d u c t i o n

Petitioner realleges and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus Brief/Petition and appellate counsel's appeal brief (Introduction), as if fully restated herein.

### T h e   C o u r t ' s   S a n d o v a l   R u l i n g

Petitioner realleges and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus Brief/Petition and appellate counsel's appeal brief (The Court's Sandoval Ruling), as if fully restated herein.

### S t a t e ' s   E v i d e n c e

Petitioner realleges and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus Brief/Petition and appellate counsel's appeal brief (State's Evidence), as if fully restated herein.

### D e f e n s e ' s   C a s e

Petitioner realleges and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus Brief/ petition and

Statement of Facts
Continued.

appellate counsel's appeal brief (Defense' Case), as if fully restated herein.

Summations

Petitioner realleges and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus Brief/Petition and appellate counsel's appeal brief (Summations), as if fully restated herein.

Charge, Verdict and Sentence

Petitioner realleges and incorporates by reference, for brevity, petitioner's Writ of Habeas Corpus Brief/Petition and appellate counsel's appeal brief (Charge, Verdict and Sentence),as if fully restated herein.

Q U E S T I O N S   P R E S E N T E D

I) Whether, judge's interjections, adopting role of prosecutor, during prosecutor's direct-examination, and defense counsel's cross-examination of the complaining witness and other witnesses, was violative of the petitioner's federal constitutional right to a fair trial by an impartial judge. U.S. CONST. AMENDS. 5, 6, 14.

II) Whether, court's Sandoval ruling, permitting the prosecutor to query petitioner about a drug related criminal offense that was irrelevant to the instant case of Robbery in the Second Degree, introduction of other prior criminal offenses and their underlying facts that were similar to the instant robbery, where their probative value far outweighed the dangers of creating unfair prejudice, and made the prosecutor's inquiry into the prior criminal offenses and their underlying facts unduly long, was violative of the petitioner's constitutional right to a fair verdict by an impartial jury. U.S. CONST. AMENDS. 5, 6, 14.

III) Whether, court's denial of the petitioner's federal constitutional right to the compulsory process, when the petitioner had invoked to exercise said right by having his co-defendant subpoenaed to testify at his trial, and where the court had not informed the petitioner of his compulsory right, violated the petitioner's right to call a witness in his behalf. U.S. CONST. AMENDS. 5, 6, 14.

IV) Whether, the deprivation of petitioner's clothing denied him the garb and presumption of innocence, when he was forced to appear before the jury wearing prison clothes. U.S. CONST. AMENDS. 5, 6, 14.



## P O I N T  I

JUDGE'S INTERJECTIONS, ADOPTING ROLE OF PROSECUTOR, DURING PROSECUTOR'S DIRECT-EXAMINATION, AND DEFENSE COUNSEL'S CROSS-EXAMINATION OF THE COMPLAINING WITNESS AND OTHER WITNESSES, WAS VIOLATIVE OF THE PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO A FAIR TRIAL BY AN IMPARTIAL JUDGE. U.S. CONST. AMENDS. 5, 6, 14.

Throughout the petitioner's entire trial the court; repeatedly interjected, adopted the role of the prosecutor, interrupted the petitioner's counsel during counsel's cross-examination of the complaining witness and other witnesses, when defense counsel began to build a defense, to pose queries structured to glean from the complainant testimony that had been previously elicited during the court's inappropriate conduction of direct-examination, which was unrelated to the clarification of confusing testimony, evidence, ambiguities, or correction of misstatements that had arose during petitioner's trial, and violated petitioner's federal constitutional right to a fair trial by an impartial judge.

During the course of a two day trial, when the prosecutor had begun to conduct the direct-examination of the complaining witness, the judge interjected and posed one-hundred and six (106) queries to the complainant. None of which were relative to the clarification of confusing testimony, evidence, or ambiguities, that had arose during petitioner's trial.

After the court inappropriately conducted direct-examination of the complaining witness and petitioner's counsel commenced to conduct cross-examination of said witness, the court interrupted petitioner's counsel while in the midst of counsel developing and presenting a defense to pose a queue of seventy-five (75) queries to the complainant; all of which were structured, formulated and posed by the court for the purpose of eliciting identical testimony from the complainant the court had adduced during its unconstitutional conduction of direct-examination of the complaining witness.

However, when the petitioner testified, the court, disregarding the tremendous influential role and respect judges play, attract, possess, and command during trial, when called on by petitioner's attorney who sought the court's attention and assistance determining an approximation of distance from the judge's bench to where the petitioner sat, responded "I was reading something. What happened ?" (Trial Transcripts, page 113, lines 13, 14.)

This inattention by the court after playing such an active role throughout the petitioner's trial, moreover, the vocalization of the court's inattention before the jury, at only a juncture when the petitioner testified, clearly subliminally evinced to the jury the judge's disbelief in the petitioner's testimony.

Moreso, even during the prosecutor's and defense attorney's examination of police officers Robertson and Burke, the court had interrupted both, the petitioner's attorney and the prosecutor, to pose twenty-seven (27) inquiries to police officer Robertson, and twenty-

Case 1:06-cv-00039-RJS-FM   Document 6   Filed 11/02/06   Page 131 of 182

three (23) queries to police officer Burke.

In only a two-day course of trial the court repeatedly interjected and interfered with the petitioner's attorney's efforts to build a defense and examine witnesses. In only a short span of two days of trial had by the petitioner, the court posed a whopping two-hundred and thirty-one (231) questions; one-hundred and eighty-one (181) of which were posed to the complainant during the very first day of petitioner's trial. With no questions posed by the court for the purpose of clarifying confusing testimony, evidence, or ambiguities that arose during petitioner's trial, nor for purposes of the court's need to make a ruling on matters imperative to the petitioner's trial.

Criminal defendant has federal constitutional right to be tried before impartial judge.

Trial judges are given discretion to manage trial so that evidence is effectively presented, and a trial judge may actively participate and give its own impressions of evidence or question witnesses, as an aid to the jury, so long as it does not step across the line and become advocate for one side. Cartalino v. Washington, 122 F.3d 8.

Trial judge must be ever conscious of the special attention and respect he commands from the jury and must exercise caution to maintain appearance of impartiality. U.S. v. Paredes, 176 F.Supp.2d 195 (S.D.N.Y. 2001); see also, U.S. v. Pisani, 773 F.2d 397.

The overarching principle restraining the court's discretion in assuming active role in truth-seeking process is that it is the

function of the judge to protect the record at trial, not make it. A court may not assume the advocacy role traditionally reserved for counsel, and in order to avoid this, the court's discretion to intervene must be exercised sparingly. People v. Arnold, 745 N.Y.S. 2d 782.

Record established that defendant was denied a fair trial as a result of manner in which trial court presided over trial; court repeatedly interrupted prosecutor and made numerous unwarranted inquiries of witnesses, and asked questions that clearly evinced court's assessment of witness' credibility. People v. Melendez, 227 A.D.2d 646.

Judge must be disinterested and objective participant in the proceedings and must not create appearance of partiality by supporting one of the parties, nor may judge undermine effective functioning of counsel by repeated interruption of the examination of witnesses. U.S. v. Logan, 998 F.2d 1025. A trial judge's participation oversteps the bounds of propriety and deprives the parties of a fair trial only when the record discloses actual bias or leaves the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality. U.S. v. Parker, 241 F.3d 114.

While district judge is more than a moderator or umpire and has active responsibility to see that criminal trial is fairly conducted, his participation during trial, whether it takes form

of interrogating witnesses, addressing counsel, or some other conduct,
must never reach point at which it appears clear to jury that court
believes the accused guilty. U.S. v. Robinson, 635 F.2d 981.
Because juries, not judges, decide whether witnesses are telling the
truth, and because judges wield enormous influence over juries,
judges may not ask questions that signal their belief or disbelief
of witnesses. U.S. v. Tilghman, 134 F.3d 414. While court can
interrogate witnesses to clarify testimony and ensure that case is
tried fairly, judge may not repeatedly interject himself into
proceedings when attorneys are conducting case in competent manner.
U.S. v. Benefield, 889 F.2d 1061.

Judicial misconduct is found where judge's remarks clearly
indicate hostility to one party, or unwarranted prejudgment of merits
of case, or alignment on part of court with one party or where
judge, in exercising his discretion interrogates witnesses, abandons
his proper role and assumes role of advocate. U.S. v. Blood, 435
F.3d 612.

Petitioner's contentions of judge's inappropriate adoption of role
of advocate and prosecutor is corroborated by the trial transcripts.
No curative instructions were ever proffered by the court to the
jury in regard to the judge's lengthy examination of witnesses,
to wit - petitioner was prejudiced by the court's conduct and was
denied an impartial verdict by the jury.

Although trial judge played relatively active role in trial,
where he specifically instructed jury to disregard any impression

they may have gained or disbelieved items of
evidence or that his questions were entitled to any more weight
than those of attorneys, instructions sufficed to eliminate any
error that may have otherwise existed and thus there was nothing
in the record to indicate that any of the trial court judge's
behavior was so offensive to deprive defendant of his right to
fair trial. U.S. ex rel. Eccleston v. Henderson, 534 F.Supp. 813.

Where court assumes role of prosecutor and displays bias,
reversal is required; judge should only ask those questions
necessary to clarify ambiguities, correct misstatements, or obtain
information necessary to make rulings, and, if judge actions create
impression of partianship, curative instructions will generally not
save the day. U.S. v. Matt, 116 F.3d 971.

District courts have a duty to avoid creating even the slightest
appearance of partiality and must refrain from repeated intervention
on the side of one of the parties. U.S. v. Weaver, 282 F.3d 302.

Judge must not only be scrupulously fair in the administration of
justice, but also foster aura of fairness. U.S. v. Brooks, 145
F.3d 446.

Trial judges are given discretion to manage trial so that
evidence is effectively presented, and trial judge may actively
participate and give its own impressions of evidence or question
witnesses, as an aid to the jury, so long as it does not step across
the line and become advocate for one side. U.S. v. Quattrone, 441
F.3d 153.

11

A district court may question witnesses to bring out needed facts or clarify the presentation of issues; however, the court should not give the appearance of partiality, nor impose its views on jury, and should not undermine the legitimate efforts of any of the parties to present their case. U.S. v. Ruffin, 117 Fed.Appx. 271; see also, U.S. v. Villiarini, 238 F.3d 530. District court must not create appearance of partiality by continued intervention on side of one of the parties or undermine effective functioning of counsel through repeated interruption of the examination of witnesses. U.S. v. Castner, 50 F.3d 1267. Critical inquiry in regard to defendant's challenge to trial judge's questioning of government witnesses is whether by its conduct trial judge conveyed to jury bias or belief regarding defendant's guilt. U.S. v. Gill, 90 F.2d 274. Although trial court may question witnesses and elicit facts not yet adduced or clarify those previously presented, judge's questions must be for purpose of aiding jury in understanding testimony and may not come at cost of strict impartiality. Fed. Rules Evid. Rule 614(b); 28 U.S.C.A.; U.S. v. Sanchez, 325 F.3d 600.

The court in the instant petition overly participated during the petitioner's trial, which can be ascertained by the trial transcripts. It is obvious, from the trial transcripts, that the court favored the prosecution. Moreover, it played the role of the prosecutor and left nothing for the prosecutor to argue. Petitioner can only pray that this Court can discern that the argument made by him is evident and a reversal is ordered. A judge's intervention in the conduct of a trial must both be

significant and adverse to defense to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeds constitutional limits. Taus v. Senkowski, 293 F.Supp.2d 238.

To succeed on his claim of judicial bias, habeas petitioner must demonstrate either that the trial judge was actually biased against him or that circumstances were such that an appearance of bias created a conclusive presumption of actual bias. Tafoya v. Tansy, 9 Fed.Appx. 862.

22 NYCRR § 100.1-A Judge Shall Uphold the Integrity of the Judiciary.

Canon 1 [1.1] Deference to judgments and rulings of courts depends upon public confidence in the integrity and independence of judges. The integrity and independence of judges depends in turn upon their acting without fear or favor. Although judges should be independent, they must comply with the law, including the provisions of this Code. Public confidence in the impartiality of the judiciary is maintained by the adherence of each judge to this responsibility. Conversely, violation of this Code diminishes public confidence in the judiciary and thereby does injury to the system of government under law.

22 NYCRR § 100.2-A Judge Shall Avoid Impropriety and the Appearance of Impropriety in All of the Judge's Activities.

Canon 2 § A-A Judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

Canon 2, 2.1 [2A]-Public confidence in the judiciary is eroded by

13

irresponsible and improper conduct by judges. A judge must avoid all impropriety and the appearance of impropriety.

Cannon 2, 2.2 [2A]—The prohibition against behaving with impropriety or the appearance of impropriety applies to both the professional and personal conduct of a judge. Because it is not practicable to list all prohibited acts, the proscription is necessarily cast in general terms that extend to conduct by judges that is harmful although not specifically mentioned in the Code. Actual improprieties under this stand-ard include violations of law, court rule or other specific provisions of this Code. The test for appearance of impropriety is whether the conduct would create in reasonable minds a perception that the judge's ability to carry out judicial responsib-ilities with integrity, impartiality and competence is impaired.

22 NYCRR § 100.3

Cannon 3 [3.2] [3B(4)]—A judge must perform judicial duties impart-ially and fairly. A judge who manifests bias on any basis in a proceeding impairs the fairness of the proceeding and brings the judiciary in disrepute.

Equally as important as ability to be impartial is requirement that judge conduct himself in such a way that the public can perceive and continue to rely upon impartiality of those who have been chosen to pass judgment on legal matters involving their lives, liberty and property. Sardino v. State Com'n on Judicial Conduct, 461 N.Y.S.2d 229.



POINT II

COURT'S SANDOVAL RULING, PERMITTING THE PROSECUTOR TO QUERY PETITIONER ABOUT A DRUG RELATED CRIMINAL OFFENSE THAT WAS IRRELEVANT TO THE INSTANT CASE OF ROBBERY IN THE SECOND DEGREE, INTRODUCTION OF OTHER PRIOR CRIMINAL OFFENSES AND THEIR UNDERLYING FACTS THAT WERE SIMILAR TO THE INSTANT ROBBERY, WHERE THEIR PROBATIVE VALUE FAR OUTWEIGHED THE DANGERS OF CREATING UNFAIR PREJUDICE, AND MADE THE PROSECUTOR'S INQUIRY INTO THE PRIOR CRIMINAL OFFENSES AND THEIR UNDERLYING FACTS UNDULY LONG, WAS VIOLATIVE OF THE PETITIONER'S CONSTITUTIONAL RIGHT TO A FAIR VERDICT BY AN IMPARTIAL JURY, U.S. CONST. AMENDS. 5, 6, 14.

Prior to the court's conduction of the direct-examination of the complaining witness, a Sandoval Hearing was held. The purpose of said hearing was conducted to allow the court to entertain and render a presidial ruling upon the asserted oral contentions of the prosecutor and the petitioner's attorney for the introduction and referential admittance, or the denial of the introduction and referential admittance, of the petitioner's prior criminal offenses/similar act evidence, and their underlying facts.

The prosecutor sought to move the court to permit the usage of the petitioner's prior criminal offenses/similar act evidence, and their underlying facts before the jury, in the event that the petitioner decided to testify at trial. However, the petitioner's attorney, oppositional to the prosecutor's contentions, requested the nisi prius to deny the introduction and referential admittance

of the petitioner's prior criminal offenses/similar act evidence, and their underlying facts before the jury, in the event that the petitioner opted to testify at trial.

The petitioner's attorney went further to stress to the nisi prius the prejudicial affect such introduction and referential admittance of said offenses/evidence would infer to the jury. The petitioner's counsel then expressed to the court that should the court permit the introduction and referential admittance of such damaging prior criminal offenses/similar act evidence, and their underlying facts before the jury, it would deprive petitioner of a constitutional, fundamentally fair verdict by an impartial jury. Also, in the event that the court rendered a ruling permitting the prosecutor to interrogate petitioner about his prior offenses, the petitioner's counsel requested the court to deny the prosecutor from delving into the underlying facts of said offenses.

After all asserted oral contentions were iterated, the court rendered a ruling permitting the prosecutor to interrogate the petitioner about his prior criminal offenses/similar act evidence, as well as their underlying facts. However, prior to the court's ruling the court iterated, as to the purpose for rendering such a ruling, that "I will allow them (the jury) to know him for who he is". It is well documented case law that the purpose for such an introduction and referential admittance of prior criminal offenses/ similar act evidence, must not be admitted solely to exhibit and display a defendant's bad character, or the propensity of him or her to commit the crime charged.

What is more, not only did the court allow the introduction and referential admittance of the petitioner's prior criminal offenses/similar act evidence, and their underlying facts, but also allowed the introduction and referential admittance of an unsimilar criminal offense of Criminal Sale of a Controlled Substance. This introduction and referential admittance of such an unsimilar crime was violative of the Similar Act Evidence Ordinance, and warrants the automatic reversal of the conviction obtained therefrom.

Furthermore, in the matter of the prosecutor's inquiry into the underlying facts of the petitioner's prior criminal offenses; said inquiry, due to the court allowing the prosecutor to delve into the underlying facts, made the prosecutor's inquisition unduly long, and prejudiced the jury against the petitioner. The court's decision to permit such a lengthy inquiry into the petitioner's prior criminal convictions, and their underlying facts, was extremely prejudicial and denied petitioner a fair verdict by an impartial jury. Moreover, the probative value of the similar act evidence introduced by the prosecutor and allowed by the court, destroyed the overall fairness of the trial.

Admission of similar act evidence would be abuse of discretion if other act were not sufficiently similar to conduct at issue, or if chain of inferences necessary to connect evidence with ultimate fact to be proved is unduly long, Fed. Rules Evid. 404(b). 404 note, 28 U.S.C.A. – U.S. v. Peterson, 808 F.2d 969.

Details of defendant's prior conviction for obstruction of justice could not be introduced as other crime evidence by

Government in Rico prosecution unless defendant put his intent in issue as to perjury charges against him. U.S. v. Biaggi, 705 F.Supp. 848 (S.D.N.Y. 1988).

"Other crimes, wrongs, or acts" evidence is admissible unless introduced for sole purpose of showing defendant's character, unless it is overly prejudicial or not relevant. U.S. v. Pascarella, 84 F.3d 556.

Evidence of other crimes is admissible if such evidence is relevant to issues such as intent and knowledge and if probative value of the evidence is not substantially outweighed by the risk of unfair prejudice. U.S. v. Ali-Balogun, 72 F.3d 9.

Appellate court's inclusionary interpretation of other crimes evidence rule allows evidence of other wrongs to be admitted so long as it is relevant and it is not offered to prove criminal propensity. U.S. v. Pipola, 83 F.3d 556.

When defendant unequivocally relies on defense that defendant did not do act charged, evidence of other acts is not admissible for purpose of proving intent. U.S. v. Ortiz, 875 F.2d 900, C.A.2 (N.Y.).

Even under the inclusionary approach to the introduction of similar act evidence, district court must be careful to consider the cumulative impact of the evidence on the jury and to avoid the potential prejudice that might flow from its admission. U.S. v. Wallach, 935 F.2d 445.

Evidence of prior acts is admissible for any purpose other than to show a defendant's criminal propensity; however, such evidence, although relevant, may be excluded if its probative

value is substantially outweighed by the danger of unfair prejudice. U.S. v. Santiago, 199 F.Supp.2d 101 (S.D.N.Y. 2002).

To determine if the trial court properly admitted other act evidence, the Court of Appeals considers whether: (1) it was offered for a proper purpose; (2) it was relevant to a disputed trial issue; (3) its probative value is substantially outweighed by its possible prejudice; and (4) the trial court administered an appropriate limiting instruction. U.S. v. Edwards, 342 F.3d 168.

Prior bad-acts evidence must be (1) offered for proper purpose, (2) relevant, (3) substantially more probative than prejudicial, and (4) at defendant's request, district court should give jury appropriate limiting instructions. U.S. v. Ozsusamlar, 428 F.Supp.2d 161 (S.D.N.Y. 2006).



P O I N T   I I I

COURT'S DENIAL OF THE PETITIONER'S FEDERAL CONSTITUTIONAL RIGHT TO THE COMPULSORY PROCESS, WHEN THE PETITIONER HAD INVOKED TO EXERCISE SAID RIGHT BY HAVING HIS CO-DEFENDANT SUBPOENAED TO TESTIFY AT HIS TRIAL, AND WHERE THE COURT HAD NOT INFORMED THE PETITIONER OF HIS COMPULSIONARY RIGHT, VIOLATED THE PETITIONER'S RIGHT TO CALL A WITNESS IN HIS BEHALF. U.S. CONST. AMENDS. 5, 6, 14.

Before the commencement of the petitioner's trial, and prior to the conduction of the Sandoval Hearing, the petitioner sought to have his co-defendant produced to testify at trial. It was the petitioner's only request to have a witness produced and the nisi prius denied petitioner's request upon the premise of untimeliness. However, the court conferred with the petitioner's attorney about the production of the petitioner's co-defendant to testify, and, though petitioner's counsel expressed to the court that he strategically did not wish to have the petitioner's co-defendant produced to testify, he nonetheless objected to the non-production of the petitioner's co-defendant at the petitioner's behest.

Nevertheless, the court denied the petitioner his federally protected constitutional right to the compulsion of a witness in his behalf. Interalia, the compulsionary process, once invoked, is controlling and the court nor a petitioner's attorney, regardless of stratagem, is capable of defeating a cognizable consciously invoked constitutional right. Such a right is individualistic and bears no semblance of dualism in its exercent.

The Compulsory Clause is one of the most fundamental tenets of the United States Constitution of America, and deviation from its prerequisites violates the Law of the land. The petitioner contends that the court's denial of permitting him to subpoena a lone witness, nonetheless, his co-defendant, whom was a participant of the crime and who had knowledge of what occurred during the commission of the crime, was an abuse of the court's discretion.

It is incontrovertible case law what the compulsory process encompasses, and to whom it encompasses once it is invocationally activated. Having endured a previous trial upon the same criminal offense herein stated, which resulted in a mistrial, depicts that there was not a preponderance of guilt, nor evidence, to convince the jury of the petitioner having committed the offense charged.

Petitioner's co-defendant, having written a notarized letter recanting his initial written statement to police officers, should not have been occluded, by the court, from the petitioner's trial. It cannot be said that petitioner's co-defendant's testimony was not pertinent or relevant, as such testimony could have exonerated the petitioner of all charges against him, or, in the least, have created a reasonable doubt in the minds of the jurors.

The complainant in this action, who pursued and apprehended the petitioner's co-defendant at the scene of the crime, may have mistaken petitioner's actions of breaking up the fisticuff between the complainant and petitioner's co-defendant, as partaking in the crime perpetrated. Logical deductive reasoning would support that complainant's sole focus would be directed at apprehending the

assailant who had filched the complainant's currency. Which was not the petitioner.

The petitioner's co-defendant's original statement, which had implicated the petitioner as the assailant that had taken the complainant's currency, is aft to raise suspicion to this Court; inasfar as the amount of money the petitioner's co-defendant had iterated the petitioner stated he needed prior to the commission of the crime, coupled with the amount of money the complainant is said to have been filched of. Before the petitioner was apprehended his co-defendant had stated that the petitioner needed one-hundred and twenty-five dollars ($125). What is uncanny is that the exact amount of money the complainant is said to have been pilfered of is one-hundred and twenty-five dollars ($125).

Although purely speculative, it should stand forth as evident to the Court that the arresting officers conveyed to petitioner's co-defendant exactly how much currency the complainant had been robbed of, which the co-defendant incorporated in his statement against the petitioner, in order for the arresting officers to corroborate the complainant's complaint. It should be apparent as well that the arresting officers divulged the exact amount of money taken from the complainant to petitioner's co-defendant. It is petitioner's contentions that had he been allowed to subpoena his co-defendant, as is mandated by the Confrontation Clause, the occurrences of what transpired the day petitioner's co-defendant was arrested would have been revealed.

Essence of a violation of the Confrontation Clause is the

presentation of an accusation against the defendant without presenting the accuser. Ryan v. Miller, 303 F.3d 231. Confrontation Clause of Sixth Amendment guarantees defendant in criminal prosecution right to confront witnesses against him or her. U.S. v. Delano, 55 F.3d 720. Confrontation Clause of Sixth Amendment, which applies to states through Fourteenth Amendment, guarantees defendant a right to confront witnesses against him, and this means more than being allowed to confront witness physically, for main and essential purpose of confrontation is to secure for opponent the opportunity for cross-examination. Henry v. Speckard, 22 F.3d 1209.

Fact finder's independent assessment of credibility of witness and compulsion of adverse witness to testify in presence of accused are such important means of testing accuracy that absence of proper confrontation at trial calls into question ultimate integrity of fact-finding process. Ayala v. Leonardo, 29 F.3d 83.

Restrictions on a criminal defendant's right to confront adverse witnesses and to present evidence may not be arbitrary or disproportionate to the purpose they are designed to serve. Overton v. Newton, 146 F.Supp.2d 267. Confrontation Clause's purpose is to ensure reliability of evidence against criminal defendant by subjecting it to vigorous testing. U.S. v. Chan, 184 F.Supp.2d 337. Constitutional right to be present is rooted in Sixth Amendment and due process clause; Sixth Amendment applies when defendant has been prohibited from confronting witnesses or evidence against him or her, and due process applies when defendant is not confronting witnesses or evidence. Gatter v. Lord, 917

F.Supp. 145. A person charged with a crime, unlike a convicted person, enjoys a presumption of innocence, the right to counsel, the right to a jury trial and the right to confront one's accuser. Pappiano v. New York City Police Department, 724 N.Y.S.2d 685. Criminal defendant has constitutional right to confront adverse witnesses. People v. Ruffano, 220 A.D.2d 701. Purpose of confrontation clause is to prohibit trial by ex parte affidavits and to advance search for truth by guaranteeing reliability of evidence submitted against criminal defendant. People v. Egan, 78 A.D.2d 34. Right to confront witness which is guaranteed by Sixth Amendment implies the right to see, hear, and, in order to effectively confront witnesses, cross-examine. People v. Vazquez, 686 N.Y.S.2d 624. Defendant's right to confront prosecution witnesses about matters critical to defense is absolute. People v. Hunte, 637 N.Y.S.2d 996. Confrontation clause seeks to ensure that witnesses against accused testify under oath at trial, where they face defendant, where they are subject to cross-examination and where jury can evaluate their demeanor. People v. Brown, 632 N.Y.S.2d 938.

To establish violation of confrontation clause, defendant is not required to show prejudice with respect to trial as the whole; rather, the focus is on individual witnesses. U.S. v. Sasson, 62 F.3d 874. Even privileges recognized by Constitution can be trumped by constitutional rights, such as right of confrontation conferred by Sixth Amendment and interpreted to include right of cross-examination. U.S. v. Rahone, 32 F.3d 1203.

What Confrontation Clause guarantees is not cross-examination

that is effective in whatever way, and to whatever extent, the defense might wish, but rather an opportunity for effective cross-examination. U.S. v. LaVite, 184 F.3d 180.

Pursuant to the Confrontation Clause of the Sixth Amendment, a defendant has a right to cross-examine the witnesses against him to expose any possible biases or motives for testifying falsely. Dailly v. New York, 388 F.Supp.2d 238, (S.D.N.Y. 2005). Right of an accused to cross-examination is more than a desirable rule of trial procedure, but is an essential and fundamental requirement for the kind of fair trial which is the country's constitutional goal. Grant v. Demskie, 75 F.Supp.2d 201, (S.D.N.Y. 1999). Under confrontation clause, a defendant is guaranteed opportunity to demonstrate a lack of credibility, reliability or truthfulness of the testimony against him. Bagby v. Kuhlman, 742 F.Supp. 137.

The Sixth Amendment guarantees a defendant the right to be confronted by witnesses against him, and testimonial statements may be introduced by a third-party witness only when the declarant is unavailable and the defendant had a prior opportunity to cross-examine the declarant regarding the statement. U.S. v. Logan, 419 F.3d 172. Although all assertions that violate the Confrontation Clause will also be a form of hearsay; not all assertions that hearsay rules prohibit will run afoul of the Confrontation Clause; Confrontation Clause targets only that testimony that contains accusations against the defendant. Ryan v. Miller (Supra).

Guarantee of compulsory process encompasses right to compel appearance of witnesses favorable to one's defense. Singleton v.

Lefkowitz, 583 F.2d 618.  Under this amendment, defendant accused of crime is guaranteed right to compel attendance of witnesses, and who those witnesses shall be is a matter for defendant and his counsel to decide and it does not rest with prosecution or person under subpoena.  U.S. v. Seeger, 180 F.Supp. 467.  Constitutionally prescribed preference for direct confrontation, personal examination, and cross-examination can be discarded only where reliability of testimony is otherwise assured, but first, prosecution must demonstrate unavailability of adverse witness.  Ayala v. Leonardo, (supra).  In determining whether a limitation on right to present witnesses rises to the level of a constitutional violation, the test is whether the omitted evidence, evaluated in the context of the entire record, creates a reasonable doubt that did not otherwise exist; in a close case, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.  Dobbin v. Greiner, 249 F.Supp.2d 241, stay granted 2003 WL 222 32852. (S.D.N.Y. 2002).  Right to cross-examine witness under confrontation clause includes opportunity to expose witness's biases and possible motives to lie.  Exposing witness's motivation for testifying is proper and important function of right of cross-examination protected by confrontation clause.  In addition to demonstrating bias, defendant is entitled under confrontation clause to use cross-examination to impeach witness's recollection, ability to observe, and general credibility.  Confrontation Clause is violated when defendant is prohibited from engaging in otherwise appropriate cross-examination designed to expose to jury facts from which jurors could appropriately draw

inferences relating to reliability of witness. Cotto v. Herbert, 331 F.3d 217.

Right to confrontation, which ordinarily assures defendants an opportunity to cross-examine witnesses against them, is not unqualified; in particular, when a declarant is unavailable to testify at trial, his or her hearsay statement is sufficiently dependable to allow its untested admission against an accused when (1) it contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to statements reliability. U.S. v. Gallego, 191 F.3d 156.

The right to call witnesses in one's own defense is essential to due process. Truman v. Wainwright, 514 F.2d 150. Right to offer testimony of witnesses, and to compel their attendance,if necessary, is in plain terms the right to present a defense, and a fundamental element of due process of law. Washington v. State of Tex., 388 U.S. 14. Right to notice, confrontation and compulsory process, taken together, guarantee that criminal charge may be answered in manner now considered fundamental to fair administration of American justice, through calling and interrogating of favorable witnesses, cross-examination of adverse witnesses, and orderly introduction of evidence, in short this amendment constitutionalizes right in an adversary criminal trial to make defense as we know it. Faretta v. California, 422 U.S. 806.

Habeas Corpus petitioner fairly presented to state courts that his conviction was obtained by depriving him of his Sixth Amendment right to present witnesses in his defense and cited

federal precedent to support his arguments, not withstanding claim
that petitioner stated only mere facts or grounds framed primarily
in state procedural law and state case law. Braunskill v. Hilton,
629 F.Supp. 511. It is manifest duty of courts to vindicate
guarantees of confrontation, compulsory process, and due process
clause, and to accomplish that it is essential that all relevant
and admissible evidence be produced. U.S. v. Nixon, 418 U.S. 683.
The right to produce witnesses, by compulsory process, if
necessary, is a constitutional guarantee. Salemme v. Ristaino,
587 F.2d 81. An accused right to subpoena witness is guaranteed
by this amendment is a fundamental element of due process. U.S.
v. Goodwin, 625 F.2d 693.
Right to compulsory process is fundamental and essential to
a fair trial and is a necessary correlative of due process.
Lawrence v. Henderson, 344 F.Supp. 1287.



# P O I N T   I V

## THE DEPRIVATION OF PETITIONER'S CLOTHING DENIED HIM OF THE GARB AND PRESUMPTION OF INNOCENCE, WHEN HE WAS FORCED TO APPEAR BEFORE THE JURY WEARING PRISON CLOTHES. U.S. CONST. AMENDS. 5, 6, 14.

During the prosecution of petitioner's case he was banned or rather barred from being held and confined at Rikers Island. Due to such banning and barring petitioner was incapable of wearing suits, dress shirts and socks, ties and shoes to appear with dignity before the jury and the Court, as well as unable to groom himself and look presentable.

Inmate's clothing is basic necessity of human existence which cannot be deprived in same manner as privilege an inmate may enjoy. Maxwell v. Mason, 668 F.2d 361.

Presumption of innocence requires garb of innocence, and regardless of ultimate outcome, or of evidence awaiting presentation, every accused is entitled to be brought before court with appearance, dignity and self-respect of a free and innocent man. Kennedy v. Cardwell, 487 F.2d 101.

Compelling a defendant to appear before jury in his prison clothes unconstitutionally infringes his due process right to be presumed innocent until proven guilty. Gaito v. Brierley, 485 F.2d 86. It is inherently unfair to try a defendant for a crime while garbed in his jail uniform, especially when his civilian clothing is at hand; no insinuations, indications or implications suggesting

guilt should be displayed before the jury, other than admissible evidence and permissible argument. Brooks v. State of Tex., 381 F.2d 619.

Case 1:06-cv-00039-RJS-FM Document 6 Filed 11/02/06 Page 153 of 182

C O N C L U S I O N

WHEREFORE, FOR THE FOREGOING REASONS, PRIOR BRIEFS, EXHIBITS
AND PERTINENT DOCUMENTS SUBMITTED BY THE PETITIONER, THE CONVICT-
ION MUST BE DISMISSED AND THE PEOPLE BARRED FROM REPRESENTATION,
AS THE OBTAINMENT OF THE CONVICTION IS UNCONSTITUTIONAL  AND  THE
COURT IS BOUND BY THE EDICTS OF THE FIFTH, SIXTH, AND FOURTEENTH
AMENDMENTS.

Respectfully,

*Echo Westley Dixon*
Echo Westley Dixon #00A6365
Auburn Correctional Facility
P.O. Box 618
Auburn, New York 13024

I DECLARE UNDER THE PENALTY OF PERJURY THAT THE FOREGOING IS TRUE
AND CORRECT TO THE BEST OF MY KNOWLEDGE, EXCEPT  TO  THOSE  MATTERS
STATED UPON INFORMATION AND BELIEF, AND TO THSOE MATTERS I BELIEVE
THEM TO BE TRUE.   28 U.S.C. § 1746.

*Echo Westley Dixon*

EXHIBIT A

REPLY/ADDENDUM

Clarence Ballard, Jr.

```
 1                                              (Jury).
 2          THE COURT:  I understand we'll reserve motions
 3    until the end of the case.
 4          One second.
 5          (Whereupon, there was a bench conference among
 6    all counsel with the court out of the presence of the
 7    jury).
 8          THE COURT:  Let me just take a short break.
 9    Then we'll see where we go.  The People have rested.
10    That's all the evidence you're going to hear from the
11    district attorney.  That's the People's direct case.
12    We'll see if the defense wants to introduce any evidence.
13    We'll take that.  I'm hoping by lunchtime the case will be
14    in your hands.  Don't discuss the case, though.  It hasn't
15    been given to you yet.
16          COURT OFFICER:  Right this way, ladies and
17    gentlemen.
18          (Whereupon, the jury left the courtroom).
19          THE COURT:  I understand we've just had a bench
20    conference about a paycheck your client received or
21    something.
22          MR. BOWMASTER:  Yes, your Honor.  I wanted to
23    introduce the evidence from the first trial.
24          THE COURT:  What is it?
25          MR. BOWMASTER:  The evidence is my client's
```

Clarence Ballard, Jr.

```
 1   paycheck for the week of June 24th through June 30th.  He
 2   was downtown on the day in question on July 7.  He had
 3   cashed his paycheck at G & G Service Corp at 440 West 41st
 4   Street.
 5              THE COURT:  What time?
 6              MR. BOWMASTER:  Judge, he picked up his paycheck
 7   -- I have to go into the exact time.  He picked up his
 8   paycheck about 8 o'clock.  He cashed his paycheck about
 9   fifteen minutes later at a nearby liquor store.
10              THE COURT:  What time was this crime?
11              MR. VENGRIN:  The crime took place at 9 o'clock.
12              THE COURT:  34th Street.
13              MR. BOWMASTER:  Right.  The liquor store, which
14   is near 34th Street, he will testify opened up at 9
15   o'clock.  And he cashed his paycheck.  Then went directly
16   back to the station.
17              THE COURT:  He can testify to that.  Insofar he
18   wants to say he was in the liquor store, you have to bring
19   somebody from the liquor store.  I'm not going to take a
20   paycheck for that.
21              MR. BOWMASTER:  Just for the record, paychecks
22   are non-hearsay.  They do have independent legal
23   significance.  He can testify as to what they are.  They
24   are admissible over my objection.
25              THE COURT:  What is the relevance?
```

Clarence Ballard, Jr.

Colloquy

1       MR. BOWMASTER:  Judge, it corroborates, number

2   one, that he was working.  Number two, why he was down in

3   the area, which is that he picked up his paycheck.  Number

4   three, the date on the paycheck and the pay stub are July

5   7, 2000, which is the date of his arrest.

6       THE COURT:  He can testify to that.  To me these

7   are hearsay documents.  I don't see what exception they

8   come in under.

9       MR. BOWMASTER:  The check is not hearsay.

10   independent significance.

11       THE COURT:  I'm not sure that's true.  You're

12   trying to say he was cashing his check, he got this check.

13   You're trying to introduce it where he was, why he was

14   there.  Are you objecting to this?

15       MR. VENGRIN:  Absolutely, Judge.

16       MR. BOWMASTER:  The payor, the payee on the

17   check are not hearsay.  If there was a memo or something

18   on the check saying this check was for X, Y, that would be

19   hearsay.  The payor or payee is not.

20       MR. VENGRIN:  The People have no dispute that

21   the defendant was working.  Whether or not the defendant

22   was working is of minimal relevance to this trial, if any

23   at all, your Honor.  He can certainly testify that he was

24   working.  This check may corroborate the fact that he was

25   working.  But it -- there is nothing on the face of this

Colloquy                                                      Page 95

1  check or the reverse of this check that corroborates that
2  the defendant was in the liquor store on that day --
3           MR. BOWMASTER:  That's not what --
4           MR. VENGRIN:  At the time of the incident.
5           THE COURT:  Go ahead.
6           MR. BOWMASTER:  I'm not using it to corroborate
7  an alibi or where he was at the time of the incident,
8  judge.  That is not the claim here.  But it -- his
9  credibility is totally at issue here.  And I'm using
10  something to shore up, corroborate his credibility,
11  corroborate his testimony, something to counteract the
12  convictions, et cetera, that are going to come in.
13          This shows that he was working at the time of
14  the incident, that he was working -- that G & G Service
15  Corp, which is nearby.  That's why he was down in
16  Manhattan at that time.
17          He lives in the Bronx.  It corroborates the fact
18  that he picked up his check on July 7 because the check
19  was in fact dated July 7.  That -- I'm talking about the
20  pay stub as well as the check.  Pay stub actually
21  corroborates the time he worked.  It corroborates that his
22  check was cashed, which goes according to his testimony.
23  And the original of this check is actually in the
24  possession of the D A's office.  This copy is from ADA
25  Brennan, who originally had the case.

Clarence Ballard, Jr.

Clarence Ballard, Jr.

| | |
|---|---|
| 1 | THE COURT: It is not a question whether the |
| 2 | check is or is not a check. I just don't see the |
| 3 | relevance to the case. It has nothing to do with where he |
| 4 | was at the moment the incident occurred insofar as -- as I |
| 5 | say, there's nothing about the check that's going to |
| 6 | indicate whether he was in the subway station or not. To |
| 7 | me it's a hearsay document. |
| 8 | If you have someone from the liquor store who |
| 9 | remembers him and wants to come in and say he was in the |
| 10 | liquor store cashing his check, I'll take that testimony. |
| 11 | I'm not going to take some check that doesn't indicate any |
| 12 | time. It seems somewhat ridiculous. I'm not going to |
| 13 | take it. That's my ruling. |
| 14 | MR. BOWMASTER: Over my objection, please, |
| 15 | Judge, with the exception. |
| 16 | THE COURT: Step up a second. |
| 17 | (Bench conference among all counsel with the |
| 18 | court). |
| 19 | THE COURT: Are you sure you want to take the |
| 20 | stand now? You know you don't have to, Mr. Dixon? |
| 21 | THE DEFENDANT: Yes. |
| 22 | THE COURT: You have to understand, you just |
| 23 | have one witness testifying against you. And. You know, |
| 24 | the People do have the burden to prove the case beyond a |
| 25 | reasonable doubt. And, you know, it's up to you. I will |

*Colloquy*

Colloquy

1  instruct the jury that if you decide not to testify, no
2  inference adverse to you may be drawn.  So they can't use
3  that against you in any way.
4      You have one person who claims you are the other
5  robber.  It's up to you if you want -- you want to take
6  the stand?
7      THE DEFENDANT:  Excuse me, your Honor.  Yes, I
8  would like to take the stand.
9      THE COURT:  Fine.  If you want to take the
10  stand.  Have you discussed this with your attorney?  You
11  sure it's what you want to do?
12      THE DEFENDANT:  Yes.  There's one more thing I
13  want to point out.
14      THE COURT:  Nothing you have to point out to me.
15  If you have some reasons you want to testify, that's up to
16  you.
17      Discussed this with him?
18      MR. BOWMASTER:  Yes.
19      THE COURT:  And he wants to testify?
20      MR. BOWMASTER:  Yes, your Honor.
21      THE COURT:  You're going to call him?
22      MR. BOWMASTER:  Yes, I am, judge.
23      THE COURT:  Fine.  Get the jury.
24      Did you want to make a motion at the end of the
25  People's case?

Clarence Ballard, Jr.

1   MR. BOWMASTER: Yes.  I make a motion for a

2   trial order of dismissal.  The People have failed to make

3   a prima facie case.

4   THE COURT: You oppose the motion?

5   MR. VENGRIN: Yes.

6   THE COURT: It's denied.

7   COURT OFFICER: Jury entering.

8   (Whereupon, the jury enters the courtroom).

9   THE COURT: All right.  I understand the defense

10  has some evidence for you.

11  What is your evidence?

12  MR. BOWMASTER: Judge, I wish to call Mr. Echo

13  Dixon to the stand.

14  THE COURT: Mr. Dixon is going to take the

15  stand.  Mr. Dixon, you want to step up here, sir?

16  THE COURT: Would you like a glass of water,

17  Mr. Dixon?

18  THE WITNESS: No.

19  E C H O    D I X O N, called as a witness by and on behalf of

20  the Defense at the trial, having been first duly affirmed,

21  testified as follows:

22  THE COURT: You may inquire.

23  DIRECT EXAMINATION

24  BY MR. BOWMASTER:

25  Q   Good morning, Mr. Dixon.

Clarence Ballard, Jr.

```
 1      A    Good morning.
 2      Q    Mr. Dixon, how old are you?
 3      A    I'm 32.
 4      Q    And how old were you at the time of this incident?
 5      A    I believe 29.
 6      Q    And where were you living at the time of this incident?
 7      A    Bronx, New York.
 8      Q    And what's the last grade of formal education you
 9  completed?
10      A    Tenth.
11      Q    Mr. Dixon, how tall are you?
12      A    5/5.
13      Q    And how much do you weigh?
14      A    180 pounds.
15      Q    And how much did you weigh in July of 2000?
16      A    160.
17      Q    Mr. Dixon, I'd like to take you back to the time of the
18  incident, July 7, 2000.  Mr. Dixon, did you aid Christopher
19  Seldon in the commission of a robbery on July 7, 2000?
20      A    No.
21      Q    Did you at any time plan to aid in the commission of a
22  robbery by Mr. Seldon --
23            MR. VENGRIN:  Objection.
24      Q    Did you at any time plan to aid --
25            THE COURT:  Do you know a Christopher Seldon?
```

Clarence Ballard, Jr.

Clarence Ballard, Jr.

```
 1          Do you know what he's talking about?
 2          THE WITNESS:  Yes.
 3          THE COURT:  You do know him?
 4          THE WITNESS:  Yes.
 5          THE COURT:  I'm not going to let these types of
 6  questions.  He says -- you can ask him if he was present
 7  or did something.  It seems to me that's the issue, where
 8  he was, what he did, what he said.  Facts, you know.
 9    Q     Did you rob Mr. Martinez --
10    A     I didn't rob anybody.
11          THE COURT:  Let him finish the question.  Is
12  that the end of your question?
13          MR. BOWMASTER:  No.
14          THE COURT:  Rephrase it.
15    Q     Did you rob Mr. Martinez on July 7, 2000?
16    A     No, I didn't.
17    Q     Mr. Dixon, were you employed in the end of June 2000?
18    A     Yes.
19    Q     And where did you work June 24 through June 30?
20    A     G & G Services on west 41 -- 41 west 40th Street.
21    Q     What is G & G Services?
22    A     Temporary services that dispatches workers to different
23  locations that want employment.
24    Q     And what work were you doing for them at that time?
25    A     I was a warehouse worker.
```

Dixon/direct/defense

1    Q    And did you have any other temporary job lined up
2  through the agency at the time of your arrest?
3    A    With another agency, yes.
4    Q    What was that?
5    A    Acer on 370 Madison Avenue, ninth floor.
6    Q    What were you going to do for them?
7    A    Telemarketing.
8    Q    Now, the week that you worked for G & G Services in the
9  warehouses, were you paid by the warehouse directly or from G &
10 G Temporary Services?
11   A    I was paid by G & G Temporary Services.
12   Q    What was the form of payment you received for the
13 warehouse work done?
14   A    Check.
15   Q    And in that period of time did you have a checking
16 account?
17   A    No.
18   Q    So when you worked -- when you would work and get paid
19 by G & G Services, what would you do to get money?
20   A    I would have to cash my paycheck at a different
21 location after I received my paycheck from G & G Services.
22   Q    Now, calling your attention to the morning of July 7th,
23 please tell the court what happened that morning?
24   A    Around 7 o'clock I received a phone call telling me to
25 get up, go get your paycheck.  So I leave the house around 7:30.

Clarence Ballard, Jr.

1  I head to the six train, because I'm across town at my
2  girlfriend's house.  And I take the six train to 125th Street
3  and get off and catch the 4 train express.  While exiting the 6
4  train I bump into Christopher Seldon.  He tells me he's --
5         Q    Prior to July 7 did you know Christopher Seldon?
6         A    Yes.
7         Q    Continue.
8         A    I bump into Christopher Seldon.  He tells me he is
9  going downtown, too.  I said, all right, I'm going downtown to
10  cash my paycheck.
11         He accompanies me downtown.  We get off at 42nd Street
12  after we take the 4 train express.  Once I get to 42nd Street, I
13  go to G & G services.  We walk across.  Because it's July, it is
14  a nice day outside, we walk across.
15         I pick my paycheck up.  I go to 270 West 36th Street to
16  cash my paycheck.  After cashing my paycheck, I goes to the
17  train station.  He follows me.  He says he don't have any money.
18  I said I'll buy you a token because I have a Metro --  excuse
19  me -- a MetroCard.  And he says -- I said, you can't get on
20  my MetroCard because it only allows, when you have a weekly
21  MetroCard, you can only swipe it every fifteen minutes.  I tell
22  him you can't get on my MetroCard.
23         When I go to pay for the token and get my change, he
24  disappears.  I look for him.  I turn around.  I don't see him.
25  I go to the staircase.  He's in the staircase fighting

Clarence Ballard, Jr.

Clarence Ballard, Jr.

1  with some man. My immediate reaction was to break up the fight.
2  When I broke up the fight, I heard a pocket rip. I looked down.
3  Then he had his hand in the man pocket.
4  I didn't know. I was standing there. I didn't go way out
5  and run. I stayed right there. The man was looking at me. We
6  was in the same area for about three seconds. He ran. He
7  jumped over the turnstile. I search my pockets for my MetroCard
8  to pay for my fare. I paid for my fare. He's standing on the
9  side of the wall.
10  THE COURT: Who is "he"?
11  THE WITNESS: Christopher Seldon. He had
12  something white in his hand. I said, "What you took from
13  that man?"
14  He said, "I didn't take anything."
15  And then a man starts coming. He starts
16  running. So the man just chases him.
17  I'm walking on the outside of the platform.
18  It's crowded in midtown at rush hour. Walking on the
19  outside of the platform and watching the man chase
20  Christopher Seldon down the thing. He goes through the
21  turnstile. He goes down the steps. We walk down the
22  steps. And then the man -- a man jumps on him, an
23  off-duty officer, he jumps on Christopher Seldon and
24  arrests Christopher Seldon right in front of me.
25  After they arrest him, some other guy came and

Dixon/direct/defense                                    Page 104

1    gave him handcuffs and put their handcuffs on him.  I went
2    home.  Later that night I got a phone call.
3         Q    Let me stop you there.  Let me just -- let's go back up
4    a little bit, get a little bit more detail, Mr. Dixon.
5         A    Right.
6         Q    Now, you said you were at your girlfriend's house?
7         A    Yes.
8         Q    Where did you stay the night of July 6, the night
9    before the incident?
10        A    1635 East 174th Street.
11        Q    What time did you leave her apartment that morning?
12        A    7:30.
13        Q    The morning of July 7th?
14        A    Yes.
15        Q    And what was your intended destination when you left
16   the house?
17        A    To pick up my paycheck, cash my paycheck.
18        Q    What was that address?
19        A    440 West 41st Street.
20        Q    How did you intend to get there?  Strike that.  How did
21   you get there?
22        A    I took the 6 train to the 4 train express.  4 train
23   express I went to 42nd Street and walked over to West 41st
24   Street.
25        Q    Where were you when you first saw Mr. Seldon that day?

Clarence Ballard, Jr.

Dixon/direct/defense

```
 1   A   I was getting off the 6 train to catch the 4 train
 2   express.  He was either coming down the platform.  I don't
 3   remember, but I saw him.
 4   Q   Did you plan to see him that day?
 5   A   No.
 6   Q   Did you know he was going to be on the platform that
 7   day?
 8   A   No.
 9   Q   And what happened after you saw him on the platform?
10   A   We exchanged, you know, greetings.  He asked me where I
11   was going.  I told him I was going downtown.  He said he was
12   going downtown, too, if he could come with me.  I said sure.
13   And that was that.
14   Q   Where did you get off the train?
15   A   42nd Street.
16   Q   How did you get from 42nd Street to G & G Temporary
17   Service at 440 West 41st Street?
18   A   We walked.
19   Q   Approximately what time did you get off the train that
20   morning?
21   A   About I'll say 8 o'clock, 7:50, sometime around there.
22   Q   What did you do after you got your check?
23   A   I headed towards the train station to take the C train
24   back up to the Bronx.
25   Q   What was your first stop after you got your check?
```

Clarence Ballard, Jr.

```
 1    A    After I got the check?

 2    Q    Right.

 3    A    Oh, I went to the, to cash the check at 270 West 36th

 4 Street.

 5    Q    And why did you go to that particular location?

 6    A    Because that was the location that my boss Lou Avarese

 7 (phon.) told me that I had to cash my paycheck there.  That's

 8 the only place I can cash my paycheck, because I don't have a

 9 checking account.

10    Q    What type of establishment is that?

11    A    It is a liquor store, I believe.

12    Q    So -- and how long did it take you to go from G and G

13 to the liquor store?

14    A    Ten, fifteen minutes.

15    Q    What time did you get to the liquor store

16 approximately?

17    A    About 8:45.

18    Q    How long were you at the liquor store?

19    A    I had to wait for it to open at 9 o'clock because it

20 doesn't open until 9 o'clock.

21    Q    Was Mr. Seldon with you the entire time when you got

22 off the train until you cashed your check at the liquor store?

23    A    Yes, he was.

24    Q    Now, after cashing your check, what was your intended

25 destination?
```

Clarence Ballard, Jr.

Clarence Ballard, Jr.

1   A   To go home.
2   Q   And what way, or what was the final subway stop you
3   were going to?
4   A   I believe it was Eighth Avenue, the C train or the B
5   train is at.
6   Q   What was the final, your final subway stop destination?
7   A   167 and Grand Concourse, the D train.
8   Q   How did you plan on getting there?
9   A   I would take the C train.  Sometimes it runs to the
10  Bronx.  Sometimes it doesn't.  But it puts you close to the D
11  train.  So I would take the D train straight up, or the C train
12  to the D train, and then go up like that.
13  Q   Where did you plan to take the C train that day?
14  A   34th Street, Eighth Avenue I believe it is.
15  Q   Where did you actually enter the subway station?
16  A   At 34th Street and Eighth Avenue.
17  Q   What, if anything, happened after you entered the
18  station?
19  A   I went downstairs.  I went to get on the train, and
20  asked Christopher Seldon if he had any money.  He said he didn't
21  have any money.  So I said I'll buy you a token.
22  Q   You said you had a MetroCard?
23  A   Yes.
24  Q   Why couldn't you use the MetroCard for Mr. Seldon as
25  well?

Clarence Ballard, Jr.

1   A    Because when you buy a MetroCard, it doesn't allow --
2   if you buy a weekly MetroCard, it doesn't allow you to swipe
3   your MetroCard repeatedly.  You have to wait a certain amount of
4   time before you swipe it again.
5   Q    And were you able to see Mr. Seldon when you were
6   buying the token?
7   A    No.
8   Q    Were you able to see him immediately after you
9   purchased the token?
10  A    No.  He was gone.
11  Q    What did you do then?
12  A    I looked around for him.  He wasn't nowhere in sight.
13  So I went back to the staircase.  And when I went -- as soon as
14  --
15  Q    Let me stop you.  You went back to the same stairs that
16  you used to enter the subway?
17  A    Yes.
18  Q    What, if anything, did you see at that time?
19  A    I saw Christopher Seldon back was to me.  He was two
20  stairs under Mr. Martinez.  Mr. Martinez was standing on top of
21  him.  And he was hitting him, hitting him.  I went
22  and broke it up.
23  Q    Who was hitting who?
24  A    Mr. Martinez was hitting Christopher Seldon, beating
25  him up.

Clarence Ballard, Jr.

```
 1     Q   Could you see Mr. Seldon's hands at this time?
 2     A   No.
 3     Q   And how exactly were they positioned on the steps in
 4   reference to you when you first saw them?
 5     A   In reference to me.  Mr. Martinez was up a few stairs.
 6   Christopher Seldon was down probably two steps.  And they was
 7   facing each other.  But their back was to me.  I could see
 8   Mr. Martinez' face.
 9     Q   Whose back was to you?
10     A   Christopher Seldon.
11     Q   What happened then?
12     A   I just went to break up the fight.
13     Q   How did you try to do that?
14     A   I went in-between them both and I separated them.
15     Q   Describe -- I notice a motion with your hand.  If you
16   can just describe that motion for the record?
17     A   Like when you get in-between two people and you put
18   your arms in and separate them like that.  I separated them.  I
19   separated, I heard a ripping sound.
20     Q   What portion of their bodies did you put your arm
21   in-between to separate them?
22     A   Their chest areas.
23     Q   What, if anything, happened at that point?
24     A   Christopher Seldon ran.
25     Q   What, if anything, happened immediately after you put
```

```
 1  your arms in-between the chest?
 2       A    I separated them.  I heard a ripping sound.  I looked
 3  down.  And I realized that this -- robbery, he was robbing the
 4  guy.
 5       Q    Did you actually see Mr. Seldon's hands in the pocket
 6  of Mr. Martinez?
 7       A    No, not when I first approached the scene or when I
 8  broke it up.  When I broke it up, that was the only time I
 9  realized what was going on.
10       Q    Right.  After you separated the two or as you separated
11  the two, did you actually see a hand in -- Mr. Seldon's hand in
12  Mr. Martinez' pocket?
13       A    No, I didn't.
14       Q    What, if anything, did Mr. Seldon do at that point?
15       A    Mr. Seldon ran.
16       Q    What did you do?
17       A    I stood in front of Mr. Martinez because I didn't know
18  what -- it wasn't -- I was shocked.  I didn't know what to do.
19  I was just standing there.  I didn't move.  I didn't run.  I
20  didn't know what to do.  Because it's a bad situation.  I
21  couldn't think because he was leaving.
22       Q    What did you do then?
23       A    After Christopher -- I moved out of his way.
24       Q    Out of whose way?
25       A    Mr. Martinez way.  I moved out his way because I didn't
```

1   know I had anything to do with that.  I didn't want anything to
2   do with it.  He stood there.  He must have thought I had
3   something to do with it.  But I didn't.  But he didn't move.  He
4   didn't yell.  He didn't do anything.
5       I went to the turnstile, and I searched my pockets because
6   I had in my pocket my papers and my pay stub inside my pocket.
7   I couldn't find my MetroCard.  They're hard to find when you put
8   them in your pocket with the other stuff.
9        Q    What about the token you had just purchased?
10       A    During the scuffle, I probably lost it.  I didn't have
11   no token in my hand at that time.  So I had to find my
12   MetroCard.
13       Q    Where were you when you were searching through your
14   pocket?
15       A    I was standing in front of the turnstile.
16       Q    During that time how far away from you was the person
17   who had been struggling with Mr. Seldon?
18       A    Three to five feet.
19       Q    Did he say anything to you at this time?
20       A    No.
21       Q    Did he make any attempt to grab you at this time?
22       A    No.
23       Q    Did he call for assistance at this time?
24       A    No.
25       Q    What did you do next?

Clarence Ballard, Jr.

Dixon/direct/defense                                      Page 112

```
 1        A    I paid my fare.  I got on the train.  I saw Christopher
 2   Seldon standing to the side.
 3        Q    Let me back you up.  You paid your fare?
 4        A    Yes.
 5        Q    Do you know where Mr. Martinez was when you paid your
 6   fare?
 7        A    He was right behind me the whole time.
 8        Q    Did you see him go through the turnstile?
 9        A    I didn't see him, no.
10        Q    What happened -- what, if anything, happened right
11   after you went through the turnstile?
12        A    I saw Christopher Seldon standing to the left like out
13   of eyeview.  If you're standing in front of the turnstiles, you
14   can't see if he's on the other side of the walls.  He's standing
15   on the other side of the wall.  I walks up to him.  He had
16   something white in his hand.  I said, "What did you take from
17   the man?"  He said, "Nothing."
18             And then this man start coming.  And he start running,
19   bumping into people.
20        Q    What did you do then?
21        A    I moved out of the way.  I walked along the platform
22   area.  It's like two sides with a pole separate the little area
23   right there.  I was on the outside walking, watching them bump
24   into people while they're running.  They running.  He's chasing
25   him.  He's bumping into people.  He's bumping into people.  So
```

Clarence Ballard, Jr.

Clarence Ballard, Jr.

```
 1  I'm watching the whole thing.
 2       Q    When you first started walking on the platform, what
 3  were you walking towards, which exit?
 4       A    The Penn Station exit.
 5       Q    Where was Seldon when you first started walking, if you
 6  know?
 7       A    When I first started walking, he was trying to run from
 8  people.
 9       Q    How far away from you was he at that point?
10       A    He's about to where you are right there.
11            MR. BOWMASTER:  Your Honor, approximately 35
12  feet.  Your Honor, approximately 35 feet from Mr. Seldon
13  --
14            THE COURT:  I was reading something.  What
15  happened?
16            MR. BOWMASTER:  I'm estimating 35 feet between
17  myself and Mr. Dixon.
18            THE COURT:  I think it's less.  20, 25 tops.
19  The jury has seen it.  It's up to them.
20       Q    Were you able to see Mr. Martinez at this point?
21       A    Yes.  Mr. Martinez was probably -- Mr. Martinez was
22  more closer to me than he was to him.  He was like about where
23  the officer is at, maybe like five feet back further.
24       Q    Mr. Dixon, would you describe the level of pedestrian
25  traffic on the platform as light, medium or crowded?
```

Clarence Ballard, Jr.

1   A    It was crowded.
2   Q    Was it difficult to negotiate your way through the
3   people?
4   A    Yes.
5   Q    And were you walking or running?
6   A    Who, me? I was walking.
7   Q    And was Mr. Seldon walking or running at this point?
8   A    He was running. But he couldn't run because it was too
9   crowded. He was running into people.
10  Q    Repeat that?
11  A    He was running, but he wasn't going anywhere because he
12  was running into people and trying to knock people over.
13  Q    So were they pulling ahead of you -- I'm sorry. Strike
14  that.
15  Q    Was Mr. Seldon pulling ahead of you or because of the
16  people were you about the -- was --
17  A    No. We was about the same. The only person that ended
18  up getting closer to him was Mr. Martinez.
19  Q    Was Mr. Martinez able to run on the platform?
20  A    No.
21  Q    Why not?
22  A    Because it was too crowded.
23  Q    And what happened next?
24  A    He exited -- we both exit the train station around the
25  same time.

Dixon/direct/defense                                        Page 115

```
 1        Q   We're talking about exiting the subway?
 2        A   Yes.
 3        Q   Into the Penn Station?
 4        A   Going towards the Penn Station area.  Christopher
 5   Seldon didn't make it to the Penn Station area because the
 6   off-duty officer must have noticed him running and jumped right
 7   on top of him.  And they arrested him right there on the scene.
 8        Q   How far away from Mr. Seldon were you at this time you
 9   saw him get jumped on?
10        A   When he initially got jumped on, I was standing maybe a
11   foot next to him.
12        Q   And where were you located at this time in reference to
13   the turnstile exiting the subway into Penn Station?
14        A   Once the officers jumped on him, I moved back three
15   feet.  And I watched them arrested him on the floor.
16        Q   What, if anything, did you do then?
17        A   I left.  I went home.
18        Q   Let me stop you there.
19             MR. BOWMASTER:  I have no further questions,
20   your Honor.
21             THE COURT:  Cross.
22             MR. VENGRIN:  Yes.
23   CROSS EXAMINATION
24   BY MR. VENGRIN:
25        Q   Mr. Dixon, you claim that your sole involvement in this
```

Clarence Ballard, Jr.

Clarence Ballard, Jr.

Dixon/direct/defense

1 incident was to break up a fight between Mr. Martinez and
2 Christopher Seldon, right?
3         A    Yes.
4         MR. BOWMASTER:  Judge, can we approach one
5 second?
6         THE COURT:  Yes.
7         (Whereupon, there was a bench conference among
8 all counsel with the court out of the presence of the
9 jury).
10        (Continued on the following page)

Page 116

Dixon - cross - People

1   A   I can't see it, I can't see his hand from behind him.
2   Q   What did you see?  You eventually got up close to them,
3   right?
4   A   Yeah, when I got up close to them.  When you come up on
5   the side of a fight, somebody is swinging, you get in between and
6   separate it.  And when I got in between and separate it, it ripped
7   and I heard a ripped sound and he had a white piece of paper in
8   his hand and he runs off and there was nothing else I could do.
9   Q   An after Mr. Seldon runs off Mr. Martinez just stands
10  there looking at you, correct?
11  A   Yes.
12  Q   And he stood there looking at you for about three
13  seconds, right?
14  A   Yes.
15  Q   And after he stands there looking at you you two both
16  walk over towards the subway turnstile, correct?
17  A   No, we don't walk over together, he's behind me.  He
18  must have don't want to come in my area because he think I have
19  something to do with it.  This is what I'm reading from the way
20  he's looking at me.  But after I paid my fare he chases, he
21  chases --
22  Q   Let's stop there just a minute, Mr. Dixon.  You said
23  that you looked for your MetroCard for approximately 30 seconds,
24  isn't that right?
25  A   Yes.

-J.L.M.-