UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

ECHO WESTLEY DIXON,                        :        **REPORT AND**
                                                    **RECOMMENDATION**
                         Petitioner,       :        **TO THE HONORABLE**
                                                    **RICHARD J. SULLIVAN**

        -against-                          :
                                                    06 Civ. 39 (RJS)(FM)
MICHAEL McGINNIS, Superintendent,          :

                         Respondent.       :

----------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____          │
│ DATE FILED: 6/9/10 _____      │
└─────────────────────────────────┘
```

I.      Introduction

        Pro se petitioner Echo Dixon ("Dixon") brings this habeas proceeding,

pursuant to 28 U.S.C. § 2254, to challenge his conviction on one count of Robbery in the

Second Degree, following a jury trial in Supreme Court, New York County, before the

Honorable Arlene Silverman.  The charge arose out of Dixon's role in a robbery in a

Manhattan subway station.  On March 17, 2003, Justice Silverman sentenced Dixon to a

prison term of ten years, to be served consecutively to his sentences arising out of two

unrelated convictions.

        In his petition ("Petition" or "Pet."), as supplemented by his memorandum

of law, Dixon argues that (a) the trial court violated his Fourteenth Amendment due

process right to a fair trial by improperly examining witnesses, questioning the defense

theory of the case before the jury, allowing the prosecutor to vouch for the complainant's

honesty and mischaracterize the defense theory of the case, allowing cross examination

about his prior convictions, and requiring him to stand trial in prison garb; (b) the trial court violated the Sixth Amendment by refusing to compel the testimony of a defense witness; and (c) his sentence was unduly harsh.

For the reasons that follow, the Petition should be denied. Additionally, pursuant to 28 U.S.C. § 2253(c)(2), Dixon should be denied a certificate of appealability because he has failed to make the necessary substantial showing of the denial of a constitutional right.

II.     Factual and Procedural Background[1]

Dixon was tried twice. At the conclusion of the first trial, in March 2001, the jury was unable to reach a verdict. (See Ex. C at 3). The second trial, resulting in his conviction, began on February 20 and concluded on February 25, 2003. (Ex. D at 2).

A.     Second Trial

1.     People's Case

Viewed in the light most favorable to the prosecution, the People's evidence at the second trial would have permitted a reasonable juror to find as follows:

On the morning of July 7, 2000, together with Christopher Seldon ("Seldon"), Dixon robbed Joseph Martinez ("Martinez"), a sixty-four-year-old man, in a stairwell of the subway station at 34th Street and Eighth Avenue. (T. 11, 19, 21). Before

---

[1]      "P." refers to the transcript of the pre-trial proceedings. "C" refers to the transcript of colloquy on February 24, 2003. "T." refers to the trial transcript. "S." refers to the sentencing minutes. "Ex." refers to the exhibits annexed to the declaration of Assistant Attorney General Paul B. Lyons, dated May 29, 2009.

the robbery, Martinez observed a man, later identified as Dixon, leaning against the wall outside the turnstiles in the subway station.  (Id. at 14, 39).  After walking by that person, Martinez saw a second man, later identified as Seldon, also leaning against the wall of the station.  (Id. at 16-17, 39).  Martinez noticed the men because their behavior was "peculiar."  (Id. at 14).

As Martinez was exiting the station, Dixon and Seldon "pounced" on him from the rear.  (Id. at 19).  Seldon pushed Martinez's shoulder against the wall while Dixon placed his hand in Martinez's pocket and forcibly removed approximately $120 in cash, Martinez's bank identification card, and his paycheck.  (Id. at 18-19, 21-22).  During the incident, Dixon and Seldon were so close that Martinez could "smell their breath."  (Id. at 36).

After the robbery, Dixon and Seldon fled into the subway.  (Id. at 22). Martinez chased them, catching Seldon at a turnstile near Pennsylvania Station and holding him (with the assistance of bystanders) until the police arrived.  (Id. at 22-24, 74-75).  Dixon, however, escaped.  (Id.).

Seldon was taken to a police precinct following his arrest.  (Id. at 25, 75). Although the police searched Seldon both at the subway station and at the precinct, none of Martinez's property was recovered.  (Id. at 75-76).

Later that day, Martinez participated in a line up, during which he identified Dixon as one of the persons who robbed him.  (Id. at 26, 85).  Dixon was arrested following the identification.  (Id. at 90).

2.     Defense Case

Dixon was the only defense witness.[2]  He testified on direct examination that he did not rob Martinez, claiming that Seldon, who was his friend, committed the crime while the two men were returning to the subway from a liquor store on West 36th Street, where Dixon had cashed his paycheck.  (Id. at 100-02, 106).  Dixon claimed that he went to buy a token for Seldon, who did not have any money.  (Id. at 102).  When he returned Seldon allegedly was "fighting with some man."  (Id. at 102-03).  Dixon tried to break up the "fight," during the course of which he allegedly "heard a pocket rip," saw Seldon's hand in Martinez's pocket, and realized "he was robbing [Martinez]."  (Id. at 103, 110). Dixon contended that even though he remained near Martinez while Seldon fled, Martinez made no attempt to grab him.  (Id. at 111).  Instead, Martinez followed Dixon into the subway.  (Id. at 112).  There, an off-duty officer apprehended Seldon as he was attempting to flee, but nobody made any attempt to stop Dixon, who was standing only a few feet away.  (Id. at 115).  After observing the arrest, Dixon left the scene.  He was not questioned about the robbery until after the police contacted him later that day.  (Id. at 104).

_____

[2]     Before Dixon testified, his counsel advised Justice Silverman that Dixon wanted Seldon to be called as a defense witness.  (T. 81).  Dixon's counsel noted that he disagreed with that strategy, which is scarcely surprising since Seldon evidently had implicated Dixon during his guilty plea allocution.  (Id. at 81-82).  After counsel made the application to "preserve Mr. Dixon's record on appeal," Justice Silverman observed that there had been no prior defense request to have Seldon produced, that is was "too late in the day" to make the request, and that even if Seldon were to be produced, "he would be impeached by his prior plea allocution where he said who assisted him in the robbery."  (Id. at 82).  For these reasons Justice Silverman denied Dixon's application.

-4-

On cross-examination, the prosecutor questioned Dixon carefully about his version of the facts.  The prosecutor also inquired about Dixon's criminal history. Consistent with Justice Silverman's pretrial <u>Sandoval</u> rulings, the prosecutor asked Dixon about his prior convictions in 1989 for Attempted Grand Larceny in the Fourth Degree, in 1992 for Robbery in the First Degree and Criminal Possession of a Weapon in the Third Degree, in 1993 for Robbery in the Second Degree, and in 2000 for Criminal Possession of a Controlled Substance in the Third Degree.  (<u>Id.</u> at 123-27).  Dixon admitted that he had committed these crimes, but claimed not to recall the facts underlying several of them. (<u>See</u> <u>id.</u> at 124-27).

B.    <u>Verdict and Sentencing</u>

On February 25, 2003, after brief deliberations, the jury returned a guilty verdict.  (<u>Id.</u> at 177).  Thereafter, on March 17, 2003, Justice Silverman sentenced Dixon, as a second violent felony offender, to a term of ten years' imprisonment, to be served consecutively to two unrelated prison sentences previously imposed.  (S. 2-3, 10).  Prior to the imposition of that sentence, Dixon addressed the court, still proclaiming his innocence. (Id. at 8).

C.    <u>Subsequent Procedural History</u>

1.    <u>Motion to Vacate Judgment</u>

On June 20, 2003, Dixon filed a <u>pro se</u> motion to vacate his conviction pursuant to Section 440.10 of the New York Criminal Procedure Law ("CPL").  (Ex. A). Dixon contended that his conviction should be vacated on the basis of prosecutorial

misconduct and newly-discovered evidence.  (Id.).  In connection with the first of these

claims, Dixon argued that Justice Silverman had improperly assisted the prosecutor and

interrupted defense counsel during the course of the trial.  In connection with the second

claim, Dixon sought an order pursuant to CPL § 440.30, directing that Martinez's ripped

pants be tested for DNA.  (Id.).

On March 4, 2004, Justice Silverman denied Dixon's motion.  (Ex. B).  In

her order, the Justice noted that Dixon's prosecutorial misconduct claim was record-based,

could be raised on direct appeal, and therefore was barred by CPL § 440.10(2)(b).  (Id. at

1-2).  Additionally, the Justice rejected Dixon's DNA claim for two reasons.   First,

because Martinez's pants never were tested for DNA, the Justice found that there was no

"newly-discovered evidence."  Second, the Justice concluded that Dixon failed to proffer

any evidence that a DNA test would have resulted in "evidence creating 'a reasonable

probability that the verdict would have been more favorable'" to him, as required by CPL

§ 440.30.  (Id.).

### 2.   Direct Appeal

In April 2004, with the assistance of counsel, Dixon appealed his conviction

to the Appellate Division, First Department, contending that he had been denied a fair trial

by virtue of the trial court's Sandoval ruling, her comment "questioning the validity of the

defense theory" of the case, and the prosecutor's "vouching for [Martinez] in summation."

(Ex. C).  Dixon also claimed that his ten-year sentence was unduly harsh and grossly

disproportionate to the sentence he previously had been offered as part of a plea bargain. (Id.).

On June 2, 2005, the Appellate Division unanimously affirmed Dixon's conviction.  In its decision, the Appellate Division found that the trial court's "Sandoval ruling balanced the appropriate factors and was a proper exercise of discretion" because the convictions about which the prosecutor had inquired "tended to show that the defendant placed his own interests above those of society and were highly relevant to his credibility." People v. Dixon, 795 N.Y.S.2d 586, 587 (1st Dep't 2005).  The court further found that the prosecutor's challenged statements were a proper response to defense counsel's arguments and did not mischaracterize the defense or improperly vouch for Martinez.  (Id.).  The court also found no basis for reducing Dixon's sentence.  Finally, the court held that Dixon's remaining claims were unpreserved[3] and declined to review them in the interest of justice, adding that even if it were to review those claims, it would reject them.  (Id.).

By letter dated June 17, 2005, Dixon's counsel sought leave to appeal to the Court of Appeals on the basis of each of Dixon's claims before the Appellate Division. (Ex. F).  Thereafter, on August 25, 2005, Dixon filed a pro se application for leave to appeal to the Court of Appeals based on the denial of his motion to vacate the judgment of

---

[3]        The Appellate Division's reference to Dixon's "unpreserved" claims suggests that the court may have considered not only his counsel's brief, but also his own pro se appeal from the denial of his Section 440.10 motion.  If so, the decision of the Appellate Division fully exhausted the claims raised in that motion.

conviction.  (Ex. G).  In this application, Dixon also claimed that Justice Silverman had

denied him due process by refusing to require Seldon to testify at his trial.  (Id.).  Dixon

further argued that the trial court violated his due process rights by requiring him to wear

prison clothing and appear "ungroomed" during his trial.  (Id.).  On September 23, 2005,

Judge Robert S. Smith of the New York Court of Appeals denied Dixon's application for

leave to appeal from the Appellate Division's decision.  People v. Dixon, 5 N.Y.3d 827

(2005).

### 3.    Second Motion to Vacate the Judgment

On August 15, 2005, Dixon filed a second pro se motion under CPL

§ 440.10 to vacate his judgment of conviction on the grounds (a) that Martinez's allegedly

inconsistent testimony regarding Dixon's height undermined the verdict, and (b) that

Justice Silverman violated his due process right to a fair trial by allowing the prosecutor to

impeach him with his prior criminal convictions, requiring him to wear a sanitation

worker's uniform during his trial, and not permitting him to call Seldon as a defense

witness.  (Ex. I.).  Dixon attached to his papers a notarized (but unsworn) statement, dated

August 4, 2004, in which Seldon took responsibility for the subway robbery, claiming that

Dixon interceded without knowing that Seldon was robbing Martinez.  Seldon also stated

that he had been "subpoena[e]d" to testify at the trial, but that "the D.A. lied" by

representing to Justice Silverman that he was not healthy enough to appear.  (Id.).

By order dated February 2, 2006, Justice Silverman denied Dixon's motion

on the ground that his claims should have been raised either on his direct appeal or as part

-8-

of his first CPL § 440.10 motion.  CPL § 440.10 (2)(c), (3)(c).  The Justice further noted

that there was "no merit" to any of Dixon's claims.  (Ex. J).  On February 6, 2006, Dixon

sought leave to appeal this decision to the Appellate Division.  (Ex. K).  That application

was denied on July 20, 2006.  (Ex. M).

          4.    Habeas Petition

      Dixon's Petition is dated November 6 and was received by the Pro Se

Office on November 29, 2005.  (Docket No. 1).  In his Petition, as supplemented by his

memorandum of law, Dixon claims that (a) the trial court violated his due process rights

under the Fourteenth Amendment by improperly examining witnesses, questioning the

defense theory of the case in the presence of the jury, allowing the prosecutor to vouch for

Martinez's honesty and mischaracterize the defense theory of the case, allowing cross

examination about his prior convictions, and requiring him to stand trial in prison garb; (b)

the trial court violated the Sixth Amendment by refusing to compel the testimony of a

defense witness; and (c) his sentence was unduly harsh.  (Pet. at 4, 8; Mem. of Law at 1)

(Docket Nos. 1, 26).   The case originally was assigned to Judge Kenneth A. Karas, who

dismissed it without prejudice because Dixon had not exhausted his appellate remedies.

(Docket No. 3).  After Dixon reported that he had done so, Judge Karas, by memorandum

endorsement, directed that the Respondent submit opposition papers by May 15, 2007.

Unfortunately, due to a clerical error, the letter containing that endorsement never was

docketed.  (See Docket No. 13).

Thereafter, on September 4, 2007, the case was reassigned to Your Honor. (Docket No. 8).  On March 19, 2008, Dixon filed a motion for default judgment because the Respondent had not answered the Petition.  (Docket No. 10).  Although Your Honor denied that motion on January 30, 2009, it highlighted the fact that Judge Karas' memorandum endorsement had not been docketed.  Accordingly, the Respondent was directed to respond to the Petition by March 30, 2009.  (Docket No. 13).

After receiving an extension of time, the Respondent's opposition papers eventually were filed on May 29, 2009.  (Docket Nos. 21, 22, 23).  The Petition then was referred to me on June 2, 2009.[4]

## III.   Discussion

### A.   Standard of Review

A habeas corpus petition is not a vehicle to relitigate every issue previously determined in state court.  Herrera v. Collins, 506 U.S. 390, 401 (1993).  Rather, a state prisoner seeking habeas relief must show that he is "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  The petitioner bears the burden of proving, by a preponderance of the evidence, that his rights have been violated.  Jones v. Vacco, 126 F.3d 408, 415 (2d Cir. 1997).

---

[4]        On February 23, 2009, while the Respondent was preparing his opposition papers, Dixon sought leave to file an interlocutory appeal to the United States Court of Appeals for the Second Circuit.  (Docket. No. 27).  By order dated November 16, 2009, the Court of Appeals determined that it lacked jurisdiction over the appeal because this Court had not issued a final order.  (See Docket No. 31).  The mandate giving effect to the Court of Appeals decision issued on December 11, 2009.  (Id.).

Section 2254, as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 (AEDPA), provides in part that:

> An application for a writ of habeas corpus on behalf of a
> person in custody pursuant to the judgment of a State court
> shall not be granted with respect to any claim that was
> adjudicated on the merits in State court proceedings unless the
> adjudication of the claim –
>
> (1) resulted in a decision that was <u>contrary to</u>, or involved an
> <u>unreasonable application of</u>, clearly established Federal law, as
> determined by the Supreme Court of the United States.

28 U.S.C. § 2254(d)(1) (emphasis added).

As the Second Circuit noted in <u>Jones v. Stinson</u>, the Supreme Court has

"construed the amended statute so as to give independent meaning to 'contrary [to]' and

'unreasonable.'  Under the 'contrary to' clause, a federal habeas court may grant the writ

if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court

on a question of law or if the state court decides a case differently than [the] Court has on

a set of materially indistinguishable facts."  229 F.3d 112, 119 (2d Cir. 2000) (citing

<u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000)).  Under the "unreasonable application"

clause, a federal habeas court should "ask whether the state court's application of clearly

established federal law was objectively unreasonable."  <u>Williams</u>, 529 U.S. at 409.  This

standard does not require that reasonable jurists would all agree that the state court was

wrong.  <u>Id.</u> at 409-10.  Rather, the standard "falls somewhere between 'merely erroneous

and unreasonable to all reasonable jurists.'"  <u>Stinson</u>, 229 F.3d at 119 (quoting <u>Francis S.</u>

<u>v. Stone</u>, 221 F.3d 100, 109 (2d Cir. 2000)).

-11-

Section 2254(d)(2) further authorizes the federal courts to grant a petition for a writ of habeas corpus when a claim considered on the merits in state court "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

Finally, to the extent that a habeas petition challenges factual findings, section 2254(e)(1) provides that "a determination of a factual issue by a State court shall be presumed to be correct" and that "[t]he [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

"If, after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody . . . violates the Constitution, that independent judgment should prevail."  Williams, 529 U.S. at 389.

B.     Exhaustion

The Petition may not be granted unless Dixon has exhausted all his available state court remedies, or there is an absence of state corrective process, or circumstances render that process ineffective to protect his rights.  See 28 U.S.C. § 2254(b)(1)(A)-(B).  As a defendant charged with crimes in New York State, Dixon unquestionably had an effective process available to him through the existing state statutes governing appeals.  See CPL §§ 450.10 (direct appeal to Appellate Division as of right), 440.15 (discretionary appeal to Appellate Division from denial of motion to vacate judgment), 450.90 (discretionary appeal from adverse Appellate Division ruling).  Therefore, to satisfy the exhaustion requirement with respect to a particular federal claim,

Dixon must show that he presented the substance of "the same federal constitutional claim[] . . . to the highest court in the . . . state." Aparicio v. Artuz, 269 F.3d 78, 89-90 (2d Cir. 2001) (internal citations and quotation marks omitted).

"A federal constitutional claim has not been fairly presented to the [s]tate courts unless the petitioner has informed those courts of 'all of the essential factual allegations' and 'essentially the same legal doctrine he asserts in his federal petition.'" Strogov v. Att'y Gen. of N.Y., 191 F.3d 188, 191 (2d Cir. 1999) (quoting Daye v. Att'y Gen. of N.Y., 696 F.2d 186, 191-92 (2d Cir. 1982)).  To meet this requirement, it is not necessary that the federal constitutional claim be presented to the state courts in haec verba.  Rather, there are a number of ways in which the claim may be presented, including:

> [1] reliance on pertinent federal cases employing constitutional analysis, [2] reliance on state cases employing constitutional analysis in like fact situations, [3] assertion of the claim in terms so particular as to call to mind a specific right protected by the Constitution, and [4] allegation of a pattern of facts that is well within the mainstream of constitutional litigation.

Daye, 696 F.2d at 194.

In this case, the Respondent contends that Dixon failed to exhaust his claim regarding the constitutionality of his sentence because he never presented it in constitutional terms to the New York courts.  The Respondent further contends that Dixon did not exhaust his claim that Justice Silverman's frequent interjections during the trial deprived him of due process.  (See Resp't's Mem. at 17-18).

Turning first to the sentencing claim, Dixon appealed to the Appellate Division's discretion, arguing that his sentence should be reduced because it was disproportionate to the sentence offered to him before trial during plea negotiations, was "unduly harsh" and was "disproportionate to [his] co-defendant's sentence."  (See Ex. C at 25-27).  In advancing these arguments, Dixon relied exclusively on state law cases which make no reference to the United States Constitution.  (Id.).  However, Dixon also contended that a prior offer of a five-year concurrent sentence showed that he was being "punished for going to trial."  (Id. at 26) (citing People v. Howard, 217 A.D.2d 530 (1st Dep't 1995)).  A claim that a defendant received an enhanced sentence simply because he exercised his right to have a jury trial constitutes a claim that the defendant was denied his Fourteenth Amendment due process rights.  See, e.g., Bordenkircher v. Hayes, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort[.]"); North Carolina v. Pearce, 395 U.S. 711, 723-24 (1969) (noting that it is a "flagrant violation of the Fourteenth Amendment" for courts to impose harsher sentences on defendants who successfully appeal their original convictions); United States v. Stockwell, 472 F.2d 1186, 1187 (9th Cir. 1973) (imposition of enhanced sentence after defendant exercises right to a trial creates unconstitutional chilling effect as great as if "defendant appeals, is reconvicted on remand and receives a greater punishment.").

Accordingly, even though Dixon's appellate counsel did not cite any federal cases, his sentencing claim "call[ed] to mind a specific right protected by the

Constitution," Daye, 696 F.2d at 194, and therefore arguably raised a federal claim.

Moreover, Dixon's counsel incorporated his sentencing claim in his letter-application for

leave to appeal.  (See Ex. F ("request[ing] the Court to consider all the issues raised in

appellant's brief.")).  Dixon's sentencing claim is therefore fully exhausted.

Dixon raised his claim that Justice Silverman unreasonably interfered in the

questioning of witnesses in both of his CPL § 440.10 motions.  In her decision denying

the first of these motions, Justice Silverman noted that the exchanges cited by Dixon were

part of the trial record and therefore had to be raised as a part of a claim on direct appeal.

Despite this admonition, however, Dixon neither sought leave to appeal from that

decision, nor incorporated his claim into his direct appeal.  Dixon therefore did not fully

exhaust this claim after Justice Silverman denied his motion.[5]

C.    Procedural Default

Even if a habeas claim is exhausted, a federal court is precluded from

reviewing it if the state court's prior denial of the claim rested on an adequate and

independent state ground.  See, e.g., Harris v. Reed, 489 U.S. 255, 262 (1989);

Wainwright v. Sykes, 433 U.S. 72, 81 (1977).  A procedural default qualifies as such an

---

[5]    As noted, Dixon raised his claim regarding Justice Silverman's alleged
misconduct anew in his second CPL § 440.10 motion.  (See Ex. I (referring to "fraud on the part
of the court")).  He thereafter sought leave to appeal from its denial, which the Appellate
Division denied.  (See Exs. J-M).  Even if this could be considered proper exhaustion, Dixon
nevertheless faces another roadblock.  Justice Silverman denied Dixon's second CPL § 440.10
motion, in part, on the basis that his claims "could have been raised on [Dixon's] appeal or
earlier CPL § 440.10 motion."  (Ex. J).  As explained in the section that follows, the judicial
misconduct claim raised in the second motion thus is barred from habeas review because it was
denied on adequate and independent state procedural grounds.

adequate and independent state ground, Harris, 489 U.S. at 262, unless the petitioner can demonstrate "cause for the default and actual prejudice as a result of the alleged violation of federal law, or . . . that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 724 (1991); Glenn v. Bartlett, 98 F.3d 721, 724 (2d Cir. 1996); accord Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 809 (2d Cir. 2000).

To establish cause for a default, a petitioner must adduce "some objective factor external to the defense" that explains why he did not raise the claim previously. Murray v. Carrier, 477 U.S. 478, 488 (1986); Gonzalez v. Sullivan, 934 F.2d 419, 422 (2d Cir. 1991). The circumstances giving rise to cause include: (a) interference by government officials which makes compliance impracticable; (b) situations in which the factual or legal basis for a claim was not reasonably known by counsel; and (c) ineffective assistance of counsel. See Murray, 477 U.S. at 488; see also Bossett v. Walker, 41 F.3d 825, 829 (2d Cir. 1994). A showing of prejudice requires a petitioner to demonstrate that the failure to raise the claim previously had a substantial injurious effect on the petitioner's case such that he was denied fundamental fairness. Reyes v. New York, No. 99 Civ. 3628 (SAS), 1999 WL 1059961, at *2 (S.D.N.Y. Nov. 22, 1999). Finally, to establish a fundamental miscarriage of justice, a petitioner must demonstrate that he is "actually innocent." Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001). As the Supreme Court has indicated, the "miscarriage of justice exception is concerned with actual as compared to legal innocence." Calderon v. Thompson, 523 U.S. 538, 559

(1998) (quoting <u>Sawyer v. Whitley</u>, 505 U.S. 333, 339 (1992)).  A claim of actual

innocence therefore must be supported by "new reliable evidence."  <u>Schlup v. Delo</u>, 513

U.S. 298, 324 (1995).  For this reason, "claims of actual innocence are rarely successful."

<u>Id.</u>

   The Respondent contends that Dixon's excessive judicial interference

and right-to-call-witness claims both are procedurally defaulted and therefore beyond

review.  As noted above, in her decision regarding Dixon's second CPL § 440.10 motion,

Justice Silverman denied those claims on the ground that CPL § 440.10(2)(b) required

that they be raised either on direct appeal or as part of Dixon's first CPL § 440.10 motion.

(<u>See</u> Ex. J) (citing CPL § 440.10(2)(c), (3)(c)).  Thereafter, the Appellate Division denied

Dixon's motion seeking leave to appeal that decision.  (Ex. M).

   For a state procedural ground to preclude federal review of a constitutional

issue, it must be one that is "firmly established and regularly followed."  <u>James v.</u>

<u>Kentucky</u>, 466 U.S. 341, 348-49 (1984); <u>see also</u> <u>Lee v. Kenna</u>, 534 U.S. 362, 376

(2002).  Both the rule requiring that record-based claims be raised on direct appeal and

the rule that a defendant must raise his collateral claims in his first post-trial motion if he

is able to do so meet this standard.  <u>See, e.g.</u>, <u>Murden v. Artuz</u>, 497 F.3d 178, 192 (2d Cir.

2007) ("New York State courts regularly apply subsection (3)(c) to deny claims that

could have been but were not raised on previous motions to vacate."); <u>Williams v. Goord</u>,

277 F. Supp. 2d 309, 318-19 (S.D.N.Y. 2003) ("[D]enial of a § 440.10 motion for failure

to raise a claim on direct appeal represents the application of a firmly established and regularly followed New York rule.").

In his papers, Dixon has shown neither cause for his procedural default nor actual prejudice. Although he has proffered Seldon's affidavit in support of his second CPL § 440.10 claim, that hardly constitutes "reliable" evidence of Dixon's innocence since Seldon apparently made post-arrest statements that led to Dixon's arrest and further implicated Dixon "by name" during his guilty plea. (T. 82).[6] Seldon's recantation also flies in the face of Martinez's testimony. The Seldon statement, which came only after Seldon was sentenced, therefore falls far short of the showing that would be required to establish Dixon's actual innocence. See, e.g., United States v. Gallego, 191 F.3d 156, 166 (2d Cir. 1999) (newly-discovered evidence consisting of witness recantation is properly viewed with "extreme skepticism").

Consequently, both Dixon's excessive judicial interference claim and his right to call witnesses claim are procedurally defaulted and cannot be reviewed in this federal habeas proceeding.

D.    Merits

Although a federal judge reviewing a habeas petition need only address claims that are fully exhausted and not procedurally barred, it is understandable that an inmate such as Dixon, who is serving a lengthy sentence, would want the merits of his

---

[6]        Indeed, because of his guilty plea allocution, the prosecution had hoped to call Seldon at trial. (T. 82).

claims to be reached.  Moreover, there is always the possibility (however remote) that another court might reach a different conclusion concerning the threshold issues of exhaustion and procedural forfeiture.  For these reasons, I have considered the merits of all of the claims raised by Dixon in his Petition.  As shown below, none of those claims warrants habeas relief.

      1.      <u>Due Process Claims</u>

          a.      <u>Judicial Interference</u>

Dixon claims that Justice Silverman violated his due process rights through frequent interjections during the trial.  Specifically Dixon argues that Justice Silverman improperly questioned witnesses and revealed her negative view of the defense theory of the case.  (Pet. 4).  He also contends that the Justice prevented defense counsel from questioning Martinez effectively, even though the prosecutor had not objected to the questions asked.  (<u>Id.</u>).

"[A] trial is not rendered unconstitutionally unfair every time a trial judge asks a question obviously intended to permit a witness to emphasize testimony helpful to the prosecution or clearly designed to challenge testimony favorable to the defense."  <u>See</u> <u>Daye v. Att'y Gen. of N.Y.</u>, 712 F.2d 1566, 1572 (1983).  Rather a "trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree before the risk of either impaired functioning of the jury or lack of the appearance of a neutral judge conducting a fair trial exceeded constitutional limits."  <u>Id.</u>  The number of questions that the trial judge asks is

not determinative.  Id. (citing United States v. Fernandez, 480 F.2d 726, 736-37 (2d Cir.

1973); United States v. DeSisto, 289 F.2d 833, 834 (2d Cir. 1961)).  Thus, even when a

trial judge's interventions are "far more extensive than what is normally appropriate for a

trial judge endeavoring to expedite proceedings and assist the jury's understanding" and

there are "some instances of pro-prosecution and comment," the conduct ordinarily does

not rise to the level of a due process violation sufficiently egregious to justify setting

aside a state court criminal conviction.  See Peterson v. Scully, No. 87 Civ. 1597 (CSH),

1991 WL 135621, at *3-*4 (S.D.N.Y. July 16, 1991) (citing Johnson v. Scully, 727 F.2d

222, 227 (2d Cir. 1984)).

   Justice Silverman frequently has been criticized for interfering excessively

with the conduct of a trial.  See, e.g., People v. Thorpe, 845 N.Y.S.2d 1, 2 (1st Dep't

2007) (finding "reversible error in the trial court's almost continuous interference");

People v. Canto, 818 N.Y.S.2d 218, 219-20 (1st Dep't 2006) (finding no basis to overturn

guilty verdict based on Justice Silverman's conduct, but citing six prior cases in which

her interference similarly was "improvident and wholly unnecessary").  In this case,

Justice Silverman similarly took an extremely active role in examinations, at times asking

pages of questions in a row.  (See, e.g., T. 12-14, 62-66, 74-75).  Her questions, however

did not demonstrate a bias either for or against either side.  To the contrary, her questions

to Martinez, the principal prosecution witness, merely clarified his story for the jury.  For

instance, she questioned Martinez extensively about Dixon's appearance and position

when Martinez first noticed him leaning against the wall.  (Id. at 15-19).  Although

Martinez's testimony inculpated Dixon, had Martinez failed to answer these questions credibly, his responses would have been favorable to the defense.  Thus, while Justice Silverman's questioning may have disrupted the presentations of both the prosecutor and defense counsel, they did not unfairly telegraph a view as to the proper outcome of the trial.

   Moreover, when Dixon testified as a defense witness, Justice Silverman allowed both his counsel and the prosecutor to conduct their examinations with virtually no interruptions.  (Id. at 98-125).  Justice Silverman also quickly agreed to provide a limiting instruction when the prosecutor cross-examined Dixon about his criminal history. The Justice's deference to counsel during this stage of the case suggests that her earlier impatience may have had to do more with a desire to move the case quickly than a preconception that only a guilty verdict would be a just result.

   Dixon alleges that Justice Silverman also violated his due process rights by improperly commenting during the prosecutor's summation on the defense theory of the case.  After defense counsel completed his summation, the prosecutor stated that Dixon's counsel had "suggested some possible motives" for Martinez to lie about Dixon's role in the robbery.  (Id. at 144).  Dixon's counsel then objected on the basis that he had not suggested that Martinez had lied, but, rather that he was "mistaken because of his bias." (Id. at 144-45).  Justice Silverman, responded as follows:

> I don't know what bias was brought out . . . Well, in any
> event, let me just hear what [the prosecutor] says.  They heard
> you and they will hear from [the prosecutor].  The final

> analysis is really going to be up to you [i.e., the jurors] to
> determine the case.  This is just argument that the attorneys
> put forth, arguments that are suggested to you, asking you to
> adopt and you are not bound to do that.  You'll have to
> determine what you feel to be reasonable and appropriate.

(Id. at 145).

Viewed in context, the first sentence of Justice Silverman's ruling, even if ill-advised, cannot seriously be characterized as so prejudicial that it deprived Dixon of a fair trial.  Indeed, at the very outset of her formal jury charge, Justice Silverman admonished the jury not to

> consider anything I said during the course of the trial, any
> questions I may have asked, or anything that I may say during
> the course of this charge as indicating that I have an opinion
> on this case one way or the other because, ladies and
> gentlemen, I have no opinion and I'm not going to form any
> opinion.

(Id. at 154).  Accordingly, even if Justice Silverman's remark regarding Martinez's bias did constitute improper comment, it cannot provide a basis to set aside Dixon's conviction because the jury must be presumed to have followed her instruction to disregard it during their deliberations.  See, e.g., United States v. Downing, 297 F.3d 52, 59 (2d Cir. 2002); United States v. Colombo, 909 F.2d 711, 715 (2d Cir. 1990); United States v. Pforzheimer, 826 F.2d 200, 205 (2d Cir. 1987).  Dixon has not adduced any evidence to overcome that presumption in this case.

b.      Prosecutorial Misconduct on Summation

Dixon next claims that the prosecutor violated his due process rights during

summation by mischaracterizing Dixon's defense theory and by vouching for the

complaining witness' credibility.  (See Pet. at 4; Ex. C at 19-22).  The Appellate Division

rejected both claims, stating that "[t]he challenged portions of the prosecutor's summation

were responsive to the defense arguments, and did not mischaracterize the defense or

constitute improper vouching for the victim" because "the defense summation was not

limited to an argument that the victim was honestly mistaken."  Dixon, 795 N.Y.S.2d at

587.

A claim of prosecutorial misconduct during summation requires a court to

consider "whether the prosecutors' comments 'so infected the trial with unfairness as to

make the resulting conviction a denial of due process.'"  Darden v. Wainwright, 477 U.S.

168, 181 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974)).  The

issue is not simply whether the prosecutor's comments were "undesirable or even

universally condemned."  Id.  Accordingly, a mere showing of prosecutorial misconduct

does not entitle a petitioner to habeas relief.  Bentley v. Scully, 41 F.3d 818, 824 (2d Cir.

1994).  Instead, the petitioner must show that he "suffered actual prejudice because the

prosecutor's comments during summation had a substantial and injurious effect or

influence in determining the jury's verdict."  Id.  In determining whether the petitioner

suffered such prejudice, a court must consider:  "(1) the severity of the prosecutor's

conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice;

and (3) whether the conviction was certain absent the prejudicial conduct." Id. (citing Gonzalez, 934 F.2d at 424).

Near the outset of his summation, the prosecutor argued that Martinez had "no motive to lie." (Tr. 144). As he explained, "Mr. Dixon is a complete and utter stranger to [Martinez], why would he fabricate a story about a man that is a stranger to him?" After the prosecutor went on to observe that defense counsel had "suggested some possible motives for that" in his summation, Dixon's counsel objected on the ground that he had suggested bias, not fabrication, on Martinez's part. (Id. at 144-45). Dixon's counsel objected again when the prosecutor said "counsel is saying that Mr. Martinez has a bias that is going to cause him to be mistaken about what happened here and that's going to cause him to lie to you about what happened to him." (Id. at 146-47).

As the Appellate Division noted, the prosecutor's statements were a reasonable response to defense counsel's summation. Although Dixon's counsel relied principally on a theory of mistaken identity, he also presented other theories for the jurors' consideration, asking them to consider (1) whether Martinez was "testifying truthfully," (2) whether he "believe[d] he [was] testifying truthfully but he may in fact [have been] mistaken," and (3) whether his "perception of events is in some way biased." (Id. at 132). Dixon's counsel also contended that Martinez's version of the events was "physically impossible." (Id. at 136).

Thus, Dixon's counsel may not have explicitly called Martinez a liar, but he did argue that Martinez's testimony was untrue, urging the jury to consider whether this

was attributable to deliberate fabrication or some other cause.  The prosecutor's
statements, therefore, were within the bounds of permissible rehabilitation.  See, e.g.,
Gonzalez, 934 F.2d at 424 (proper to respond to defense suggestion that witness testified
solely to impress another witness by arguing that he had no reason to lie); see also United
States v. Tacco, 135 F.3d 116, 130 (2d Cir. 1998) (federal prosecutors have "wide
latitude" to respond to defense arguments, provided they do not misstate the evidence);
Reid v. Giambruno, No. 03-cv-0250 (VEB), 2007 WL 3232497, at *22 (W.D.N.Y. Oct.
31, 2007) ("Where the defense has attacked the credibility of the prosecution witnesses in
summation, appellate courts in New York have rejected similar assertions that a
prosecutor improperly vouches for the victim's credibility by statig that she or he had no
motive to lie.") (collecting cases); Rohit v. Conway, No. 03-cv-1817 (SLT) (VVP), 2007
WL 1540268, at *10 (E.D.N.Y. May 24, 2007) (rhetorical question asking whether
witnesses had a motive to lie constitutes a proper appeal to jury's common
sense); Rosario v. Walsh, No. 05 Civ. 2684 (PKC) (AJP), 2006 WL 1431410, at *22
(S.D.N.Y. May 25, 2006) ("[F]aced with an attack on prosecution witnesses, a prosecutor
may properly respond to that attack[.]"), report and rec. adopted, 2006 WL 1880958
(S.D.N.Y. July 5, 2006).

      Even if one were to assume that the prosecutor's statements constituted
improper comment, Justice Silverman issued a prompt curative instruction, in which she
indicated that counsel were merely advancing arguments that did not bind the jury.  (Tr.
145).  Here again, the jurors must be presumed to have followed the court's instruction.

See, e.g., Dowling, 297 F.3d at 59; Colombo, 909 F.2d at 715 ("[W]e presume that a jury adheres to the curative instructions of the trial court.").

      Finally, in his own testimony, Dixon admitted attacking Martinez. Although he denied taking any of Martinez's property, his contention that Martinez made no effort to detain him after Seldon fled, or later when the two men were standing together near the site of Seldon's arrest, was, to say the least, implausible. Given the trial court's curative instruction, the strength of the People's case, and Dixon's implausible defense, Dixon cannot show, as he must, that the prosecutor's comments caused him actual prejudice.

      Turning to the vouching claim, Dixon has pointed to no instance in which the prosecutor personally attested to Martinez's honesty. Instead, in his appellate brief, Dixon merely cited to portions of the summation during which the prosecutor discussed characteristics of Martinez which suggested that he would tell the truth. (See Ex. C at 22 (citing Tr. 146 ("He's a working man. He counsel's [sic] kids on getting into college."); Tr. 147 ("[He's] got better things to do than to come down here and do this. The only sensible reason he would go through all this trouble is because he's telling you the truth."))).

      Prosecutors engage in improper vouching when they "express [their] personal belief[s] or opinions as to the truth or falsity of any testimony or evidence or guilt of the defendant." See United States v. Modica, 663 F.2d 1173, 1178-79 (2d Cir. 1981) (quoting ABA Standards for Criminal Justice, Standard 3-5.8(b) (1980)). The

concern is that a prosecutor "may prejudice a defendant by suggesting to a jury that there is additional evidence, not introduced at trial but known to the prosecutor, that supports the witness' credibility."  United States v. Newton, 369 F.3d 659, 681 (2d Cir. 2004).

Here, as the Appellate Division correctly found, none of the statements made by the prosecutor constituted improper vouching.  See, e.g., People v. Marte, 891 N.Y.S.2d 408, 409 (1st Dep't 2010) (record-based arguments as to why witnesses should be believed do not constitute vouching).

c.      Sandoval Ruling

Prior to trial, the court conducted a Sandoval hearing,[7] during which the People sought leave to cross-examine Dixon about several of his prior convictions if he testified.  (P. 135).  Justice Silverman ruled that the prosecutor could inquire into the facts underlying several of Dixon's convictions, reasoning that his crimes related to his credibility, "his pattern of putting his interests ahead of those of society," and his "specializ[ation] in a particular type of behavior."  (Id. at 142-44).  The Justice nevertheless precluded the prosecutor from seeking to establish that Dixon's fourth-degree grand larceny convictions involved failed robbery attempts or that his first-degree robbery conviction involved the use of a gun.  (Id. at 142-43).  The Justice further precluded the prosecutor from asking about the facts underlying Dixon's drug and weapons-related convictions.  (Id. at 143).

---

[7]      See People v. Sandoval, 34 N.Y.2d 371 (1974).

-27-

On appeal, Dixon argued on the basis of <u>Sandoval</u> and its progeny that Justice Silverman had abused her discretion in deciding which criminal convictions could be used for impeachment purposes and to what extent.  (<u>See</u> Ex. C at 16-19).  Referring fleetingly to the Fourteenth Amendment to the United States Constitution, Dixon also argued that he had been deprived of a fair trial.  (<u>Id.</u> at 15-16).  In this court, Dixon apparently seeks to press both his state and federal arguments concerning his prior convictions.  (<u>See</u> Pet. at 2).

Dixon's state law evidentiary claim is not justiciable in this forum.  <u>See</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 63 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); <u>Urena v. Lape</u>, 373 F. Supp. 2d 449, 454-55 (S.D.N.Y. 2005) (declining to consider whether uncharged crimes evidence was appropriately received under New York evidentiary rules); <u>Allaway v. McGinnis</u>, 301 F. Supp. 2d 297, 300 (S.D.N.Y. 2004) (same).  Indeed, as Judge Dolinger has noted, the mere "admission of prior convictions is not in and of itself a constitutional violation."  <u>See</u> <u>Butler v. Graham</u>, No. 07 Civ. 6586 (JSR)(MHD), 2008 WL 2388740, at *5 (S.D.N.Y. June 12, 2008).  To prevail on his <u>Sandoval</u> claim in this forum, Dixon therefore must show that he was denied a fundamentally fair trial in violation of the Due Process Clause of the Fourteenth Amendment.  <u>Estelle</u>, 502 U.S. at 75; <u>Allaway</u>, 301 F. Supp. 2d at 300; <u>Sutton v. Herbert</u>, 39 F. Supp. 2d 335, 338 (S.D.N.Y. 1999).  For an evidentiary error to rise to this level, it must have had a "substantial and injurious effect or influence in determining the jury's verdict."  <u>Brecht v.</u>

Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  The evidence consequently "must have been 'sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it.'"  Dunnigan v. Keane, 137 F.3d 117, 125 (2d Cir. 1998) (quoting Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992)).  This standard requires a showing of "actual prejudice."  Brecht, 507 U.S. at 637.

Although the case against Dixon was essentially a one-witness case, Dixon likely bolstered it by testifying as a defense witness against the advice of his counsel. Among other things, through his testimony, Dixon placed himself at the scene of the crime with Seldon.  Dixon also admitted that he had assaulted Martinez, although he characterized his actions as having innocently come to the aid of a friend.  Although Dixon testified that it was Seldon, not he, who stole Martinez's money, the arresting officer searched Seldon twice and did not recover any of Martinez's property.  Given this evidence, and the sheer implausibility of Dixon's story that he remained in the area of the assault but that Martinez made no efforts to apprehend him, the case against Dixon was relatively strong despite the absence of any testimony from bystanders who witnessed the robbery.

On appeal, and before this Court, Dixon nevertheless has argued that Justice Silverman turned the tide against him by improperly permitting "propensity" evidence to be introduced at trial.  Specifically, he complains about the Justice's decision to let the jury hear questions about the details of four robberies that bore similarities to the charged

offense.  (See Ex. C at 17).  Dixon suggests in that regard that two of the prior

convictions were virtually identical to the Martinez robbery since he had acted in concert

with another person, had pushed the victim into the wall in one of the cases, and had hit

and kicked the victim in the other case.  (Id.; see also T. 124-25).  However, both when

this evidence was received and again later in her jury charge, Justice Silverman expressly

instructed the jurors that they could not consider Dixon's prior criminal convictions as

proof that he had committed the Martinez robbery and could, instead, consider them only

in determining Dixon's credibility.  (T. 125-26, 159-60).  Dixon has not shown any

reason why the usual presumption that the jury followed these instructions should be

disregarded here.  He therefore has not established, as he must, that the jury's improper

consideration of his prior convictions provided a basis for the jury's verdict of guilty or

removed a reasonable doubt that otherwise would have existed.  See Dunnigan, 137 F.3d

at 125.

Perhaps more importantly, even if Dixon were able to show that the trial

court misapplied Sandoval in a manner that permitted propensity evidence to be

improperly considered by the jury, this would not be a sufficient basis for granting him

habeas relief since the Supreme Court has yet to rule that the use of such evidence gives

rise to a constitutional violation.  See, e.g., Estelle, 502 U.S. at 75 n.5 ("Because we need

not reach the issue, we express no opinion on whether a state law would violate the Due

Process Clause if it permitted the use of prior crimes evidence to show propensity to

commit a charged crime."); Nieves-Delgado v. New York, No. 00 Civ. 1397 (LTS), 2003

WL 21310815, at *3 (S.D.N.Y. June 9, 2003) (rejecting petitioner's <u>Sandoval</u> claim because the state court ruling was not contrary to "clearly established federal law as determined by the Supreme Court"); <u>see</u> <u>also</u> <u>Spencer v. Texas</u>, 385 U.S. 554, 556, 561-62 (1967) (procedure under Texas recidivist statute requiring that jury be advised of defendant's prior convictions but told to disregard them in determining guilt does not violate due process).

        d.    <u>Prison Clothes</u>

Dixon's only other due process claim is that the trial court violated his rights by requiring him to stand trial while wearing "a green sanitation-like prison uniform." (Pet. at 4). The trial record does not reflect that Dixon was wearing a prison uniform during his trial, much less that he or his attorney raised any objection to that garb. For federal habeas purposes, this is dispositive. "[A]lthough the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation." <u>Estelle v. Williams</u>, 425 U.S. 501, 512-513 (1976). Thus, this aspect of Dixon's due process claim also fails.[8]

---

[8]    As the respondent correctly notes, the only record evidence of Dixon's attire also contradicts Dixon's claim. Specifically, when Martinez was asked to identify his assailant, he pointed to Dixon, the "young man . . . wearing a gray sweatshirt, sort of." (T. 22).

2.      Sixth Amendment Claims

Dixon also contends that the trial court violated his Sixth Amendment rights to confront his accuser and compel the attendance of witnesses on his behalf by refusing to require Seldon's attendance at trial.  (See Pet. at 8).  Neither claim withstands scrutiny.

a.      Confrontation Clause

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const amend. VI.  This protection constitutes a "fundamental right" which is applicable to the states through the Fourteenth Amendment. Poute v. Texas, 380 U.S. 400, 403 (1965).  Thus, states are precluded from offering the testimony of witnesses at a criminal trial unless the defendant can observe and cross-examine them.  See Crawford v. Washington, 541 U.S. 36, 50 (2004).  The Confrontation Clause also restricts the use of out-of-court statements that are testimonial in nature unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine him.  Id. at 68-69.

Here, Seldon was not called as a trial witness.  Moreover, none of his out-of-court statements were offered against Dixon.  Indeed, when the prosecutor began to ask about Seldon's post-arrest processing, Justice Silverman cautioned the prosecutor that she was "not going to allow anything about that."  (T. 77).

Accordingly, because none of Seldon's statements were introduced into evidence at Dixon's trial, there clearly could not have been a violation of the

-32-

Confrontation Clause.  See Crawford, 541 U.S. at 68-69 (Confrontation Clause violated by admission of statement made by victim during police interrogation without allowing petitioner to cross-examine victim at trial).

b.      Compulsory Process Clause

In state court and in this forum, Dixon complains that he was not permitted to call Seldon as a defense witness.  He thus appears to be asserting a claim under the Compulsory Process Clause of the Sixth Amendment.  Justice Silverman rejected Dixon's claim regarding the failure to call Seldon as a defense witness on procedural grounds based upon his failure to raise it in either his direct appeal or his first motion to vacate the judgment of conviction.  (See Ex. J).  In any event, even if the claim were not procedurally defaulted, the fact that Seldon was not produced at trial does not entitle Dixon to habeas relief.

The protection afforded by the Compulsory Process Clause is a fundamental right applicable to state prosecutions pursuant to the Fourteenth Amendment.  Howard v. Walker, 406 F.3d 114, 131 (2d Cir. 2005) (citing Washington v. Schriver, 255 F.3d 45, 56 (2d Cir. 2001)).  Nevertheless, despite its revered status, the constitutional right to compel witnesses to testify for the defense is not unlimited and may have to "yield to rules and procedure of the adversary process that 'provide each party with a fair opportunity to assemble and submit evidence.'"  Id. (citing Taylor v. Illinois, 484 U.S. 400, 410-11 (1988)).  As the Supreme Court noted in Taylor, "[t]he Compulsory Process Clause cannot be invoked without the prior planning and affirmative conduct of the defendant."

-33-

484 U.S. at 415-16.  Such "routine preparation involves location and interrogation of potential witnesses and the serving of subpoenas on those whose testimony will be offered at trial."  Id.

In deciding whether Dixon's rights were violated, the Court must first consider "the trial court's reasons for excluding the evidence" and then "the strength of the prosecution's case as a whole."  Howard, 406 F.3d at 132.  Here, Justice Silverman concluded that the request was made "too late in the day."  The Justice also noted that, even if Seldon had been produced, he would be impeached through his guilty plea.  (T. 82).  There was cause for the court to be concerned about timing.  Indeed, when Justice Silverman inquired about Seldon before the trial began, the prosecutor noted that Seldon was housed in the regional medical center at the Wende Correctional Faciltity in Alden, New York, and that he had been told by a prison representative that Seldon was incontinent, was able to walk only a short distance, and could not be transported to the court.  The prosecution apparently also handed up to the Justice a letter confirming Seldon's medical condition.  (C. 7-8).

Seldon's statement prepared in 2004 suggests that the prosecutor "lied" when he stated that Seldon was not healthy enough to come to court.  (See Ex. I at 5).  During Dixon's trial, however, there was no reason for Justice Silverman to believe that Seldon could be brought to court on a schedule which would enable him to testify as a defense witness without unduly delaying the trial.  Certainly, until the last day of the trial, Dixon's counsel had not made any request that Seldon be brought to New York City.  In

-34-

fact, he did not even make such a request when he communicated Dixon's wishes regarding Seldon, which were contrary to his own trial strategy.[9]

The record thus clearly shows that Dixon's counsel chose not to subpoena Seldon or arrange for him to be produced at trial. Moreover, at the point that Dixon made his request, there was no reason to believe that Seldon could be produced as a defense witness without significant delay.[10] Finally, if Seldon had testified, the jury in all likelihood would have learned that he previously had implicated Dixon by name during his own guilty plea allocution.

In these circumstances, the trial court's refusal to delay the trial so that Seldon could be produced as a trial witness plainly does not rise to the level of a Compulsory Process Clause violation.

### 3.   Sentencing Claim

The trial court sentenced Dixon to a ten-year prison term, to be served consecutive to two sentences he already was serving. (S. 10). In his Petition, Dixon asserts that this sentence was unduly harsh. (Pet. at 3). Under the New York Penal Law, the sentence for a second violent felony offender convicted of a Class C felony "must be at least seven years and must not exceed fifteen years." New York Penal Law ("PL")

---

[9]      When Justice Silverman asked Dixon's lawyer whether he had done "anything to get [Seldon] here," he did not respond. (T. 81).

[10]      The Court can take judicial notice that Wende Correctional Facility in Alden is in Erie County, more than 300 miles from the court. See Fed. R. Evid. 201(b).

§ 70.04(1), (3)(b).  Robbery in the Second Degree is a Class C felony.  PL § 160.10.

Thus, state law permitted the trial court to impose a ten-year sentence for this crime.

In addition, under New York law Justice Silverman clearly had the

discretion to order that Dixon's sentence be served following his prior sentences.

Sentences must run concurrently only if they are "committed through a single act or

omission."  PL § 70.25(2).  Dixon does not contend the prior crimes for which he still

owed time were in any way related to the Martinez robbery.  Accordingly, his consecutive

sentence was fully consistent with state law.  Although Dixon further contends that his

sentence was unduly harsh, that is not a federal constitutional issue.  See Hutto v. Davis,

454 U.S. 370, 373-74 & n.3 (1982) (no constitutional issue unless sentence is so

disproportionate to crime as to violate ban on cruel and unusual punishment); White v.

Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) (no federal constitutional issue where

sentence is within range prescribed by state law).

Finally, Dixon contends that his sentence was retaliatory because it was

greater than the sentence offered to him as part of a proposed plea bargain.  (Pet. 3; Ex. C

at 26).  In advancing this argument, Dixon overlooks the fact that he was convicted after

he took the stand to testify on his own behalf.  Since the jury's guilty verdict establishes

that he perjured himself, this alone would have justified the imposition of a lengthier

sentence than Dixon was offered prior to trial.  Moreover, had he pleaded guilty, he

would have accepted responsibility for his crime, which is a well-established basis for

imposing a lower sentence.  See, e.g., U.S. Sentencing Guidelines Manual § 3E1.1

(Acceptance of Responsibility).  Instead, far from accepting responsibility, Dixon continued to claim that he was innocent even at sentencing.  (See S. 8) ("I . . . didn't rob anybody.").

In sum, the circumstances at the time of sentencing were different than at the time Dixon was offered a plea bargain.  Since the sentence ultimately imposed fell well within the range permitted by state law, it cannot reasonably be considered punishment for Dixon's decision to exercise his right to a trial and, therefore, does not violate the Fourteenth Amendment.

V.    Conclusion

Dixon has failed to show that his conviction was secured in violation of the United States Constitution or federal law.  The Petition therefore should be denied. Additionally, because Dixon has failed to make a substantial showing of the denial of a constitutional right, he should not be granted a certificate of appealability.  See 28 U.S.C. § 2253(c)(2).

VI.    Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen (14) days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a) and (d).  Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Richard J. Sullivan and to my chambers at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing

parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an

extension of time for filing objections must be directed to Judge Sullivan. The failure to

file these timely objections will result in a waiver of those objections for purposes of

appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474

U.S. 140 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir. 1992).

DATED:     New York, New York
           June 9, 2010

                                          _____
                                          FRANK MAAS
                                          United States Magistrate Judge

Copies to:

Echo Westley Dixon
00-A-6365
Attica Correctional Facility, Box 149
Attica, New York, 14011-0149

Paul B. Lyons, Esq.
Assistant Attorney General
State of New York
Fax: (212) 416-8229

-38-